JOSHUA STEBBINS (D.C. Bar No. 468542)
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
50 F Street NW, 8th Floor
Washington, DC 20001
(202) 675-6273
josh.stebbins@sierraclub.org

DOUG HAYES (Colorado Bar No. 39216)
(admitted *pro hac vice*)
ERIC HUBER (Colorado Bar No. 40664)
(admitted *pro hac vice*)
SIERRA CLUB ENVIRONMENTAL LAW PROGRAM
1650 38th Street, Suite 102W
Boulder, CO 80301
(303) 449-5595
doug.hayes@sierraclub.org
eric.huber@sierraclub.org

JAMES MURPHY (Vermont Bar No. 3367)
(application for admission *pro hac vice* pending)
NATIONAL WILDLIFE FEDERATION
149 State Street
Montpelier, VT 05602
(802) 552-4325
jmurphy@nwf.org

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SIERRA CLUB**,<br>85 Second Street, 2nd Floor<br>San Francisco, CA 94105,<br><br>and<br><br>**NATIONAL WILDLIFE FEDERATION**,<br>11100 Wildlife Center Drive<br>Reston, VA 20190,<br><br>       Plaintiffs,<br><br>       vs. | **Case No. 1:13-cv-1239 KBJ**<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br>**National Environmental Policy Act**<br>**Clean Water Act**<br>**Administrative Procedure Act**<br>**Freedom of Information Act** |

**LIEUTENANT GENERAL THOMAS P. BOSTICK** (in his official capacity as Commanding General and Chief of Engineers of the U.S. Army Corps of Engineers), **COLONEL RICHARD A. PRATT** (in his official capacity as Commander and District Engineer of the U.S. Army Corps of Engineers Tulsa District), **COLONEL MARK DESCHENES** (in his official capacity as District Commander of the U.S. Army Corps of Engineers Rock Island District), **COLONEL ANDREW D. SEXTON** (in his official capacity as District Commander of the U.S. Army Corps of Engineers Kansas City District), and **COLONEL CHRISTOPHER HALL**, (in his official capacity as St. Louis District Commander of the U.S. Army Corps of Engineers), and **UNITED STATES ARMY CORPS OF ENGINEERS**,
441 G Street NW
Washington, DC 20314-1000,

and

**ANTHONY FOXX** (in his official capacity as Secretary of the United States Department of Transportation), and **CYNTHIA L. QUARTERMAN** (in her official capacity as Administrator of the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration), and **UNITED STATES DEPARTMENT OF TRANSPORTATION PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION**,
East Building, 2nd Floor
1200 New Jersey Ave., SE
Washington, DC 20590,

and

**DANIEL M. ASHE** (in his official capacity as Director of the United States Fish and Wildlife Service), and **UNITED STATES FISH AND WILDLIFE SERVICE**,
1849 C Street, NW
Washington, DC 20240,

2

and

**SALLY JEWELL** (in her official capacity as
Secretary of the Interior), **KEVIN K.
WASHBURN** (in his official capacity as
Assistant Secretary – Indian Affairs), and
**UNITED STATES DEPARTMENT OF
INTERIOR BUREAU OF INDIAN AFFAIRS**,
MS-3658-MIB
1849 C Street, NW
Washington, DC 20240,

**GINA MCCARTHY** (in her official capacity as
Administrator of the Environmental Protection
Agency), and the **UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY,**
1200 Pennsylvania Ave., NW
Washington, DC 20460,

Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## NATURE OF THE CASE

1.       This case challenges the approval of a major tar sands crude oil pipeline by

Defendant U.S. Army Corps of Engineers (the "Corps") and other federal agencies with no

public review process and no analysis of the entire project's environmental impacts as required

by the National Environmental Policy Act ("NEPA"); and challenges the Corps' continued

refusal to disclose project documents with Plaintiffs under the Freedom of Information Act

("FOIA").

2.       The Flanagan South tar sands pipeline ("Flanagan South" or the "Project") is a

589-mile tar sands oil pipeline proposed by Enbridge, Inc. and its subsidiaries and/or affiliates.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Flanagan South would transport approximately 600,000 barrels per day of heavy Canadian tar sands crude oil through the states of Illinois, Missouri, Kansas, and Oklahoma.

3.      The construction and operation of Flanagan South pipeline would have significant environmental impacts. Flanagan South would require a right-of-way to be cleared along the pipeline's entire length, including through thousands of water bodies, wetlands, wildlife habitat, and other sensitive areas, and requires a vast network of pump stations, electric transmission lines, and access roads to be constructed.

4.      Furthermore, the risk of oil spills from Flanagan South poses a major health and safety risk to communities along the pipeline route. For example, Enbridge responsible for largest terrestrial oil spill in United States history when in 2010, another of its tar sands crude oil pipelines ruptured in Michigan, spilling 840,000 gallons of tar sands crude oil into the Kalamazoo River. After nearly three years and one billion dollars spent, that spill has not yet been fully cleaned up.  Nevertheless, neither the Corps nor any other federal agency has performed a NEPA analysis on the risks or impacts of oil spills on the Flanagan South Pipeline.

5.      Enbridge recently began construction of Flanagan South following its permitting, approval, and regulation by numerous federal agencies, including the Corps' verifications of dredge and fill of United States waters pursuant to a nationwide permit and section 404 of the Clean Water Act, a Biological Opinion and Incidental Take Statement issued by United States Fish and Wildlife Service (the "Service") permitting the "take" of endangered and threatened species, the approval of the pipeline's emergency response plan by the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), and several other actions by other federal agencies. These actions, individually and collectively, constituted major federal action that triggered Defendants' NEPA obligations. However, none of the Defendant agencies prepared either an environmental assessment ("EA") or an environmental impact statement

("EIS") for the entire Project pursuant to NEPA, nor have they designated a lead agency to undertake this analysis.

6.     In addition, no agency issued any public notice or provided any opportunity for public participation in the approval process. In fact, the Corps and other agencies have actively concealed even the most basic project documents with the public. The Sierra Club made numerous requests to the Corps for Enbridge's application materials and information about impacts to waterways under FOIA, 5 U.S.C. § 552, which the Corps denied by claiming that they were protected from disclosure under the "deliberative process" privilege of FOIA's Exemption 5. However, that privilege does not apply to documents prepared by a non-federal party such as Enbridge. The Corps has also delayed ruling on Sierra Club's FOIA appeal, which has deprived Sierra Club the documents while construction of the project has begun.

7.     In short, due to the repeated failure of the responsible agencies to conduct a transparent review of the Project's environmental impacts, this massive pipeline has been authorized without any public notice, without any opportunity for public comment, without any public hearings, and without any NEPA review of the extensive environmental impacts of the entire pipeline, including the grave risk of oil spills.

8.     Based upon the above facts and upon the reasons set forth more fully below, Plaintiffs seek a declaratory ruling that: (a) the Corps should have prepared an EA or EIS for its verifications and easements; (b) the Service should have prepared an EA or EIS for its Biological Opinion and Incidental Take Statement; (c) PHMSA should have prepared an EA or EIS for the Project's emergency response plan; (d) the Corps or one of the other federal agencies involved should have prepared an EA or EIS for the entire Flanagan South Pipeline project, or at a minimum designated a lead agency for that comprehensive NEPA analysis; and (e) the Corps' verifications of the Project were contrary to the Clean Water Act and the

5

applicable nationwide permit. In addition, Plaintiffs seek a declaratory ruling that the Corps has violated the FOIA by withholding documents and not responding in a timely fashion.

9.      To remedy Defendants' violations of law, Plaintiffs respectfully request the Court to order the Corps to promptly produce the documents due under the FOIA; and to issue preliminary and permanent injunctions enjoining construction and operation of the Flanagan South pipeline, unless and until Defendants comply fully with NEPA, the Clean Water Act, and the Administrative Procedure Act.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction under 28 U.S.C. § 1331 (questions of federal law); 28 U.S.C. §§ 2201-2202 (power to issue declaratory judgments in cases of actual controversy, and to issue further relief based on such judgments); the APA, 5 U.S.C. §§ 701-06; and 5 U.S.C. § 552(a)(4)(B), (a)(6)(E)(iii) ("FOIA").

11.      Venue is proper in this judicial district and in this Court under 28 U.S.C. § 1391(e)(1)(A) because Defendants are federal agencies and officers who reside in this judicial district, and 5 U.S.C. § 552(a)(4)(B).

## PARTIES

### Plaintiffs

12.      Plaintiff Sierra Club was founded in 1892 and is the nation's oldest grassroots environmental organization.  The Sierra Club is incorporated in California, and has its headquarters in San Francisco, California.  It has approximately 600,000 members nationwide, including nearly 23,000 members in Illinois, over 8,000 members in Missouri, over 4,000 members in Kansas, and over 3,000 members in Oklahoma.  The Sierra Club is dedicated to the protection and preservation of the natural and human environment, including but not

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

limited to wetlands, rivers, streams, and forests.  The Sierra Club's mission is to explore, enjoy and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments.

13.     The Sierra Club has members in Missouri, Kansas, and Illinois whose real property, recreational, aesthetic, business, and/or environmental interests have been, are being, and will be adversely affected by the Defendants' actions as set forth herein.  The Sierra Club brings this action on behalf of itself and its members.

14.     The Sierra Club and its members monitor the use of waters of the United States and compliance with the law respecting these water bodies, educate their members and the public concerning the management of these water bodies, and advocate policies and practices that protect the natural value of these water bodies.

15.     Sierra Club and its members will suffer concrete injury from the unlawful construction and operation of the Flanagan South pipeline and other utility lines under the authority of NWP 12 and other federal authorizations without adequate environmental review or adequate opportunities for public notice and comment.  Members of the Sierra Club own property located directly on the route of the Project.  These members' use and enjoyment of their property would be diminished by the construction and operation of the Project.   Sierra Club's members also use the waterways and surrounding areas that stand to be filled and deforested by the construction and operation of the Project for recreation and business purposes such as wildlife and bird viewing, fishing, hiking, and camping.   Sierra Club's members also use waterways at risk of oil spills from the Project for irrigation and for drinking water.

16.     Plaintiff National Wildlife Federation ("NWF") is the nation's largest conservation advocacy and education organization. Founded in 1936, NWF is a non-profit

7

organization incorporated in the District of Columbia with its headquarters in Virginia. NWF's mission is to inspire Americans to protect wildlife for our children's future. NWF has 48 affiliates in U.S. states and territories, including affiliate organizations in Illinois, Missouri and Kansas. NWF and its over 4 million members and supporters are dedicated to protecting important resources like rivers, streams, and wetlands from the impacts of development such as major pipeline projects and from major risks to wildlife and habitat like oil spills. NWF is also committed to addressing the causes of climate change, which imperil wildlife and wildlife habitat.

17.     Sierra Club and National Wildlife Federation ("Plaintiffs"), and their members are and will be injured as a result of the Defendants' authorization and regulation of the Project without the preparation of the appropriate project-specific environmental analyses required by NEPA, the Clean Water Act, and the APA.  Plaintiffs and their members and/or citizens regularly comment on proposals for individual Clean Water Act § 404 permits and on NEPA documents such as environmental assessments and EISs, and rely on information and data contained in these documents to plan their activities, to prepare and inform their participation concerning agency actions affecting the water bodies, and to disseminate the information to their members/citizens and the general public for their information and use.  These activities are impaired by the lack of public notice or disclosure that occurs when projects such as Flanagan South seek to proceed under NWP 12, and by the lack of information on the impacts of such projects that would otherwise be available through an individual Clean Water Act 404 permit process.  Plaintiffs and many of their members would attend public hearings, offer comments, and otherwise remain actively involved in any public review process for the Project should Defendants offer one. The procedural and informational interests and organizational

8

purposes of Plaintiffs and their members are and will be directly injured by the Defendants' failure to comply with the statutes and regulations cited in this Complaint.

18.     Plaintiffs and their members/citizens have aesthetic, scientific, recreational, business, and property interests in the wetlands, river, streams, and other water bodies, as well as the areas in the immediate vicinity of those water bodies, that will be adversely impacted by projects proceeding under NWP 12, including but not limited to the proposed Project. Plaintiffs and their members use, enjoy, and/or depend on the water bodies affected by NWP 12 and the proposed Project for clean water, healthy forests and wetland ecosystems, presence of wildlife, and outdoor recreation and business activities of various kinds, including nature study, photography, commercial guiding, bird watching, fishing, canoeing, hunting, backpacking, camping, solitude, and a variety of other activities.

19.     The Defendants' actions at issue in this case, which violate the Clean Water Act, NEPA, and the APA, pose a risk of harm and do cause harm to Plaintiffs' interests.

20.     Plaintiffs have exhausted their administrative remedies or have no administrative remedies for the claims set forth in this complaint.  The actions Plaintiffs challenge are either final actions or actions unlawfully withheld that are subject to judicial review under the APA, and an actual, justiciable controversy exists between Plaintiffs and Defendants. Plaintiffs have standing for the claims made herein; and Plaintiffs have no adequate remedy at law.

### Defendants

21.     Defendant United States Army Corps of Engineers (the "Corps") is the federal agency charged with administering permits under section 404 of the Clean Water Act for discharge of dredged or fill material into the waters of the United States, among other

responsibilities. The Corps is headquartered in Washington, D.C.   The Corps has district offices throughout the country, including in Rock Island, St. Louis, Tulsa, and Kansas City.

22.     Defendant Lieutenant General Thomas P. Bostick is Commanding General and Chief of Engineers of the U.S. Army Corps of Engineers in Washington, D.C. and is designated to act for the Secretary of the Army.  Plaintiffs bring this action against Lieutenant General Bostick in his official capacity only. Lieutenant General Bostick is the federal officer personally responsible for compliance with any injunction related to the Corps that this Court issues.

23.     Defendant Colonel Richard A. Pratt is the Commander and District Engineer of the U.S. Army Corps of Engineers Tulsa District.   Plaintiffs bring this action against Colonel Pratt in his official capacity only.   Colonel Pratt is responsible for the Tulsa District's verification of the Project under NWP 12, which is the subject of this action.

24.     Defendant Colonel Mark Deschenes is the District Commander of the U.S. Army Corps of Engineers Rock Island District. Plaintiffs bring this action against Colonel Deschenes in his official capacity only.  Colonel Deschenes is responsible for the Rock Island District's verification of the Project under NWP 12, which is the subject of this action.

25.     Defendant Colonel Christopher Hall is the District Engineer and Commander of the U.S. Army Corps of Engineers St. Louis District.   Plaintiffs bring this action against Colonel Hall in his official capacity only.   Colonel Hall is responsible for the St. Louis District's verification of the Project under NWP 12, which is the subject of this action.

26.     Defendant Colonel Andrew D. Sexton is the Commander and District Engineer of the U.S. Army Corps of Engineers Kansas City District.   Plaintiffs bring this action against Colonel Sexton in his official capacity only.  Colonel Sexton is responsible for the Kansas City District's verification of the Project under NWP 12, which is the subject of this action.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

27.     Defendant United States Department of Transportation, and its subdivision, PHMSA, are the federal agencies charged with approving facility response plans for oil pipelines under the Oil Pollution Act.  The Department of Transportation and PHMSA are headquartered in Washington, D.C.  PHMSA is responsible for approving the Oil Pollution Act facility response plan for the proposed Project, which is the subject of this action.

28.     Defendant Anthony Foxx is Secretary of the United States Department of Transportation in Washington, D.C.  Plaintiffs bring this action against Mr. Foxx in his official capacity only.  Mr. Foxx is the federal officer ultimately responsible for overseeing the operations of PHMSA, a subagency within the Department of Transportation.

29.     Defendant Cynthia L. Quarterman is Administrator of the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration in Washington, D.C.  Plaintiffs bring this action against Ms. Quarterman in her official capacity only.  Ms. Quarterman is the federal officer personally responsible for compliance with any injunction related to PHMSA that this Court issues.

30.     Defendant United States Fish and Wildlife Service is the federal agency charged with consulting with other federal agencies to determine the impact of federal agency action on endangered and threatened species under section 7 of the Endangered Species Act.  The Service prepared the biological opinion and incidental take statement that are the subject of this action.

31.     Defendant Daniel M. Ashe is Director of the United States Fish and Wildlife Service in Washington, D.C.  Plaintiffs bring this action against Mr. Ashe in his official capacity only.  Mr. Ashe is the federal officer personally responsible for compliance with any injunction related to the Service that this Court issues.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

32.     Defendant United States Department of Interior Bureau of Indian Affairs is the federal agency responsible for natural resources management on Indian trust lands.  As relevant to this action, the Bureau granted Enbridge easements to cross 34 tracts of Bureau-managed federal Indian land in connection with the Project.

33.     Defendant Sally Jewell is Secretary of the United States Department of the Interior in Washington, D.C.  Plaintiffs bring this action against Ms. Jewell in her official capacity only.  Ms. Jewell is the federal officer ultimately responsible for overseeing the operations of the Bureau of Indian Affairs, a subagency within the Department of the Interior.

34.     Defendant Kevin K. Washburn is the Assistant Secretary – Indian Affairs of the United States Department of the Interior.  He leads Interior's Bureau of Indian Affairs in Washington, D.C.  Plaintiffs bring this action against Mr. Washburn in his official capacity only.  Mr. Washburn is the federal officer primarily responsible for compliance with any injunction related to the Bureau that this Court issues.

35.     Defendant United States Environmental Protection Agency ("EPA") is the federal agency responsible for approving spill prevention, control, and countermeasure ("SPCC") plans for oil spill prevention, preparedness, and response to prevent oil discharges to navigable waters and adjoining shorelines.  EPA is headquartered in Washington, D.C.  EPA is responsible for approving the SPCC plan for the Project, which is the subject of this action.

36.     Defendant Gina McCarthy is Administrator of the United States Environmental Protection Agency in Washington, D.C.  Plaintiffs bring this action against Ms. McCarthy in her official capacity only.  Ms. McCarthy is the federal officer personally responsible for compliance with any injunction related to EPA that this Court issues.

## LEGAL BACKGROUND

### The National Environmental Policy Act

37.     NEPA is our "basic national charter" for environmental protection. 40 C.F.R. §
1500.1. Among the statute's goals are to "insure that environmental information is available to
public officials and citizens before decisions are made and actions are taken," and to "help
public officials make decisions that are based on [an] understanding of environmental
consequences, and take actions that protect, restore, and enhance the environment." *Id.* §
1500.1(b)-(c).

38.     To achieve these objectives, NEPA requires all agencies of the federal
government to prepare an EIS for all "major Federal actions significantly affecting the quality
of the human environment." 42 U.S.C. § 4332(2)(C).  According to regulations promulgated by
the Council on Environmental Quality ("CEQ"), an agency created by Congress to implement
NEPA, the term "major Federal action" includes "actions with effects that may be major and
which are potentially subject to Federal control and responsibility."  40 C.F.R. § 1508.18.

39.     Major federal actions include "new and continuing activities, including projects
and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal
agencies," 40 C.F.R. § 1508.18(a), and "[a]pproval of specific projects, such as construction or
management activities located in a defined geographic area. Projects include actions approved
by permit or other regulatory decision as well as federal and federally assisted activities." 40
C.F.R. § 1508.18(b)(4). "Major reinforces but does not have a meaning independent of
significantly."  40 C.F.R. § 1508.18.

40.     The EIS must describe, among other things: (1) the environmental impact of the
proposed action, and (2) any adverse environmental effects that cannot be avoided should the
proposal be implemented. *Id.* § 4332(2)(C)(i), (ii).30. CEQ regulations require that a "lead

agency" supervise the NEPA analysis.  Lead agencies are selected according to the following factors, among others: (1) the magnitude of the agency's involvement; (2) the agency's project approval/disapproval authority; (3) the agency's expertise concerning the action's environmental effects; (4) the duration of the agency's involvement; and the (5) the sequence of the agency's involvement. 40 C.F.R. § 1501.5(c).

41.    To determine whether a proposed action significantly affects the environment, and whether an EIS is required, the lead federal agency may first prepare an environmental assessment.  40 C.F.R. § 1508.9.  An environmental assessment must provide sufficient evidence and analysis to determine whether to prepare an EIS.  *Id.*  The lead agency must take a 'hard look' at the relevant environmental concerns and alternatives to the proposed action. *Id*.

42.    If the agency concludes in an environmental assessment that a project may have significant impacts on the environment, then an EIS must be prepared.  40 C.F.R. § 1501.4. To determine whether a proposed action may significantly affect the environment, the agency must consider both the context and intensity of the proposed action, including whether the project will take place in "ecologically critical areas," and whether the project will affect endangered species. 40 C.F.R. § 1508.27 (a) & (b).

43.    NEPA also mandates that the lead agency consider "the degree to which the action is related to other actions . . . with cumulatively significant impacts . . ." 40 C.F.R. § 1508.27(b)(7).  NEPA defines "cumulative impact" to mean "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.  A federal action will significantly affect the environment "if it is reasonable to anticipate a cumulatively significant impact on the environment.  Significance cannot be avoided by terming an action temporary or by breaking it

down into small component parts." 40 C.F.R. § 1508.27(b)(7). NEPA requires that a reviewing agency consider in the same EIS any "connected" actions, including actions that are "interdependent parts of a larger action" and "depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1)(iii).

44.     If an environmental assessment concludes that there are no potentially significant impacts to the environment, the federal agency must provide a detailed statement of reasons why the project's impacts are insignificant and issue a finding of no significant impact ("FONSI"). 40 C.F.R. § 1508.13. If the agency issues an environmental assessment and FONSI, it must make a convincing case for a finding of no significant impact on the environment.

45.     The CEQ regulations require a give and take between an agency and members of the public. See 40 C.F.R. §§ 1500.1(b) (2010) ("public scrutiny [is] essential"), 1500.2(d) (2010) (the agency must "encourage and facilitate public involvement"), 1506.6 (2010) (the agency must "[m]ake diligent efforts to involve the public" in preparing environmental documents, give "public notice of . . . the availability of environmental documents so as to inform those persons . . . who may be interested or affected," and "solicit appropriate information from the public."). CEQ regulations require federal agencies to give the public as much information as is practicable, so that the public has a sufficient basis to address those areas that the agency must consider in preparing the environmental assessment. 40 C.F.R. § 1501.4 (2010).

**The Clean Water Act**

46.     The Clean Water Act was enacted by Congress in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

To achieve this goal, section 404 of the Clean Water Act prohibits the discharge of any pollutant, including dredged spoil or other fill material, into navigable waters unless authorized by a permit. *Id.* § 1344.

47.     Section 404 of the CWA gives the Corps primary responsibility for permitting construction activities that involve dredge and fill of U.S. waters. 33 U.S.C. § 1344. The Corps oversees the § 404 permit process and must comply with guidelines promulgated by the U.S. Environmental Protection Agency ("EPA"), which are incorporated into the Corps' own regulations. Id. § 1344(b)(1); 33 C.F.R. §§ 320.4(b)(4) (2010), 325.2(a)(6) (2010). The guidelines provide that no discharge of dredged or fill material shall be permitted for an individual project: (1) if there is a practicable alternative to the proposed discharge; (2) if the discharge causes or contributes to violations of applicable state water quality standards; (3) if the discharge will cause or contribute to significant degradation of the environment; and (4) unless all appropriate steps have been taken to minimize potential adverse impacts.  40 C.F.R. § 230.10 (2010).

48.     Public participation plays an important role in Clean Water Act permitting decisions. The Clean Water Act provides in its general policy section that "public participation in the development . . . of any . . . program established by the Administrator. . . under this chapter shall be provided for, encouraged, and assisted by the Administrator . . ." 33 U.S.C. § 1251(e). Section 404 states: "[t]he Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). The applicable Corps regulations state: "any person may request, in writing, . . . that a public hearing be held . . . Requests for a public hearing under this paragraph shall be granted, unless the district engineer determines that the

issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing."

33 C.F.R. § 327.4(b).

49.     The Corps is also responsible, under section 10 of the Rivers and Harbors Act,

for reviewing and approving the construction of structures in United States ports and navigable

waters.  33 U.S.C. § 403.  The Corps has promulgated regulations governing the section 10

permit process at 33 C.F.R. pts. 320 to 332.

50.     When issuing an individual Clean Water Act section 404 permit and permit

under section 10 of the Rivers and Harbors Act for a specific project, the Corps must comply

with the requirements of NEPA.

51.     An alternative to the individual permit process is the nationwide permit

program.  Section 404(e) allows the Corps to, "after notice and opportunity for public hearing,

issue general permits on a State, regional, or nationwide basis for any category of activities

involving discharges of dredged or fill material if the Secretary determines that the activities in

such category are similar in nature, will cause only minimal adverse environmental effects

when performed separately, and will have only minimal cumulative adverse effect on the

environment." 33 U.S.C. § 1344(e)(1).

52.     If a project meets the terms and conditions of a Nationwide Permit, it does not

need an individual § 404 permit.  Thus, a project is approved under a Nationwide Permit often

does not undergo the comprehensive and transparent site-specific environmental and public

interest review that individual § 404 permits require. 33 C.F.R. § 323.3(a). Nationwide permits

can last up to five years, at which point they must be reissued or left to expire. 33 U.S.C. §

1344(e)(2).

53.     In this case, the Corps approved the Flanagan South pipeline to be built in

numerous wetlands, river, and streams, pursuant to Nationwide Permit 12.

**Nationwide Permit 12**

54.     On February 21, 2012, the Corps issued a final rule issuing/reissuing 52 Nationwide Permits, including Nationwide Permit 12 ("NWP 12") that is at issue in this case. 77 Fed. Reg. 10,184 (Feb. 21, 2012). The Corps also issued a "Decision Document" and FONSI for NWP 12, dated February 13, 2012, which purports to comply with NEPA.

55.     The final rule also contains a set of general conditions and definitions that apply to all of the nationwide permits, including NWP 12. 77 Fed. Reg. 10,184, 10,288.  As such, any reference to "NWP 12" herein includes both NWP 12 itself and the definitions and general conditions that apply to NWP 12.

56.     The Corps' Nationwide Permit 12 ("NWP 12") authorizes "[a]ctivities required for the construction, maintenance, repair, and removal of utility lines and associated facilities [including oil pipelines] in waters of the United States, provided the activity does not result in the loss of greater than 1/2-acre of waters of the United States for each single and complete project."  77 Fed. Reg. at 10,271.  However, the definition of "single and complete linear project" allows the Corps to treat each water crossing as a separate "single and complete project." 77 Fed. Reg. at 10,290.

57.     NWP 12 requires a permittee (in this case, Enbridge) to submit a preconstruction notification ("PCN") to the Corps' district engineer before commencing the activity if the project meets any one of seven criteria. 77 Fed. Reg. 10286. For example, a PCN is required if the activity involves mechanized land clearing in a forested wetland, or if the activity would result in the loss of greater than one-tenth of an acre of waters of the United States. 77 Fed. Reg. 10286. Id.

58.     NWP 12 relies on the discretion of division and district engineers to ensure that specific utility projects permitted under NWP 12 would not have more than minimal individual

and cumulative adverse environmental effects, as required by CWA 404(e).  For example, the Federal Register announcement states: "in response to pre-construction notifications for NWP 12 activities that are linear projects, district engineers will evaluate the cumulative effects of those linear projects on the aquatic environment when determining whether authorization by NWP is appropriate." 77 Fed. Reg. at 10,260; *see also* 77 Fed. Reg. at 10,287 ("In reviewing the PCN for the proposed activity, the district engineer will determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects or may be contrary to the public interest.").

59.    NWP 12 requires the Corps district offices to evaluate the cumulative environmental effects of overall utility lines, including all "single and complete projects" along a linear project's length, and make a determination as to whether the cumulative environmental effects would be more than minimal: "In reviewing the PCN for the proposed activity, the district engineer will determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects... For a linear project, this determination will include an evaluation of the individual crossings to determine whether they individually satisfy the terms and conditions of the NWP(s), as well as the cumulative effects caused by all of the crossings authorized by NWP." 77 Fed. Reg.  10287.

60.    NWP 12's General Condition 7 states: "No activity may occur in the proximity of a public water supply intake, except where the activity is for the repair or improvement of public water supply intake structures or adjacent bank stabilization."

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**The Oil Pollution Act**

61.     The Oil Pollution Act, 33 U.S.C. § 2701 *et seq.*, amended section 311 of the Clean Water Act to strengthen the nation's ability to prevent and respond to oil spills in a variety of ways, including through contingency planning by both government and industry.

62.     The Oil Pollution Act requires that owners or operators of certain facilities "prepare and submit to the President a plan for responding, to the maximum extent practicable, to a worst case discharge, and to a substantial threat of such a discharge, of oil or a hazardous substance." 33 U.S.C. § 1321(j)(5)(A)(1).   Covered facilities include onshore facilities that "could reasonably be expected to cause substantial harm to the environment by discharging into or on the navigable waters, adjoining shorelines, or the exclusive economic zone." 33 U.S.C. § 1321(j)(5)(C)(iv).

63.     Under the Oil Pollution Act, the President must promptly review facility response plans, require amendments to any plan that does not meet relevant requirements, and approve any plan that meets the requirements.   33 U.S.C. § 1321(j)(5)(E).   Periodic review of plans is also required.   33 U.S.C. § 1321(j)(5)(E)(v).

64.     The President has delegated these review and approval responsibilities to the Secretary of the United States Department of Transportation, who has in turn delegated them to PHMSA.   Exec. Order 12,777 (Oct. 18, 1991).   PHMSA has promulgated regulations implementing the Oil Pollution Act's spill planning requirements.   *See* 49 C.F.R. pt. 194.

65.     A covered facility generally may not operate until its facility response plan is approved.   33 U.S.C. § 1321(j)(5)(F).   Under a limited exception, and with approval by PHMSA, "the President may authorize a . . . facility to operate without a response plan . . . until not later than 2 years after the date of the submission to the President of a plan." 33

U.S.C. § 1321(j)(5)(G).  In order to utilize this exception, the facility owner or operator must

obtain approval from PHMSA; in particular, the operator must "certif[y] that the owner or

operator has ensured by contract or other means *approved by the President* the availability of

private personnel and equipment necessary to respond, to the maximum extent practicable, to a

worst case discharge or a substantial threat of such a discharge."  33 U.S.C. § 1321(j)(5)(G)

(emphasis added).

### The Hazardous Liquid Pipeline Safety Act

66.     The purpose of the Hazardous Liquid Pipeline Safety Act, 49 U.S.C. § 60101 *et

seq.* ("Pipeline Safety Act"), "is to provide adequate protection against risks to life and

property posed by pipeline transportation and pipeline facilities by improving the regulatory

and enforcement authority of the Secretary of Transportation."  49 U.S.C. § 60102(a)(1).

67.     Under the Pipeline Safety Act, the Department of Transportation is required to

"prescribe minimum safety standards for pipeline transportation and for pipeline facilities,"

regulate the qualifications of pipeline operators, and oversee operators' maintenance of an

inventory of information about their pipelines, among other things.  49 U.S.C. § 60102(a)(2),

(a)(3), (e).

68.     The Pipeline Safety Act requires that the Department of Transportation

"prescribe minimum standards requiring an operator of a pipeline facility . . . to maintain, to

the extent practicable, information related to operating the facility. . . and, when requested, to

make the information available" to the Department of Transportation and an appropriate state

official.  49 U.S.C. § 60102(d).  This information must include "an emergency response plan

describing the operator's procedures for responding to and containing releases."  49 U.S.C. §

60102(d)(5).

69. PHMSA has issued regulations implementing the Department of Transportation's authority under the Pipeline Safety Act. *See* 49 C.F.R. pt. 195. These regulations include extensive reporting requirements, as well as technical requirements covering all aspects of design, construction, and operation and maintenance of pipelines.

## The Endangered Species Act

70. The Endangered Species Act requires federal agencies, through consultation with the United States Fish and Wildlife Service, to "insure that any action authorized, funded, or carried out by the agency . . . is not likely to jeopardize the continued existence of" any listed species or adversely modify its critical habitat. 16 U.S.C. § 1536(a)(2). "Action" is defined to include all activities or programs of any kind authorized, funded, or carried out by federal agencies, including actions directly or indirectly causing modifications to the land, water, or air. 50 C.F.R. § 402.02. An agency must initiate consultation with the Service whenever it takes an action that may affect a listed species, subject to limited exceptions. 50 C.F.R. § 402.14(a).

71. The result of the interagency consultation process is a biological opinion that evaluates impacts to listed species to determine if the action is likely to jeopardize the species' existence or adversely modify critical habitat. If the conclusion of the opinion results in a determination of jeopardy or adverse modification, then the opinion identifies changes to the action to avoid these effects. 16 U.S.C. § 1536(b).

72. The Service may also issue, along with the biological opinion, an incidental take statement, which provides for a specified level of "incidental take" of listed species in connection with the proposed action. 16 U.S.C. § 1536(b)(4).

73.     Under the Endangered Species Act, "take" of listed species – broadly defined, under 16 U.S.C. § 1532(19) and 50 C.F.R. § 17.3, to cover a variety of harm to or harassment of species or destruction of their habitat – is generally prohibited.   *See* 16 U.S.C. § 1538(a)(1)(B).   Despite this prohibition, incidental take statements authorize a limited and specified amount of take that is incidental to an action conducted by a federal agency or applicant for federal authorization.   Incidental take is defined as take that does not jeopardize a species' continued existence or adversely modify its critical habitat and that "result[s] from, but [is] not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant."   50 C.F.R. § 402.02; *see also* 16 U.S.C. § 1536(b)(4)(B).

74.     The incidental take statement identifies "reasonable and prudent measures" that the Service considers "necessary or appropriate" to minimize the impacts of the proposed action on listed species.   16 U.S.C. § 1536(b)(4)(ii).   The statement also "sets forth the terms and conditions . . . that must be complied with by the Federal agency or applicant (if any), or both" in order to implement the reasonable and prudent measures identified.   16 U.S.C. § 1536(b)(4)(iv).   The statement thus allows the agency with which the Service consults, as well as the project proponent, to avoid violations of the Endangered Species Act in connection with incidental taking that occurs during agency-sanctioned project activity.

## Rights-of-Way Across Federal Lands

75.     Section 28 of the Mineral Leasing Act, 30 U.S.C. § 185, provides general authority for the granting of rights-of-way for oil pipelines across federal lands.   It provides: "[r]ights-of-way through any Federal lands may be granted by the Secretary of the Interior or appropriate agency head for pipeline purposes for the transportation of oil, natural gas,

synthetic liquid or gaseous fuels, or any refined product produced therefrom."   30 U.S.C. § 185(a).

76.     Grants of rights-of-way across federal land pursuant to 30 U.S.C. § 185 are subject to the requirements of NEPA.  30 U.S.C. § 185(h).

77.     The Department of the Interior, through the Bureau of Indian Affairs, is also empowered "to grant a right-of-way in the nature of an easement for the construction, operation, and maintenance of pipe lines for the conveyance of oil and gas through any Indian reservation, through any lands held by an Indian tribe or nation in the former Indian Territory, through any lands reserved for an Indian agency or Indian school, or for other purpose in connection with the Indian Service."   25 U.S.C. § 321.   Before the grantee's title in such a right-of-way may vest, the grantee must file "maps of definite location" with Interior, and the maps must be approved.  *Id.*

78.     Bureau of Indian Affairs regulations also provide that "the Secretary is authorized to grant the right-of-way by issuance of a conveyance instrument" upon satisfactory compliance with Bureau regulations.  25 C.F.R. § 169.15.

79.     United States Army regulations also govern the power of the Army, including its subdivision, the Corps, to grant easements across Army land.  The granting of easements across Corps land is not permitted when the relevant "use of real property, water or other natural resources when the use conflicts with the goals and intent of overall Federal policy on environmental quality and historical preservation."   Dep't of Army Reg. 405-80(4-8).   Moreover, all such actions must comply with federal environmental review requirements.  *Id.*

## The Administrative Procedure Act

80.     The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, provides for judicial review of agency actions such as those at issue here. A reviewing court shall hold unlawful and set aside any agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

81.     The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. "[A]gency action" includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).  Under the APA, a "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

## The Freedom of Information Act

82.     The Freedom of Information Act (FOIA), 5 U.S.C. § 552 *et. seq.*, is designed to provide the public with the information it needs to meaningfully engage with government decision making, and sets a basic policy of full agency disclosure.

83.     President Obama has ordered that FOIA "be administered with a clear presumption: In the face of doubt, openness prevails." Memorandum for the Heads of Executive Departments and Agencies 74 Fed. Reg. 4,683 (Jan. 21, 2009). He ordered that all agencies "should take affirmative steps to make information public." *Id.*

84.     The Corps' FOIA regulations state that "[t]he public has a right to information concerning the activities of its Government. Army policy is to conduct its activities in an open manner and provide the public with a maximum amount of accurate and timely information

concerning its activities, consistent always with the legitimate public and private interests of the American people." 32 C.F.R. § 518.6(a).

85.     FOIA requires records to be made "promptly available" upon request. 5 U.S.C. §552(a)(3)(A)(ii). FOIA requires agencies to process requests with due diligence at all times. *Id. at* §552(a)(6)(D)(iii).

86.     The Corps is required to respond to FOIA requests within 20 working days. *Id.* at §552(a)(6)(A); 32 C.F.R. § 518.8(d)(2)(vi).

87.     FOIA contains nine categories of documents that agencies are not required to release to the public. *Id. at* §552(b). If an agency claims that requested documents fall under one of the exemptions, FOIA allows requestors to appeal that decision to the agency.  *Id. at* §552(a)(6)(A).  The Corps must make "a determination with respect to any appeal within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of such appeal." *Id. at* §552(a)(6)(A)(ii); see also 32 C.F.R. § 518.8(d)(2)(vi).

88.     The twenty-day period during which the Corps must make a determination on an appeal "shall commence on the date on which the request is first received by the appropriate component of the agency, but in any event not later than ten days after the request is first received by any component of the agency that is designated in the agency's regulations under this section to receive requests under this section." *Id. at* §552(a)(6)(A)(ii)

89.     A person submitting a FOIA request "shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions" contained in FOIA. 5 U.S.C.A. § 552(a)(6)(c)(i).

## **FACTS**

### **Enbridge's Flanagan South Pipeline Project**

90.     Enbridge's proposed Flanagan South pipeline would consist of a 589-mile pipeline that would transport 600,000 barrels per day of crude oil from Flanagan, Illinois to Cushing, Oklahoma. The pipeline would be partially in an expansion of an existing pipeline right-of-way for the "Spearhead" oil pipeline; and partially built in a new right-of-way.

91.     Upon information and belief, and based in part on the Biological Opinion issued by the Service and the April 12, 2013 Clean Water Act section 401 certification issued by the Missouri Department of Natural Resources, the Project's construction and operation would have significant adverse effects to the environment along the pipeline route.  However, there has been no public notice or opportunity for public comment, no environmental assessment (EA) or environmental impacts statement (EIS) under NEPA for the pipeline by any agency, and Plaintiffs have been unable to obtain project documents from agencies despite numerous requests under the Freedom of Information Act. As such, most of the Project's environmental impacts remain undisclosed.

92.     The Project would transport tar sands crude oil, also known as oil sands crude oil, diluted bitumen, or Western Canadian Sedimentary Basin crude oil.  Tar sands oil is an unconventional and environmentally destructive petroleum source that is mined from a mixture of sand, clay, water, and bitumen underlying the boreal forests of Alberta, Canada. The extraction and conversion of the tar sands to a synthetic crude oil requires the destruction of large areas of pristine forests, the use of significant energy and water resources, and far greater amounts of air pollutants and greenhouse gases emissions than from conventional oil. Due to its highly viscous and corrosive qualities, tar sands crude oil must be pumped through pipelines at

high temperatures and pressures that weaken the integrity of pipelines and increase the potential for leaks and spills.

93.     As compared to conventional crude oil, tar sands crude oil is heavier, more corrosive, and more viscous. As such, it is more difficult to clean up when released into the environment. Because tar sands crude oil sinks to the bottom of affected waterways, traditional cleanup methods such as skimmers are ineffective.  For example, the 2010 rupture of a Enbridge tar sands pipeline in Michigan's Kalamazoo River spilled over 800,000 gallons of tar sands crude oil.  The cleanup efforts are still ongoing, and so far have cost around a billion dollars.

94.     The National Transportation Safety Board's report on Enbridge's Michigan spill, dated July 10, 2012, found that "[t]he rupture and prolonged release were made possible by pervasive organizational failures at Enbridge Incorporated (Enbridge)" and contributing to the disaster was PHMSA's "PHMSA's lack of regulatory guidance for pipeline facility response planning" and its "limited oversight of pipeline emergency preparedness that led to the approval of a deficient facility response plan." NTSB Report at xii.

95.     The Flanagan South pipeline would require the filling of numerous waterways that are considered "waters of the United States," and thus the pipeline requires a permit under § 404 of Clean Water Act.

96.     Upon information and belief, the Project would involve well over a thousand water crossings across four Corps districts.  Within the portion of the Kansas City District that is located in Missouri, the Project would cross approximately 334 streams and 158 jurisdictional wetlands.  Within the portion of the Rock Island District that is located in Missouri, the Project would cross approximately 40 jurisdictional wetlands and 114 other waters of the United States.   Within the portion of the Rock Island District that is located in Illinois, the Project would cross approximately 89 jurisdictional wetlands and 306 other waters

28

of the United States.  Within the St. Louis district, the Project would cross approximately 44 jurisdictional wetlands and 121 other waters of the United States.  Accordingly, across all of these districts the Project would cross approximately 331 wetlands and approximately 875 other waters of the United States. Upon information and belief, the impacts of the Project as a whole would be even greater.

97.     In Missouri, approximately 8 of the stream crossings and 7 of the wetland crossings would use horizontal directional drilling, while the rest would use standard open cut techniques. Within the portion of the Kansas City District that is located in Missouri, there would be five subsurface crossings of streams and four subsurface wetland crossings accomplished by horizontal direction drilling or a comparable technique; the remaining crossings would be done using open cut techniques.  Within the Rock Island District, there would be 20 subsurface stream crossings and 11 subsurface wetland crossings; the remaining crossings would be done using open cut techniques.  Within the St. Louis District, all crossings would be done using open cut techniques.  Upon information and belief, the impacts of the Project as a whole would be even greater.

98.     Upon information and belief, each standard open cut crossing would require a trench to be dug and the excavated materials from the trenches to be stored either on the banks of the waterways or in the waterways themselves before being placed over the installed pipeline.  Upon information and belief, each horizontal directional drilling crossing would involve a channel to be drilled under the waterbody in which the pipeline would be placed.  In either case, approaches to waterbodies may require clearing and grading activities to accommodate construction.

99.     In Missouri alone, the Project would permanently and temporarily impact approximately 62,480 linear feet of stream, equaling an area of 24.91 acres, and would

permanently and temporarily impact approximately 38.23 acres of wetlands.  Within the Rock Island District, the Project would permanently impact 18.29 acres of wetland and 4.70 acres of streams, and would temporarily impact 19.29 acres of wetland and 5.35 acres of streams. Within the St. Louis District, the Project would permanently impact 2.88 acres of wetland and 1.95 acres of streams, and would temporarily impact 3.22 acres of wetland and 2.18 acres of streams.  Upon information and belief, the impacts for the Project as a whole would be even greater.

100.    The Project would result in significant losses of important wetlands and other water bodies, including high quality forested wetlands that provide habitat for birds and wildlife.  The Project would also impact a number of exceptional areas of high ecological value, including the Marais des Cygnes River Waterfowl Area in Missouri, which is adjacent to and ecologically and hydrologically connected with a national wildlife refuge.

101.    The Project would require a right-of-way approximately 50 feet wide, or more, to be cleared of trees and shrubs, graded, and permanently maintained along the 589-mile-long route.   An additional right-of-way of approximately 85 feet would be cleared during construction.

102.    The Project would also require extensive and ongoing operation and maintenance activities post-construction, including vehicle traffic, clearing of vegetation and trees within the right-of-way, other right-of-way trenching and regrading activities, and maintenance of access roads.

103.    The proposed Project would also require hydrostatic testing of pipeline integrity, which would require, upon information and belief, approximately 262,000 gallons of water per mile of pipeline.  This water would, in some cases, be returned not to the stream of origin but to an upland area.

104.    Despite these enormous project impacts, the Kansas City District has not required any mitigation for temporary or permanent wetland and waterbody losses.  The Rock Island District has not required any stream mitigation, although it has proposed some inadequate mitigation for wetland impacts.  Upon information and belief, across the four districts, the mitigation proposed for the Project as a whole is inadequate and does not come close to ameliorating the Project's extensive potential impacts.

105.    The proposed Project will cross through areas in which endangered Indiana bats are known to occur, and will displace and harm Indiana bats and destroy bat habitat.  Enbridge surveys determined that essentially all forested habitat within the proposed pipeline corridor is potential roosting habitat for the bat, and that a total of approximately 621 acres of bat habitat and 1,870 maternity roost trees would be removed as a result of the Project.

106.    The proposed Project would also adversely impact the endangered American Burying Beetle by disturbing, harming, and harassing beetles during construction and operation and maintenance activities and potential fuel spills.  For example, construction equipment may crush or expose beetle brood chambers or crush beetles directly.  Construction and operation of the pipeline would also fragment, alter, and destroy 99.3 acres of beetle habitat on a temporary basis and result in conversion of 14.1 acres of habitat and permanent loss of 2.1 acres of habitat on a permanent basis.  The beetle is extremely sensitive to habitat loss, which is the primary factor leading to its decline.

107.    The proposed Project would also involve mowing and grading in habitat suitable for the threatened decurrent false aster, adversely impacting that species as well.

108.    The Project would also impact freshwater mussels occurring in waterbodies crossed by the proposed Project, including the Mississippi River, where freshwater mussels have declined.  Freshwater mussels are sensitive to river substrate disturbance and would be

31

harmed by the removal of their riparian habitat during the construction and operation of the proposed pipeline. The proposed Project also poses rises related to the introduction and spread of non-native plants and animals, including zebra mussels, which displace and harm native species.

109. In Missouri alone, three large recreational reservoirs – Truman, Lake of the Ozarks, and Mark Twain Lake – are located downstream of the proposed pipeline. These resources would be seriously impacted by a pipeline failure, jeopardizing widely used recreational resources. The Project would also be located within one mile of at least three public service water supply intakes and thus present threats to public drinking water associated with a potential pipeline failure.

110. The Corps' NEPA analysis for NWP 12 did not analyze the potential impacts of tar sands crude oil spills on waterways, nor did it analyze any other impacts associated with large tar sands pipelines such as Flanagan South.

111. No federal agency responsible for overseeing, regulating, and approving the Flanagan South project has prepared a NEPA analysis specific to the Flanagan South pipeline.

### The Corps' Role in the Approval of Flanagan South

112. Enbridge submitted preconstruction notifications ("PCNs") to the Rock Island, St. Louis, Kansas City, and Tulsa District offices of the Corps requesting that construction of Flanagan South in United States waters be verified under NWP 12.

113. Under the terms of NWP 12, there is no public notice for the PCN submissions or the Corps' evaluation of the PCNs. In this case, the Corps never formally announced Enbridge's PCN submissions to the public, and the Corps has steadfastly refused to share the PCNs with Plaintiffs and the public despite numerous attempts to acquire them. Plaintiffs and

their affected members have had no opportunity to learn even the most basic information about the project, such as the exact number and location of water crossings, submit written comments on the project, attend Corps hearings, or otherwise participate in the Corps' evaluation of the Project in any way.

114.    On or about August 12, 2013, the Rock Island District notified Enbridge of its decision that construction of the Project in United States waters meets the terms and conditions of NWP 12 and verified the Project under NWP 12. This decision was not made available to the public.

115.    On or about August 12, 2013, the St. Louis District notified Enbridge of its decision that construction of the Project in United States waters meets the terms and conditions of NWP 12 and verified the Project under NWP 12.  This decision was not made available to the public.

116.    On or about August 12, 2013, the Kansas City District notified Enbridge of its decision that construction of the Project in United States waters meets the terms and conditions of NWP 12 and verified the Project under NWP 12. This decision was not made available to the public.

117.    To Plaintiffs' knowledge, the Tulsa District has not yet notified Enbridge of any decision on its request for verification of the Project under NWP 12.

118.    Upon information and belief, across the four Corps districts the Project would require over a thousand crossings of waters of the United States across the four Corps districts.

119.    The Project would also require the Corps to issue easements permitting Enbridge to cross government fee property at locations where the Flanagan South pipeline crosses Corps land on the Mississippi River in Illinois and Missouri and on the Arkansas River in Oklahoma.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

120.    Upon information and belief, the Corps has already granted the easements to Enbridge. In the alternative, the Corps has not yet granted the easements but is allowing the Enbridge to proceed with construction before all federal approvals have been granted and before required environmental review has been completed in violation of 40 C.F.R. § 1506.1.

**Sierra Club's Freedom of Information Act Requests**

121.    In April and May of 2013, Sierra Club contacted the Corps district offices in Kansas City, Tulsa, St. Louis, and Rock Island, and requested copies of Enbridge's prec-construction notifications and other application materials for the Flanagan South pipeline. The Corps informed Sierra Club that they must file requests under the Freedom of Information Act ("FOIA") to access those documents.

122.    Accordingly, on May 16, 2013, the Sierra Club submitted FOIA requests to the Kansas City, Tulsa, St. Louis, and Rock Island Corps district offices pursuant to the FOIA, 5 U.S.C. § 552, seeking the PCNs that Enbridge submitted to the Corps offices and other information about the Flanagan South pipeline.

123.    Each of the four FOIA requests sought "all existing and future preconstruction notifications (PCNs) submitted by Enbridge for the proposed 'Flanagan South' pipeline."

124.    On June 27, 2013, the Sierra Club sent a follow-up letter to the Tulsa and St. Louis district offices stating that more than 20 days had passed without a response, in violation of 5 USC 552 (a)(6)(A), and requesting a response.

125.    On July 1, 2013, the Corps district office in Tulsa responded to the Sierra Club's FOIA request by stating that the request had been forwarded to the Corps' Southwestern Division office in Dallas, Texas.

126.    Each of the four district offices ultimately denied the Sierra Club's FOIA requests on the grounds that the PCNs allegedly are exempt from release under FOIA Exemption 5, which provides for withholding for release "inter-agency or intra agency memoranda or letters which would not be available by law other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Specifically, the Corps stated that the requested documents are not releasable under the deliberative process privilege of Exemption 5. The denial letters were dated June 20, 2013 (Rock Island and Kansas City); July 2, 2013 (Dallas); and July 8, 2013 St. (Louis).

127.    The Sierra Club submitted appeals of each of the four district office decisions, because the deliberative process privilege of Exemption 5 only applies to inter-agency or intra-agency deliberative documents, but does not apply to documents such as PCNs that were prepared by an outside party (such as Enbridge in this case) and submitted to an agency. The appeals were dated June 27, 2013 (Rock Island and Kansas City); July 8, 2013 (Tulsa); and July 15, 2013 (St. Louis).

128.    The Rock Island district office confirmed that it received Sierra Club's appeal on July 2, 2013.

129.    The Kansas City Corps confirmed that it received Sierra Club's appeal on June 27, 2013; that it forwarded the appeal to Corps headquarters on July 2, 2013; and that Corps headquarters forwarded the to the Army's General Counsel on or about July 22, 2013.

130.    On August 9, 2013, the Corps' Office of General Counsel notified Sierra Club that it had received all four FOIA appeals, that they had been aggregated and would likely be processed together, and that the estimated time for completion of the FOIA appeals was 6-8 weeks.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

131.   As of August 22, 2013, the Corps has not ruled on any of Sierra Club's appeals and has thus missed its deadlines pursuant to 5 U.S.C. §552(a)(6)(A)(ii) and 32 C.F.R. § 518.8(d)(2)(vi).

### PHMSA's Role in the Approval of Flanagan South

132.   Upon information and belief, PHMSA has not yet required Enbridge to submit a Response Plan, as required under the Oil Pollution Act, explaining its plans for dealing with a potential oil spill.  Further, upon information and belief, PHMSA does not plan to require Enbridge to prepare such a plan prior to the construction and operation of the Project. Consequently, PHMSA has not yet reviewed or approved, and will not review or approve, a Response Plan prior to the construction and operation of the Project.  These actions expose the public to an unacceptable risk of oil spills and resulting impacts during the project's operations.

133.   Upon information and belief, PHMSA has not prepared, and has no plans to prepare, a NEPA document analyzing the environmental consequences of approving any Response Plan that Enbridge ultimately submits.  Meanwhile, the irretrievable commitment of resources to the Project, in the form of Project construction, has begun and is ongoing.

### Fish and Wildlife Service's Role in the Approval of Flanagan South

134.   On or about June 27, 2013, the U.S. Fish and Wildlife Service's Missouri Ecological Services Field Office informed Sierra Club that the Service had received from the Corps and/or Enbridge a Biological Assessment describing the impacts of the proposed Project on species listed under the Endangered Species Act; and that the Service was preparing a Biological Opinion analyzing the impacts of the proposed Project on species listed under the Endangered Species Act.

36

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

135.     When, on or about June 27, 2013, the Sierra Club made an informal request for the Biological Assessment(s), draft Biological Opinion for the proposed Project, and any other project-related documents, the Service refused to share those documents with the Sierra Club.

136.     On or about July 24, 2013, the Service finalized and issued its Biological Opinion analyzing the proposed Project's impacts on the endangered Indiana Bat and American Burying Beetle and the threatened Decurrent False Aster.  In addition, on or about the same date, the Service finalized and issued an Incidental Take Statement allowing the "take" of these species for the proposed Project.  The Biological Opinion and Incidental Take Statement set forth alleged reasonable and prudent measures designed to minimize the impacts of the entire Project on the Indiana Bat and American Burying Beetle.  The measures related to the bat are addressed to the Corps and Enbridge, and the measures related to the beetle are addressed to the Bureau and Enbridge.

137.     Upon information and belief, the Service has not prepared, and has no plans to prepare, a NEPA document analyzing the environmental impacts of its Biological Opinion and Incidental Take Statement.

## Other Federal Regulatory Actions Related to Flanagan South

138.     In addition to the federal actions described above, several additional federal regulatory actions are indispensable prerequisites to the construction and operation of Flanagan South.

139.     In addition to its role in reviewing and approving Enbridge's Response Plan under the Oil Pollution Act, PHMSA is also responsible for setting minimum safety standards with which Enbridge must comply, including a requirement that Enbridge maintain and make

available to PHMSA information related to Project operations, including an emergency response plan describing Enbridge's procedures for responding to and containing releases.

140.    PHMSA also must ensure that Enbridge has in place procedures ensuring a prompt and effective response to emergencies, including explosions and accidental release, and ensuring the availability of personnel and equipment necessary to respond to an emergency. PHMSA also has extensive control over various details of Project operation, including regulation over the qualifications of pipeline operators.

141.    The U.S. Environmental Protection Agency ("EPA") must approve a spill prevention, control, and countermeasure ("SPCC") plan for the Project that covers Project construction and mitigation activities such as spills of diesel fuel from heavy equipment.  33 U.S.C. § 1321(j).  Enbridge or its contractors responsible for construction of the proposed Project will store or handle quantities of oil sufficient to subject Project construction to federal SPCC preparation requirements, and EPA must approve an SPCC plan prior to construction. 40 C.F.R. pt. 112.

142.    The proposed Project would also require easements to Enbridge to construct and operate Flanagan South across 34 tracts of federal Indian land, comprising approximately 13.6 miles of the proposed Project corridor, that are managed by the Bureau.  Upon information and belief, the Bureau has not yet issued temporary and permanent easements to cross these 34 tracts; and is preparing an EA for the portion of the pipeline that would cross the Indian land.

## CLAIMS FOR RELIEF

### CLAIM I

**Corps Violations of the Freedom of Information Act
and Administrative Procedure Act**

143.   The allegations made in all preceding paragraphs are realleged and incorporated by this reference.

### a)   Unlawful Denial of Sierra Club's FOIA Request for Documents on the Flanagan South Project

144.   In response to Sierra Club's FOIA requests and appeals, the Corps has withheld the requested information, including Enbridge's PCNs and supporting documents, invoking FOIA's Exemption 5 for deliberative process. U.S.C. §§ 552(b)(5).

145.   However, the provisions of FOIA's Exemption 5 do not apply to the information being withheld from Plaintiff in this case and FOIA's Exemption 5 is inapplicable to bar the information's release because the deliberative process privilege does not apply to documents prepared by outside entities such as Enbridge.

146.   Plaintiffs have a statutory right to the records they seek, and there is no legal basis for Defendant to assert that any of FOIA's nine disclosure exemptions apply.  *See* 5 U.S.C. § 552(b)(l)-(9).

147.   Plaintiffs have exhausted their administrative remedies pursuant to 5 U.S.C.A. § 552(a)(6)(c)(i) because the Corps failed to comply with the applicable time limit provisions contained in FOIA.

### b)   Violations of FOIA Deadlines

148.    The Corps violated Sierra Club's rights under FOIA by not providing a final determination on its appeal of the denial of its FOIA request within the time mandated by FOIA. FOIA, 5 U.S.C. §552, requires a response to an appeal within twenty days from the receipt of that appeal; however the Corps has still not responded to Sierra Club's appeals of the denials of its FOIA requests despite the passage of more than twenty days.

149.    The Corps' actions described above prejudice Sierra Club and prevent its professional activities, including disseminating the information to its members and the public and using the information in regards to the Flanagan South pipeline.

150.    The Sierra Club will continue to employ FOIA's provisions in information requests to the Corps in the foreseeable future; and its professional activities will be adversely affected if the Corps is allowed to continue violating FOIA as it has in this case.

151.    Unless enjoined and made subject to a declaration of Plaintiffs' legal rights by this Court, the Corps will continue to violate the rights of Plaintiffs to receive public records under the FOIA.

152.    Sierra Club has exhausted its administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(c)(i), or is unable to do so, because the Corps failed to comply with the applicable time limit provisions contained in FOIA.

153.    The Corps failure and refusal to provide to Sierra Club documents responsive to its information requests and appeals and the Corps' violations of the deadlines are in violation of FOIA's statutory mandates and are arbitrary, capricious, or an abuse of discretion and not in accordance with law contrary to the APA, 5 U.S.C. § 706(2); and/or constitute agency action unlawfully withheld and unreasonably delayed contrary to the APA, 5 U.S.C. § 706(1).

154.    Plaintiffs are entitled to reasonable costs of litigation, including attorneys' fees and costs for this claim pursuant to FOIA. 5 U.S.C. § 552(a)(4)(E).

## CLAIM II

### The Corps' Issuance of its Verifications and Easements
### Violate NEPA, the APA and Applicable Regulations

155.    Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

40

### a) Lack of NEPA Analysis of Corps' Verifications of the Project

156.     The Corps' Kansas City, Rock Island, and St. Louis Districts issued three verifications stating that the Project qualifies under NWP 12 and allowing the Project to go forward under § 404 of the Clean Water Act.

157.     The Project could not proceed as proposed without the Corps' verification of water crossings under NWP 12 and/or CWA § 404.

158.     In verifying the Project, each Corps district offices was required by NWP 12 to analyze the adverse environmental effects of individual water crossings as well as the cumulative environmental effects of the entire pipeline, including the sections of the Project located in the other Corps districts.

159.     The issuance of each of these verifications, and of the three verifications collectively, constituted major federal action significantly affecting the quality of the human environment, and NEPA therefore required that an EA and/or EIS be prepared for the verifications individually and/or collectively. 42 U.S.C. §4332(2)(C); 40 C.F.R. §§ 1501.4, 1501.8, 1508.13, 1508.18 and 1508.27.

160.     Although the Corps prepared a "Decision Document" and Finding of No Significant Impact for NWP 12, the Corps failed to prepare an EA or EIS or any NEPA document specifically for the verifications of the Project. The Corps has thus done no project-specific NEPA analysis examining the direct, indirect, and cumulative environmental effects of the verifications, including but not limited to the risks and impacts associated with crude oil spills.

### b) Lack of NEPA Analysis of Corps' Easements for the Project

161.     In addition, the Project cannot proceed as proposed without easements and/or rights-of-way across Corps land, including land adjacent to the Mississippi and Arkansas

41

Rivers. Based on information and belief, the Corps has already granted the easements to Enbridge. In the alternative, the Corps has not yet granted the easements but is allowing the Enbridge to proceed with construction before the easements have been granted and before required environmental review has been completed in violation of 40 C.F.R. § 1506.1.

162.   The issuance of each of these easements is subject to and must be reviewed under NEPA. The issuance of each of the easements constituted major federal action significantly affecting the quality of the human environment, and NEPA therefore required that an EA and/or EIS be prepared for each of the easements individually and/or collectively.  42 U.S.C. §4332(2)(C); 40 C.F.R. §§ 1501.4, 1501.8, 1508.13, 1508.18 and 1508.27.

163.   However, the Corps failed to prepare an EA and/or EIS, or any other NEPA document for the easements.  The Corps has thus done no NEPA analysis examining the environmental effects of its decision to allow a major tar sands oil pipeline to cross its land adjacent to major United States rivers.

164.   Because the Corps issued the verifications and/or easements without the required NEPA review, its actions were arbitrary and capricious and not in accordance with law and must be set aside under the APA, and/or the Corps' failure to prepare the required NEPA analysis constitutes agency action unlawfully withheld that must be judicially compelled under the APA.  5 U.S.C. §§ 706(1) and (2).

### CLAIM III

**The Service's Issuance of the Biological Opinions and
Incidental Take Permits Violate NEPA,
the APA and Applicable Regulations**

165.   Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

166.    On or about July 24, 2013, the U.S. Fish and Wildlife Service (the "Service") issued a Biological Opinion and Incidental Take Statement allowing the Corps, the Bureau of Indian Affairs (the "Bureau") and Enbridge to "take" the endangered Indiana Bat, American Burying Beetle and a threatened plant, the Decurrent False Aster, in connection with the Flanagan South project.

167.    Upon information and belief, the Corps and Enbridge are implementing the Biological Opinion and Incidental Take Statement.  For instance, the Corps has implemented the Incidental Take Statement through the issuance of its verifications. However, no NEPA assessment or documentation was prepared by the Service or the Corps or the Bureau in connection with the issuance, adoption and/or implementation of the Biological Opinion and Incidental Take Statement.

168.    The Service's Incidental Take Statement is functionally equivalent to a permit because the activity in question would, for all practical purposes, be prohibited but for the Incidental Take Statement. In addition, the Biological Opinion and Incidental Take Statement are binding upon the action agencies and they bear responsibility for imposing their conditions upon Enbridge.

169.    The Biological Opinion and Incidental Take Statement constitute "major Federal action significantly affecting the quality of the human environment" under NEPA. 42 U.S.C. § 4332(2)(C).  As such, the Service was required to assess their environmental impacts, either in an EA or an EIS. 42 U.S.C. §4332(2)(C); 40 C.F.R. §§ 1501.4, 1501.8, 1508.13, 1508.18 and 1508.27.

170.    However, the Service did not prepare an EA or EIS, or any NEPA analysis before issuing the Biological Opinion and Incidental Take Statement.  The Service's failure to do so violated NEPA; was arbitrary and capricious and not in accordance with law and the

43

Biological Opinion and Incidental Take Statement must be set aside under the APA; and the lack of NEPA analysis constitutes agency action unlawfully withheld which must be judicially compelled under the APA.  5 U.S.C. §§ 706(1) and (2).

171.    In addition, the Corps did not prepare any NEPA analysis for the Biological Opinion and Incidental Take Statement. This further demonstrates that the Corps must perform an EA or EIS on its verifications and/or easements, *i.e.* they are NEPA triggering actions, and that the Biological Opinion and Incidental Take Statement must be addressed by the Corps in that analysis.  The Corps failure to do so is contrary to NEPA and its implementing regulations set forth above, and is arbitrary and capricious and not in accordance with law and/or constitutes agency action unlawfully withheld which must be judicially compelled under the APA.  5 U.S.C. §§ 706(1) and (2).

## CLAIM IV

**PHMSA's Failure to Review Enbridge's Response Plan Under NEPA Prior to the Commencement of Project Construction Violated NEPA and the APA**

172.    Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

173.    PHMSA has an obligation under the Oil Pollution Act to review and approve Enbridge's Response Plan.

174.    The Project cannot begin operation until PHMSA approves the Response Plan, unless PHMSA grants Enbridge an exception authorizing it to "operate without a response plan . . . until not later than 2 years after the date of the submission to the President of a plan" pursuant to  33 U.S.C. § 1321(j)(5)(G).

175.    PHMSA's approval of Enbridge's Response Plan under the Oil Pollution Act is subject to review under NEPA.  PHMSA's approval of Enbridge's Response Plan under the Oil

Pollution Act, and/or it's granting of a waiver pursuant to 33 U.S.C. § 1321(j)(5)(G), is a "major Federal action significantly affecting the quality of the human environment" under NEPA. 42 U.S.C. § 4332(2)(C). As such, this approval requires the preparation of an EA or EIS. *Id*; 40 C.F.R. §§ 1501.4, 1501.8, 1508.13, 1508.18 and 1508.27.

176.   Under NEPA, environmental review must be conducted *before* resources are irreversibly and irretrievably committed to the action under review.  42 U.S.C. § 4332(C); 40 C.F.R. § 1501.2.  Accordingly, PHMSA is required to prepare a NEPA document analyzing the environmental impacts of the proposed Flanagan South Project *before* funds are expended to construct and operate Flanagan South.

177.   Upon information and belief, PHMSA has failed to review and approve Enbridge's Response Plan and failed to even require Enbridge to submit a Response Plan prior to construction and operation of the Project.  PHMSA has also failed to prepare a NEPA analysis supporting its approval decision.  These actions violate NEPA's requirement that required environmental review be conducted before resources are irretrievably committed to the Project because they allow the Project to be built and begin to operate before significant oil spill risks are ever reviewed.

178.   PHMSA's authorization of a massive pipeline carrying toxic and corrosive substances to operate without a response plan under 33 U.S.C. § 1321(j)(5)(G) also constitutes major federal action that must be reviewed under NEPA prior to Project construction.

179.   PHMSA's failure to require Enbridge to submit a Response Plan; its failure to review, approve, and analyze the plan under NEPA prior to Project construction; and its authorization of a massive tar sands pipeline to operate without a response plan under § 1321(j)(5)(G) violate NEPA; are arbitrary and capricious and not in accordance with law and

must be set aside under the APA; and constitute agency action unlawfully withheld which must

be judicially compelled under the APA. 5 U.S.C. § 706(1) and/or (2).

### CLAIM V

**The Actions of the Corps, the Service, PHMSA and the Other Federal Agencies
Collectively Constitute Major Federal Action Requiring NEPA Analysis of the Entire
Pipeline and Designation of a Lead Agency to Perform this Analysis**

180.   Plaintiffs reallege, as if fully set forth herein, each and every allegation

contained in the preceding paragraphs.

181.   As set forth above, numerous federal actions by several federal agencies,

including various approvals and regulatory and oversight actions, are required before the

proposed Project can be lawfully constructed and operated.  These actions, taken together,

establish a comprehensive and far-reaching federal oversight and approval regime that control

the Project's construction and operation.  They include but are not limited to the following:

a.    The Corps, acting pursuant to its authority to approve dredge and fill in waters

of the United States under Clean Water Act § 404, adopted NWP 12; and three of the four

responsible Corps districts have issued verifications that the proposed Project may be

constructed and operate in over one thousand jurisdictional waterways under NWP 12;

b.    The Corps granted Enbridge easements allowing its proposed Project to cross

Corps land;

c.    The Service, acting pursuant to its mandate to review the impacts of agency

actions that may affect species listed under the Endangered Species Act, issued a Biological

Opinion and Incidental Take Statement specifying the listed species "take" that may occur for

the proposed Project;

46

d.      PHMSA is required to review and approve the oil spill Response Plan for the proposed Project under the Oil Pollution Act, and has broad authority to oversee and regulate minute details of Project operations under the Pipeline Safety Act;

e.      The Bureau issues easements allowing the Project across Indian land, and upon information and belief is conducting an EA for the easements; and

f.      EPA approved a spill prevention, control, and countermeasure plan that covers Project construction and mitigation activities such as spills of diesel fuel from heavy equipment, under Clean Water Act section 311.

182.    These federal actions, singly, in combination, and cumulatively constitute major federal action and thus trigger the requirement under NEPA that the Corps prepare an EA and/or EIS for the *entire* Flanagan South Project, including all water crossings and easements and all uplands portions of the project, pursuant to 40 C.F.R. § 1508.25(a)(1)(iii), 33 C.F.R. § 325 App. B, 40 C.F.R. § 1508.9, and/or 40 C.F.R. § 1501.4.

183.    This NEPA analysis must include the portions of the Project that occur on private land, or portions of the pipeline for which no federal permit allegedly is required, as they are connected to, or interrelated with, the portions over which the federal agencies have control. *Id.*

184.    The various agency actions are related or connected to one another, and the Project is one connected action, that must be addressed in one EA and/or EIS. 40 C.F.R. §1508.25(a)(1)(iii).

185.    Until this NEPA analysis is complete, the federal agencies have no authority to issue the federal permits, licenses, and/or authorizations that Enbridge must obtain.

186.    Nevertheless, no federal agency has prepared an EA or EIS that covers the entire proposed Project.  Each federal agency responsible for overseeing, regulating, and

47

approving the proposed Project either has already issued the approvals or finalized the oversight actions for which it is responsible without the required NEPA review, or, if some NEPA review has been done, it did not cover the entire project.

187.     At a minimum, the Corps and the other agencies were required under 40 C.F.R. § 1501.5(C) to determine which agency would act as the "lead agency" and prepare a NEPA analysis for the entire Project, but did not.  As a result, no federal agency is acting as the lead agency and no NEPA analysis is being prepared for the Flanagan South pipeline as a whole and complete project.

188.     The federal agencies have thus allowed resources to be irretrievably committed to the proposed Project before the conclusion of the NEPA process required for its approvals or oversight actions, contrary to 40 C.F.R. §1506.1.

189.     In sum, the agency failures to designate a lead agency and prepare a NEPA analysis for the entire project violate NEPA and the applicable regulations; are arbitrary and capricious and not in accordance with law and must be set aside under the APA; and the failure to comply with NEPA constitutes agency action unlawfully withheld which must be judicially compelled under the APA. 5 U.S.C. §706(1) and/or (2).

## CLAIM IV

### The Corps' Verifications of the Project Violate NWP 12, Clean Water Act §404(e), the APA and Applicable Regulations

190.     Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

191.     On or about August 12, 2013, the Rock Island, St. Louis, and Kansas City districts notified Enbridge that construction of the Project in United States waters meets the terms and conditions of NWP 12 and that the Project is authorized to proceed under NWP 12.

48

192. The verifications violate section 404(e) of the Clean Water Act, the terms and conditions of NWP 12, and are arbitrary and capricious and not in accordance with law under the APA for the following reasons:

a. Based on the information contained in the Corps' Kansas City District's verification of the Project under NWP 12, and contrary to the requirements of NWP 12, 77 Fed. Reg. 10,184, 10,271, some of the Project's individual crossings would result in the loss of more than one-half acre of waters of the United States.

b. Upon information and belief, and contrary to Clean Water Act section 404(e) and NWP 12, the Project would have more than minimal individual and cumulative environmental effects, whether measured crossing by crossing, watershed-wide, pipeline-wide, or region-wide.

c. Upon information and belief, and based on the verification issued by the Kansas City District of the Corps, the Corps' verifications fail to make the cumulative effects determination required under NWP 12.

d. The verifications violate the interagency coordination requirements of NWP 12. NWP 12's General Condition 31(d)(2) requires coordination with other resource agencies, including the EPA, on "all NWP activities that require pre-construction notification and result in the loss of greater than 1⁄2-acre of waters of the United States." The Project would result in the loss of far more than half an acre of waters of the United States, both cumulatively and at individual crossings, but, upon information and belief, the required interagency coordination has not taken place.

e. The verifications violate the General Condition 7, which states: "No activity may occur in the proximity of a public water supply intake, except where the activity is for the repair or improvement of public water supply intake structures or adjacent bank stabilization."

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Flanagan South requires the construction and operation in United States waters in the proximity of at least three public water supply intakes.

       f.      The Project is ineligible for authorization under NWP 12 and the Corps' verification of the Project under NWP 12 was improper.  Instead, the Corps is required to issue an individual Clean Water Act § 404 permit for the Project pursuant to 33 U.S.C. § 1344(a) before the Project can proceed.

       193.    For these reasons, the Corps' verification of the Project under NWP 12 is arbitrary and capricious and not in accordance with law and must be set aside under the APA, 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

      **WHEREFORE,** Plaintiffs request this Court to find for Plaintiffs and to enter a judgment:

      a)      Declaring the Corps' verifications of the Project under NWP 12 null and void and in violation of the APA, the Clean Water Act, and NEPA;

      b)      Declaring the decisions by the Corps to grant Enbridge easements allowing it to cross Corps to be null and void and in violation of the APA and NEPA;

      c)      Declaring the Service's issuance of its Biological Opinion and Incidental Take Statement to be null and void and in violation of the APA and NEPA;

      d)      Declaring PHMSA's approval of the Response Plan or exception thereto is  null and void and in violation of the APA and NEPA;

      e)      Declaring that the federal agencies' failure to designate a lead agency and prepare a NEPA analysis that covers the entire Flanagan South project is arbitrary and capricious and violates NEPA;

f)     Pursuant to the APA, 5 U.S.C. §706(2), setting aside and vacating (i) all Corps' verifications of the Project under NWP 12; (ii) all Corps and Bureau easements for the Project; and (iii) the Biological Opinion and Incidental Take Statement for the Project, and enjoining the Corps, the Bureau, and the Service from further approving or authorizing the Flanagan South Project;

g)     Issuing permanent and preliminary injunctions enjoining Enbridge from conducting any activities in reliance on the Corps verifications and easements, the Bureau easements, and the Service's Biological Opinion and Incidental Take Statement, including but not limited to any ground disturbance, excavation, dredging, filling, or other alterations of waters of the United States, or any activities that may affect the species covered by the Biological Opinion and Incidental Take Statement;

h)     Ordering PHMSA to complete its review and approval of the Oil Pollution Act Response Plan for the Project, including review under NEPA, prior to the commencement of Project construction;

i)     Issuing preliminary and permanent injunctions on construction and operation of the Flanagan South pipeline unless and until Defendants fully comply with NEPA, the Clean Water Act, and the APA;

j)      Declare the Corps' failure to disclose the documents requested by Plaintiffs to be unlawful under the FOIA, 5 U.S.C. § 552(a)(4)(A)(iii), as well as agency action unlawfully withheld and unreasonably delayed, 5 U.S.C. § 706(1), and/or arbitrary, capricious, an abuse of discretion, and not in accordance with law, 5 U.S.C. § 706(2);

k)      Declare the Corps' failure to timely make a determination on Plaintiffs' information request and appeal to be unlawful under the FOIA, 5 U.S.C. § 552(a)(6)(A)(ii), as well as agency action unlawfully withheld and unreasonably delayed, 5 U.S.C. § 706(1), and/or

arbitrary, capricious, an abuse of discretion, and not in accordance with law, 5 U.S.C. § 706(2);

l)        Issuing preliminary and permanent injunctions ordering the Corps to
immediately provide all records responsive to Sierra Club's FOIA requests;

m)       Awarding Plaintiffs their costs, expenses and attorneys' fees for their FOIA
claim under FOIA; and for all other claims under the Equal Access to Justice Act, 28 U.S.C. §
2412, 5 U.S.C.A. § 552(a)(4)(E)(i), and other applicable law; and

n)        Providing for such other relief as the Court deems just and appropriate.

DATED:  August 22, 2013

Respectfully submitted,

*/s/ Joshua Stebbins*
JOSHUA STEBBINS,
D.C. Bar No. 468542
SIERRA CLUB
50 F Street NW, 8th Floor
Washington, DC 20001
(202) 675-6273
josh.stebbins@sierraclub.org

*/s/ Douglas Hayes*
DOUGLAS HAYES, Colo. Bar No. 39216
(admitted *pro hac vice*)
ERIC HUBER, Colo. Bar No. 40664
(admitted *pro hac vice*)
SIERRA CLUB
1650 38th Street, Suite 102W
Boulder, Colorado 80301
(303) 449-5595
(303) 449-6520 (fax)
doug.hayes@sierraclub.org
eric.huber@sierraclub.org

JAMES MURPHY, Vt. Bar No. 3367
(application for admission *pro hac vice* pending)
NATIONAL WILDLIFE FEDERATION
149 State Street
Montpelier, VT 05602
(802) 552-4325
jmurphy@nwf.org

*Attorneys for Plaintiffs*

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF