## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SIERRA CLUB,** and<br><br>**NATIONAL WILDLIFE FEDERATION**,<br><br>     Plaintiffs,<br><br><br>      vs.<br><br><br>**LIEUTENANT GENERAL THOMAS P. BOSTICK** (in his official capacity as Commanding General and Chief of Engineers of the U.S. Army Corps of Engineers), *et al.*,<br><br>and<br><br>**ANTHONY FOXX** (in his official capacity as Secretary of the United States Department of Transportation), *et al.*,<br><br>and<br><br>**DANIEL M. ASHE** (in his official capacity as Director of the United States Fish and Wildlife Service), *et al.*,<br><br>and<br><br>**SALLY JEWELL** (in her official capacity as Secretary of the Interior), *et al.*,<br><br>and<br><br>**GINA MCCARTHY** (in her official capacity as Administrator of the Environmental Protection Agency), *et al.*,<br><br>     Defendants. | **Case No. 1:13-cv-1239 KBJ**<br><br><br><br><br><br>**MOTION FOR PRELIMINARY INJUNCTION**<br><br><br>**Oral Argument Requested** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ i

MOTION FOR PRELIMINARY INJUNCTION ........................................................................ 1

STATEMENT OF SPECIFIC POINTS OF LAW AND AUTHORITY IN
SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION ................................................ 2

I.     INTRODUCTION ............................................................................................. 2

II.    STATEMENT OF FACTS ................................................................................. 3

       A.     Description of the Flanagan South Project and its Environmental
              Impacts ................................................................................................. 3

       B.     Federal Agency Actions and Lack of NEPA Analysis ............................ 5

              1.     The Corps' Verifications, Easements and Lack of
                     Cumulative Effects  Analysis ....................................................... 5

              2.     FWS Biological Opinion and Incidental Take Statement ............ 6

              3.     Other Federal Agency Actions .................................................... 7

       C.     Denial of Sierra Club's FOIA Requests and Lack of Public
              Participation ......................................................................................... 8

III.   STANDARD OF REVIEW ................................................................................ 9

IV.    ARGUMENT AND CITATION OF AUTHORITY ................................................. 10

       A.     Plaintiffs are Likely to Succeed on the Merits ................................... 10

              1.     The Corps Violated the Freedom of Information Act ............... 10

              2.     Federal Defendants Violated NEPA by Failing to Prepare
                     an Environmental Impact Statement or Environmental
                     Assessment for Flanagan South ................................................ 12

                     a.     The Corps' Actions Approving Flanagan South
                            Constitute Major Federal Action Requiring a NEPA
                            Analysis ......................................................................... 13

                            i.     The Corps' Verifications Constitute Major
                                   Federal Action ............................................... 13

                            ii.    The Corps' Easements/Rights-of-Way
                                   Constitute Major Federal Action Triggering
                                   NEPA .............................................................. 16

                            iii.   The NWP 12 Decision Document Does Not
                                   Excuse the Lack of NEPA Analysis for the

Corps' Verifications, Easements or the
Project Overall. ...........................................................17

  iv. The Corps Must Analyze the Impacts of the
Entire Project in its NEPA Analysis................................19

 b. The Fish and Wildlife Service's Biological Opinion
and Incidental Take Statement Constitute Major
Federal Action Requiring NEPA Analysis...................................21

 c. PHMSA's Approval of Response Plan Constitute
Major Federal Action Requiring NEPA Analysis ......................22

 d. The Cumulative Federal Involvement Constitutes
Major Federal Action ...................................................24

 e. The Federal Defendants Individually and
Collectively Violated NEPA .......................................27

  i. Failure to Pick a Lead Agency .........................................27

  ii. Failure to Prepare an EA and/or EIS that
Analyzed the Impacts of the Entire Pipeline ...................28

  iii. Allowing an Irretrievable Commitment of
Resources ...............................................................29

 3. The Corps' Verification of Flanagan South Violates
Nationwide Permit 12 and was Arbitrary and Capricious
and Violated the CWA ........................................................30

B. Immediate and Irreparable Harm in the Absence of an Injunction.....................32

C. The Balance of Equities Decidedly Tips in Plaintiffs' Favor..............................36

D. The Public Interest Favors Issuance of a Preliminary Injunction.......................41

V. CONCLUSION ....................................................................45

# TABLE OF AUTHORITIES

**Cases**

*Alaska Center for the Environment v. West,*
   31 F.Supp.2d 711 (D. Alaska 1998)......................................................................40

*Alaska Conservation Council v. U.S Army Corps of Eng'rs,*
   472 F.3d 1097 (9th Cir. 2006) ............................................................................40

*All Indian Pueblo Council v. United States,*
   975 F.2d 1437 (10th Cir. 1992) ..........................................................................16

*Amoco Prod. Co. v. Vill. of Gambell,*
   480 U.S. 531, 545 (1987) ...........................................................................34, 36

*Assassination Archives & Research Ctr. v. CIA,*
   334 F.3d 55 (D.C.Cir.2003)...............................................................................10

*California ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency,*
   766 F.2d 1319 (9th Cir. 1985) ............................................................................45

*Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior,*
   344 F. Supp. 2d 108 (D.D.C. 2004) ....................................................................25

*Catron Cty. Bd. of Commissioners v. United States Fish & Wildlife Serv.,*
   75 F.3d 1429 (10th Cir.1996) .............................................................................35

*Citizen's Alert Regarding Env't v. U.S. Dep't of Justice,*
   1995 WL 748246, *11 (D.D.C. 1995)...................................................................42

*Colo. Wild Inc. v. U.S. Forest Serv.,*
   523 F. Supp. 2d 1213 (D. Colo. 2007) ................................................................42

*Colo. Wild v. U.S. Forest Serv.,*
   299 F. Supp. 2d 1184 (D. Colo. 2004) ................................................................45

*Ctr. for Int'l Envtl. Law v. Office of U.S. Trade Representative,*
   237 F. Supp. 2d 17 (D.D.C. 2002) ......................................................................11

*Davis v. Mineta,*
   302 F.3d 1104 (10th Cir. 2002) ...............................................................40, 41, 44

*Dep't of Interior v. Klamath Water Users Protective Ass'n,*
   532 U.S. 1 (2001)......................................................................................10, 11

*Dep't of Transp. v. Pub. Citizen,*
   541 U.S. 752 (2004) ........................................................................................14

*

i

*Flint Ridge Development Co. v. Scenic Rivers Ass'n of Oklahoma,*
   426 U.S. 776 (1976) ........................................................................................25

*Florida Audubon Soc. v. Bentsen,*
   94 F.3d 658 (D.C. Cir. 1996) ..............................................................................9

*Fund for Animals v. Clark,*
   27 F.Supp.2d 8, 14 (D.D.C. 1998) ...............................................................34, 41

*Fund for Animals v. Espy,*
   814 F. Supp. 142, 151 (D.D.C. 1993) ...........................................................34, 41

*Fund for Animals v. Norton,*
   281 F. Supp. 2d 209 (D.D.C. 2003) .........................................29, 34, 36, 40, 41

*Fund for Animals, Inc. v. Rice,*
   85 F.3d 535 (11th Cir. 1996) ...........................................................................15

*Grand Canyon Trust v. FAA,*
   290 F.3d 339 (D.C. Cir. 2002) ..........................................................................10

*Greater Yellowstone Coal. v. Flowers,*
   321 F.3d 1250, 1258 (10th Cir. 2003) ..............................................................35

*Greater Yellowstone Coal. v. Flowers,*
   359 F.3d 1257 (10th Cir. 2004) .......................................................................22

*Hammond v. Kempthorne,*
   448 F. Supp. 2d 114 (D.D.C. 2006) ..................................................................16

*Harrison v. U.S. Dep't of Army,*
   CIV.A. 3:08CV-105-H, 2009 WL 3347109 (W.D. Ky. Oct. 14, 2009)..................16

*Hooker v. U.S. Dep't of Health & Human Servs.,*
   887 F. Supp. 2d 40 (D.D.C. 2012) ....................................................................11

*Humane Soc. of U.S. v. Bryson,*
   924 F. Supp. 2d 1228 (D. Or. 2013)..................................................................22

*Humane Soc. of U.S. v. Johanns,*
   520 F. Supp. 2d 8 (D.D.C. 2007) ......................................................................12

*Humane Soc. of U.S. v. Kempthorne,*
   481 F. Supp. 2d 53, 69 (D.D.C. 2006) ..............................................................34

*In re Consolidated Salmonid Cases,*
   688 F. Supp. 2d 1013 (E.D. Cal 2010) ..............................................................15

*

ii

*Int'l Broth. of Teamsters v. U.S. Dept. of Transp.*,
714 F.3d 580 (D.C. Cir. 2013) ..............................................................38

*Johnson v. U.S.D.A.*,
734 F.2d 774 (11th Cir. 1984) ..............................................................41

*Jones v. Dist. of Columbia Redevelopment Land Agency*,
499 F.2d 502 (D.C. Cir. 1974) ..............................................................44

*Judicial Watch, Inc. v. U.S. Dep't of Treasury*,
796 F. Supp. 2d 13 (D.D.C. 2011) ..........................................................11

*Kansas v. Adams*,
705 F.2d 1267 (10th Cir. 1983) ............................................................44

*Kern v. BLM*,
284 F.3d 1062 (9th Cir. 2002) ..............................................................43

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ..........................................................................38

*Lujan v. National Wildlife Federation*,
497 U.S. 871 (1990) ..........................................................................10

*Maryland Native Plant Soc'y v. U.S. Army Corps of Engineers*,
332 F. Supp. 2d 845 (D. Md. 2004) ....................................................30, 31

*Mobil Oil Corp. v. F.T.C.*,
562 F.2d 170 (2d Cir.1977) ..................................................................29

*Montana Wilderness Ass'n v. Fry*,
310 F.Supp.2d 1127 (D.Mont. 2004) ......................................................43

*Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975) ..........................................................................11

*Nat'l Wildlife Fed'n v. Burford*,
835 F.2d 305 (D.C. Cir. 1987) ..............................................................44

*Nat'l Sec. Archive v. C.I.A.*,
859 F. Supp. 2d 65 (D.D.C. 2012) ..........................................................11

*Natural Resources Defense Council v. Morton*,
337 F. Supp. 167 (D.D.C. 1971) ............................................................45

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
565 F.3d 683 (10th Cir. 2009) ..............................................................31

\*

iii

*

*Ocean Advocates v. U.S. Army Corps of Engineers,*
   402 F.3d 846 (9th Cir. 2005) .................................................................18

*Or. Natural Desert Ass'n v. Bureau of Land Management,*
   531 F.3d 1114 (9th Cir. 2008) ..............................................................31

*Ouachita Watch League v. Jacobs,*
   463 F.3d 1163 (11th Cir. 2006) ............................................................38

*Pennaco Energy Inc. v. U.S. Dept. of Interior,*
   377 F.3d 1147 (10th Cir. 2004) ............................................................43

*Ramsey v. Kantor,*
   96 F.3d 434 (9th Cir. 1996) ...................................................... 13, 21, 22

*Rapanos v. United States,*
   547 U.S. 715, 777 (2006) .....................................................................42

*Realty Income Trust v. Eckerd,*
   564 F.2d 447 (D.C. Cir. 1977) .............................................................44

*Sampson v. Murray,*
   415 U.S. 61 (1974) ...............................................................................40

*San Luis & Delta-Mendota Water Auth. v. Salazar,*
   686 F. Supp. 2d 1026 (E.D. Cal. 2009) ...............................................15

*San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.,*
   657 F. Supp. 2d 1233 (D. Colo. 2009) .................................................39

*Seattle Audubon Society v. Evans,*
   771 F. Supp. 1081 (W.D. Wash. 1991) ...............................................43

*Sierra Club v. Clinton,*
   689 F. Supp. 2d 1123 (D. Minn. 2010) ...............................................27

*Sierra Club v. Mainella,*
   459 F. Supp. 2d 76 (D.D.C. 2006) ................................................14, 20

*Sierra Club v. Marsh,*
   872 F.2d 497 (1st Cir. 1989).....................................................34, 35, 41

*Sierra Club v. Martin,*
   933 F. Supp. 1559, 1570–71 (N.D. Ga. 1996).....................................35

*Sierra Club v. Peterson,*
   717 F.2d 1409 (D.C. Cir. 1983) ....................................................23, 29

*

*Sierra Club v. Sigler*,
  695 F.2d 957 (5th Cir. 1983) .................................................................18

*Silverton Snowmobile Club v. U.S. Forest Serv.*,
  433 F.3d 772 (10th Cir. 2006) ..............................................................43

*Snoqualmie Valley Pres. Alliance v. U.S. Army Corps of Engineers*,
  683 F.3d 1155 (9th Cir. 2012) ..............................................................14

*Spiller v. Walker*,
  A-98-CA-255-SS, 2002 WL 1609722, (W.D. Tex. July 19, 2002).........................24

*Spiller v. Walker*,
  No. A-98-CA-255-SS, 1998 U.S. Dist. LEXIS 18341
  (W. D. Texas, Aug. 25, 1998)..........................17, 19, 23, 24, 26, 43

*Spiller v. White*,
  352 F.3d 235 (5th Cir. 2003) .................................................................43

*Stop the Pipeline v. White*,
  233 F. Supp. 2d 957 (S.D. Ohio 2002)..................................................18

*Utahns For Better Transp. v. U.S. Dept. of Transp.*,
  2001 WL 1739458 (10th Cir. Nov. 16, 2001) .......................................42

*Utahns for Better Transp. v. U.S. Dept. of Transp.*,
  305 F.3d 1173 (10th Cir. 2002) .....................................................21, 29

*Vaughn v. Rosen*,
  523 F.2d 1136 (D.C. Cir. 1975).............................................................11

*Westlands Water Dist. v. U.S. Dep't of Interior, Bureau of Reclamation*,
  850 F. Supp. 1388 (E.D. Cal. 1994).................................................22, 26

*White Tanks Concerned Citizens, Inc. v. Strock*,
  563 F.3d 1033 (9th Cir. 2009) ..............................................................20

*Wilderness Watch v. Mainella*,
  375 F.3d 1085 (11th Cir. 2004) ............................................................41

*Wilderness Workshop v. U.S. Bureau of Land Management*,
  531 F.3d 1220 (10th Cir. 2008) ............................................................28

*Winnebago Tribe of Nebraska v. Ray*,
  621 F.2d 269 (8th Cir. 1980) ................................................................20

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).............................................................................1, 32

*Wyoming Outdoor Council v. U.S. Corps of Engineers,*
   351 F. Supp. 2d 1232 (D.Wyo. 2005) .................................................................13


**Statutes**

16 U.S.C. § 1536 ..................................................................................................6, 7

30 U.S.C. § 185 ......................................................................................................16

33 U.S.C. § 1251 .................................................................................................9, 42

33 U.S.C. § 1321 .............................................................................. 7, 19, 22, 23, 25

33 U.S.C. § 1344 .................................................................................................9, 14

42 U.S.C. § 4321 ......................................................................................................2

42 U.S.C. § 4332 .............................................................................. 12, 23, 29, 43

49 U.S.C. § 60102 ...................................................................................................25

49 U.S.C. § 60108 ...................................................................................................25

5 U.S.C. § 552 ...............................................................................................8, 10, 12

5 U.S.C. § 706 .............................................................................................10, 24, 30


**Regulations**

33 C.F.R. § 320.4 ....................................................................................................42

33 C.F.R. § 325 .................................................................................................19, 20

33 C.F.R. § 327.4 ......................................................................................................9

40 C.F.R. § 1500.1 ...............................................................................................9, 39

40 C.F.R. § 1500.2 ....................................................................................................9

40 C.F.R. § 1501.2 .............................................................................................29, 43

40 C.F.R. § 1501.4 .............................................................................................12, 39

40 C.F.R. § 1502.14 .................................................................................................43

40 C.F.R. § 1502.22 ................................................................................................................43

40 C.F.R. § 1506.1 ............................................................................................... 17, 24, 29, 30

40 C.F.R. § 1506.6 ..................................................................................................................9

40 C.F.R. § 1508.18 ............................................................. 12, 13, 15, 21, 23, 24, 26, 27

40 C.F.R. § 1508.20 ..............................................................................................................13

40 C.F.R. § 1508.25 ..........................................................................................................13, 28

40 C.F.R. § 1508.27 ......................................................................................... 12, 13, 26

40 C.F.R. § 1508.7 ................................................................................................................13

40 C.F.R. § 1508.8 ................................................................................................................13

40 C.F.R. § 1508.9 ................................................................................................................12

40 C.F.R. § 230.10 ................................................................................................................14

40 C.F.R. § 230.5 ..................................................................................................................14

40 C.F.R. §1501.5 ................................................................................................................27

50 C.F.R. § 402.15 ..........................................................................................................15, 16

## Other Authorities

77 Fed. Reg. 10,260 ................................................................................................................6

77 Fed. Reg. 10,271 ................................................................................................................5

77 Fed. Reg. 10,283 ..............................................................................................................32

77 Fed. Reg. 10,287 ...................................................................................................... 6, 14, 30

Exec. Order 12,777 ................................................................................................................23

Exec. Order 13,337 ................................................................................................................27

## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

Plaintiffs Sierra Club and National Wildlife Federation, pursuant to Fed. R. Civ. P. 65(a), hereby respectfully move for a preliminary injunction staying the U.S. Army Corps of Engineers' verifications and easements for the Flanagan South tar sands oil pipeline, the U.S. Fish and Wildlife Service's Incidental Take Statement, as well as the easements and actions of other federal defendants authorizing the project, and enjoining construction and operation of the pipeline.  Plaintiffs have conferred with opposing counsel and Defendants oppose this motion. Plaintiffs state:

1)      Plaintiffs satisfy each of the four elements for a preliminary injunction: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tips in their favor, and (4) an injunction would be in the public interest. *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

2)      This Motion is based on: a) the following Statement of Specific Points of Law and Authority in support; b) the exhibits filed herewith; c) Plaintiffs' Amended Complaint and d) all other materials properly of record at the time of this Court's hearing on this motion.

**WHEREFORE**, Plaintiffs respectfully request that the Court issue a preliminary injunction suspending the federal actions at issue and  enjoining Enbridge Pipelines LLC and all of its agents, officers, employees and anyone acting in concert with it, from construction and operation of the Flanagan South pipeline pending a final ruling on the merits. Plaintiffs request oral argument. A proposed order is attached.

**STATEMENT OF SPECIFIC POINTS OF LAW AND AUTHORITY IN
SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## I.   INTRODUCTION

Plaintiffs request this Court maintain the *status quo* pending a resolution of this case on the merits by issuing a preliminary injunction enjoining the federal actions enabling the construction and operation of the Flanagan South Pipeline (the "Pipeline" or the "Project"). The Pipeline is a controversial 593-mile pipeline clearing an 85 to 135-ft. right of way across the states of Illinois, Missouri, Kansas and Oklahoma. The Pipeline would transport heavy Canadian tar sands crude oil across nearly two thousand streams and wetlands, putting them and the communities and ecosystems in the Pipeline's path at risk of being contaminated by crude oil leaks and spills.

The defendant U.S. Corps of Engineers (the "Corps") has wrongfully withheld all documents from Sierra Club that were requested under the Freedom of Information Act, which would reveal the scope and impacts of the project. The Corps also circumvented all public participation and environmental review requirements by issuing verifications of the project under its Nationwide Permit 12 ("NWP 12"), without analyzing the verifications or the requisite easements across Corps' property under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et. seq*. The Corps did not give public notice of, or opportunity to comment on, the applicant Enbridge's pre-construction notifications or the Corps' approvals, much less any opportunity for public hearings. In this process, the Corps also violated NWP 12 itself, by failing to perform a cumulative impacts analysis across the four Corps districts that have approved the Pipeline.

In addition, the defendant U.S. Fish and Wildlife issued an Incidental Take Statement allowing the "take" of certain threatened and endangered species and their habitat along the

Pipeline's route – also without any NEPA analysis. And, despite numerous actions by several federal agencies approving and regulating this Pipeline, they have failed individually and collectively to designate a "lead agency" and prepare a NEPA analysis that covers the environmental impacts of the entire Pipeline. Accordingly, Plaintiffs are asking the Court to enforce the federal laws and issue a preliminary injunction suspending the federal actions at issue and enjoining the ongoing construction of the Pipeline, pending a ruling on the merits.

## II.     STATEMENT OF FACTS

### A.     Description of the Flanagan South Project and its Environmental Impacts

The action at issue in this case is the construction, operation and maintenance of Enbridge Pipeline LLC's Flanagan South Pipeline. Based on the Biological Opinion and Incidental Take Statement issued by the U.S. Fish and Wildlife Service (the "Service," or "FWS"), this would be a 36-inch diameter pipeline that would traverse approximately 593 miles though Illinois, Missouri, Kansas and Oklahoma. It would transport approximately 600,000 barrels per day of heavy Canadian tar sands crude oil to refineries in the Midwest and the U.S. Gulf Coast. Exhibit ("Ex.") G at 2. Construction began on or about August 14, 2013. Ex. F. Enbridge's initial construction will take place over the next nine months and clean-up and restoration are projected to be complete by the end of summer 2014. Ex. G at 58. Operation is projected to occur over the next 50 years. Ex. G at 2.

This Pipeline is a major industrial project that will transport tar sands oil through 1,950 water crossings across four Corps districts. Ex. G at 10; Amended Complaint, ¶ 96. The right-of-way ("ROW") will be up to 135 ft. wide, or 110 ft. wide in "emergent wetlands and heavily forested uplands," and 85 ft. wide in "scrub/shrub and forested wetlands." Ex. G at 14, 27. A "50-ft permanent ROW" will be established and Enbridge will prevent trees from re-growing

3

for the next 50 years. *Id*. In Missouri alone, approximately 208 miles of pipeline would be installed, and construction is estimated to "permanently and temporarily impact approximately 62,840 linear feet of stream [nearly 12 miles] equaling an area of 24.91 acres and approximately 38.23 acres of wetland." Ex. E at 30 *et. seq*.  In addition to the Pipeline, the Project will include the construction of pump stations and valve sites, pipe storage yards, access roads, and contractor yards. Ex. G at 2.

Although the Corps refused to produce environmental documents in response to Sierra Club's requests, the documents that Sierra Club was able to obtain from other sources reveal that construction of the Flanagan South pipeline will destroy forests and plants and kill fish and wildlife.  For example, the Service found that the Project would kill and harm certain endangered and threatened species, namely the endangered American burying beetles, Indiana bats and a plant, the decurrent false aster. Ex. G at 3. And, although no agency prepared an EIS for this project, the State Department prepared one for the similar proposed Keystone XL pipeline, which describes the significant harm to soils and sediments, surface water and groundwater, wetlands, vegetation, wildlife, fisheries, land use, recreation and special interest areas, visual areas, air quality and noise, risks from spills, and cumulative impacts that result from the construction, operation of maintenance of a major tar sands oil pipeline such as this one. Ex M pp. 1-36.

There is also a significant risk of oil spills and leaks from this Project with severe environmental repercussions. For example, an Enbridge pipeline spilled 834,444 gallons of tar sands oil into Michigan's Kalamazoo River in 2010, which is still not cleaned up. Ex. H. In 2013 another tar sands oil pipeline spill occurred in Arkansas, which also involved serious harm to life, property and the environment. Ex. I. The Keystone XL EIS acknowledged numerous leaks

4

and spills in another new tar sands pipeline that required PHMSA to shut it down, and PHMSA found that such events are "not unusual start up issues that occur on pipelines and are not unique," hence they can be expected in this case as well. Ex. M at 47-49. In fact, PHMSA data shows that the 10-year average for national hazardous liquid pipeline incidents is 364 spills per year; *i.e.*, nearly one spill per day for 10 years. Ex. J. Nevertheless, neither the Corps, the Service, nor any of the other federal agencies involved in the Flanagan South project did *any* analysis of the risk of oil spills from the project. No agency has prepared an Environmental Assessment or Environmental Impact that covers this entire project.

### B.    Federal Agency Actions and Lack of NEPA Analysis

####     1.    The Corps' Verifications, Easements and Lack of Cumulative Effects Analysis

NWP 12 authorizes the construction of oil pipelines in waters of the United States "provided the activity does not result in the loss of greater than 1/2 acre for each single and complete project." 77 Fed. Reg. at 10,271. Under NWP 12 an applicant submits preconstruction notifications ("PCNs") to the Corps districts, which can then issue "verifications" of the project to proceed without individual permits under Clean Water Act §404. In this case, on or about August 12, 2013, the Rock Island, St. Louis and Kansas City Corps districts issued such verifications to Enbridge, allowing the wetlands fill and crossing of thousands of streams and wetlands, treating each of the 1,950 wetland fills and water crossings as if it were "a single and complete project."[1] To Plaintiffs' knowledge, the Tulsa District has not yet notified Enbridge of any decision on its request for verification of the Project under NWP 12.

---

[1] The only verification Sierra Club has been able to obtain is the Kansas City one, Ex. E hereto.

Although the Corps prepared a "Decision Document" and Finding of No Significant Impact for NWP 12, the Corps did not prepare any NEPA analysis, either an Environmental Assessment ("EA") or Environmental Impact Statement ("EIS"), for these verifications or for the Flanagan South Pipeline.

The Project would also require the Corps to issue easements permitting Enbridge to cross government fee property at locations where the Flanagan South pipeline crosses Corps land on the Mississippi River in Illinois and Missouri and on the Arkansas River in Oklahoma. Ex. G at 10. The Corps has already granted the easements to Enbridge or is allowing Enbridge to proceed without them. Either way, the Corps prepared no EA or EIS under NEPA for these easements.

In addition, NWP 12 requires the Corps district offices to evaluate the "cumulative effects" of overall pipelines, including all "single and complete projects" along a linear project's length. 77 Fed. Reg. at 10,260, 10,287. In this case, based on the verification issued by the Kansas City District of the Corps, the Corps' verifications fail to make the cumulative effects determination required under NWP 12. Ex. E.

### 2.    FWS Biological Opinion and Incidental Take Statement

The Endangered Species Act requires federal agencies, through consultation with the Service, to "insure that any action authorized, funded, or carried out by the agency . . . is not likely to jeopardize the continued existence of" any listed species or adversely modify its critical habitat. 16 U.S.C. § 1536(a)(2). The result of the interagency consultation process is a biological opinion that evaluates impacts to listed species to determine if the action is likely to jeopardize the species' existence or adversely modify critical habitat. If the conclusion of the opinion results in a determination of jeopardy or adverse modification, then the opinion

identifies changes to the action to avoid these effects. 16 U.S.C. § 1536(b). The Service may also issue, along with the biological opinion, an incidental take statement, which provides for a specified level of "incidental take" of listed species in connection with the proposed action. 16 U.S.C. § 1536(b)(4).

On July 24, 2013, the Service issued its Biological Opinion analyzing the proposed Project's impacts on the endangered Indiana bat and American burying beetle and the threatened decurrent false aster. Ex. G. At the same time the Service issued an Incidental Take Statement allowing the "take" of these species for the proposed Project. Ex. G at 71 *et. seq*. The Biological Opinion and Incidental Take Statement set forth alleged reasonable and prudent measures designed to minimize the impacts of the Project. The measures related to the bat are addressed to the Corps and Enbridge, and the measures related to the beetle are addressed to the Bureau of Indian Affairs and Enbridge. *Id.*

Upon information and belief, the Service has not prepared, and has no plans to prepare, a NEPA document analyzing the environmental impacts of its Biological Opinion and Incidental Take Statement.

### 3.    Other Federal Agency Actions

The federal involvement in the Flanagan South pipeline is pervasive and covers virtually every aspect of the project. For instance, in addition to the Corps and the Service's actions set forth above, the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA") approves the oil spill response plan pursuant to 33 U.S.C. § 1321(j)(5)(E),(F) and regulates pipeline design, construction and maintenance under the Pipeline Safety Act; the U.S. Bureau of Indian Affairs ("Bureau") grants easements across Indian lands;

the U.S. Environmental Protection Agency ("EPA") approves a spill prevention, control, and countermeasure plan that covers Project construction under CWA § 311.

The Bureau is preparing an EA for the easements for the pipeline to cross its land, which demonstrates that the Corps can and should prepare at least an EA for its easements as well. However, PHMSA has prepared no NEPA analysis for its approval of the response plan or exception to its requirement. Nor has EPA prepared any NEPA analysis for its action.

None of these agencies—the Corps, the Service, PHMSA, the Bureau or the EPA, individually or collectively—have designated a "lead agency" to conduct any NEPA analysis that would cover the entire Flanagan South Pipeline.  The end result is that no federal agency is or will be conducting an analysis under NEPA of all of the direct, indirect and cumulative impacts of this massive interstate oil pipeline.

### C.      Denial of Sierra Club's FOIA Requests and Lack of Public Participation

On May 16, 2013, the Sierra Club submitted FOIA requests to the Kansas City, Tulsa, St. Louis, and Rock Island Corps district offices pursuant to the FOIA, 5 U.S.C. § 552, seeking the voluminous pre-construction notifications ("PCNs") that Enbridge submitted to the Corps offices to gain authorization under NWP 12, along with other information about the Flanagan South pipeline. Ex. A. After missing response deadlines, each of the four district offices denied the Sierra Club's FOIA requests on the grounds that the requested documents were allegedly not releasable under the deliberative process privilege of FOIA Exemption 5. Ex. B. The Sierra Club appealed each of the decisions because the deliberative process privilege applies to inter-agency or intra-agency deliberative documents, not to documents such as PCNs that were prepared by Enbridge. Ex. C. Nevertheless, the Corps missed the deadlines to rule on the appeals and has still not produced the documents. Ex. D.

As a result of these FOIA violations, Sierra Club and the public have been unable to obtain the documentation of this Project that would reveal its full scope, route, environmental and human health impacts.[2] The Corps effectively has concealed the communications between Enbridge, the Corps and the other agencies that led to the Corps' verifications and other federal actions. The Sierra Club has been unable to review or disseminate the documents to its members, the public or local governments along the pipeline route, use these in public comments or hearings, educate the public or appeal to elected officials, or use them in connection with this lawsuit. Combined with the approval of the project under NWP 12 instead of the individual CWA §404 permit process that would involve public notice and comment on the permit,[3] and the lack of NEPA process that would entail public notice and comment on an EA or EIS,[4] the Corps' denial of the FOIA is stonewalling Plaintiffs and the public and preventing any meaningful public review, comment or participation in the federal processes.

## III.   STANDARD OF REVIEW

The National Environmental Policy Act ("NEPA") does not provide a separate cause of action for plaintiffs seeing to enforce its requirements. *Florida Audubon Soc. v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996). As such, this case is brought under the Administrative Procedure Act

---

[2] The Sierra Club did obtain photographs of portions of the Kansas City PCN from an environmental organization that reviewed the document at the Missouri Department of Natural Resources on or about July 25, 2013. Ex. U.

[3] *See* 33 U.S.C. § 1251(e) ("public participation … shall be provided for, encouraged, and assisted. . ."); 33 U.S.C. § 1344(a) ("[t]he Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites."); 33 C.F.R. § 327.4(b) ("Requests for a public hearing under this paragraph shall be granted…).

[4] *See* 40 C.F.R. §§ 1500.1(b) ("public scrutiny [is] essential"), 1500.2(d) (the agency must "encourage and facilitate public involvement"), 1506.6 (the agency must "[m]ake diligent efforts to involve the public" in preparing environmental documents, give "public notice of . . . the availability of environmental documents so as to inform those persons . . . who may be interested or affected," and "solicit appropriate information from the public.").

("APA"). *Lujan v. National Wildlife Federation,* 497 U.S. 871, 882–83 (1990) (noting that the APA may provide a right to sue for final agency actions that omit some procedural requirement).

Under the APA, the Court "shall . . . set aside" an agency's decision if it is arbitrary, capricious, an abuse of discretion, or "otherwise not in accordance with law" or was adopted "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D). The APA also allows the court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The Court owes no deference to an agency's interpretation of NEPA because NEPA was addressed to all federal agencies and not one alone. *Grand Canyon Trust v. FAA*, 290 F.3d 339, 341-42 (D.C. Cir. 2002).

The Freedom of Information Act ("FOIA") does provide a court with "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). FOIA's goal is broad disclosure, and thus its exemptions are to be narrowly construed. *Dep't of Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. 1, 7-8 (2001). The government agency has the burden to demonstrate that the documents requested are exempt from disclosure. *Assassination Archives & Research Ctr. v. CIA,* 334 F.3d 55, 57 (D.C.Cir.2003).

## IV.    ARGUMENT AND CITATION OF AUTHORITY

### A.    Plaintiffs are Likely to Succeed on the Merits

#### 1.    The Corps Violated the Freedom of Information Act

The Corps violated FOIA and the APA by wrongfully withholding Sierra Club's requested documents under Exemption 5, which allows an agency to withhold from public disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This

deliberative process privilege protects advice, recommendations, and opinions that are part of the deliberative, consultative, decision-making processes of government. *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–54 (1975); *Vaughn v. Rosen*, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975) (a deliberative document "makes recommendations or expresses opinions on legal or policy matters.").[5]

The Corps wrongfully withheld Enbridge's PCNs because the requested documents are not "inter-agency or intra-agency memorandums or letters." Documents submitted to an agency by an outside party, such as Enbridge's PCNs in this case, do not qualify for the deliberative process privilege. *Klamath*, 532 U.S. at 8 (for a document to qualify under the deliberative process privilege, "its source must be a Government agency…").

Furthermore, the PCNs are not "deliberative" documents. Material is considered deliberative only if "it reflects the give-and-take of the consultative process." *Nat'l Sec. Archive v. C.I.A.*, 859 F. Supp. 2d 65, 70 (D.D.C. 2012). "[F]actual material must be disclosed but advice and recommendations may be withheld." *Hooker v. U.S. Dep't of Health & Human Servs.*, 887 F. Supp. 2d 40, 56 (D.D.C. 2012). Here, the PCNs are factual materials submitted by Enbridge describing its plans, presumably including maps of the project and information about the location and extent of the project's impacts on wetlands, streams, rivers, and other environmentally-sensitive resources. They are the functional equivalent of permit applications, and do not bear on how the Corps may or may not reach a decision or what the decision may be.

---

[5] In keeping with the FOIA's goal of broad disclosure, the Section 552(b)(5) exemption is construed narrowly. *Ctr. for Int'l Envtl. Law v. Office of U.S. Trade Representative*, 237 F. Supp. 2d 17, 23 (D.D.C. 2002) (citing *Klamath*). The government agency has the burden to demonstrate that the documents requested are exempt from disclosure. *Judicial Watch, Inc. v. U.S. Dep't of Treasury*, 796 F. Supp. 2d 13, 23 (D.D.C. 2011) (citing *Assassination Archives*, 334 F.3d 55 at 57).

The Corps is also violating FOIA by not ruling on Sierra Club's administrative appeals within the 20-day limits proscribed in FOIA's §552(a)(6)(A)(ii). The Corps' response was due on or about August 12, 2013, yet as of this date, the Corps has still failed to rule on the appeals. Meanwhile, the Corps issued its verifications, which allows Enbridge to begin construction.

> **2.     Federal Defendants Violated NEPA by Failing to Prepare an Environmental Impact Statement or Environmental Assessment for Flanagan South**

NEPA requires all agencies of the federal government to prepare an Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  Major federal actions include projects that are "potentially subject to Federal control and responsibility" or "regulated, or approved by federal agencies," including construction projects that are "approved by permit or other regulatory decision. . . ." 40 C.F.R. § 1508.18. A major Federal action occurs "whenever an agency makes a decision which permits action by other parties which will affect the quality of the environment." *Humane Soc. of U.S. v. Johanns*, 520 F. Supp. 2d 8, 22 (D.D.C. 2007).

To determine whether a proposed action significantly affects the environment, and whether an EIS is required, the lead federal agency may first prepare an environmental assessment (EA). 40 C.F.R. § 1508.9.  The lead agency must take a 'hard look' at the relevant environmental concerns and alternatives to the proposed action. *Id*. If the agency concludes in an EA that a project may have significant impacts on the environment, then an EIS must be prepared. 40 C.F.R. § 1501.4. To determine whether a proposed action may significantly affect the environment, the agency must consider both the context and intensity of the proposed action, including whether the project will take place in "ecologically critical areas," and whether the project will affect endangered species. 40 C.F.R. § 1508.27 (a) & (b).  An EIS

must consider direct, indirect and cumulative impacts, alternatives, mitigation measures and ten significance factors. 40 C.F.R. §§ 1508.7, 1508.8, 1508.20, 1508.25, 1508.27.

In this case, no agency prepared an EIS before construction of Flanagan South began. That means no agency analyzed the full range of direct, indirect, and cumulative impacts of this pipeline, including the risks and impacts of oil spills, or analyzed any alternatives to the project, as required by NEPA. In fact, no agency prepared even a less detailed EA to determine whether a full EIS was warranted.

**a.     The Corps' Actions Approving Flanagan South Constitute Major Federal Action Requiring a NEPA Analysis**

**i.     The Corps' Verifications Constitute Major Federal Action**

The Flanagan South Pipeline is a major federal action pursuant to 40 C.F.R. § 1508.18, as it constitutes a construction project that was "approved by permit or other regulatory decision. . . ."  The Corps' verifications under NWP 12 permit the construction of the Pipeline in over 1,950 jurisdictional waterways spread along the project's 593-mile length. No part of Flanagan South could operate without the verifications. Therefore, because Corps' approval is "essential to completion of the project," the Corps is responsible for analyzing the Pipeline's impacts under NEPA. *Wyoming Outdoor Council v. U.S. Corps of Engineers,* 351 F. Supp. 2d 1232, 1242 (D.Wyo. 2005); *Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir. 1996) ("if a federal permit is a prerequisite for a project with adverse impact on the environment, issuance of that permit does constitute major federal action and the federal agency involved must" comply with NEPA).

The Corps must prepare an EIS for Flanagan South because its verification of the pipeline's 1,950 water crossings under CWA §404 has "a reasonably close causal relationship" to the adverse environmental effects of the Pipeline. *Dep't of Transp. v. Pub. Citizen,* 541 U.S.

13

752, 767 (2004). While *Public Citizen* held that an agency need not analyze the environmental impacts of a decision where it had *no ability* to prevent those impacts, 541 U.S. at 768-770, the opposite is true here. The Corps unquestionably *does* have the ability to prevent the environmental effects of Flanagan South. The Corps' NWP 12, for example, requires it to determine, *inter alia*, whether the overall Project's cumulative adverse effects on the environment, not just on U.S. waterways, would be more than minimal. *See, e.g.*, 77 Fed. Reg. 10,287.[6] If the environmental effects would be more than minimal, the project cannot proceed under NWP 12.[7] *Id.*; *see also* 33 U.S.C. § 1344(e)(1) (authorizing the Corps to approve projects with no more than minimal environmental effects under nationwide permits).

Therefore, the Corps' decision on whether to verify the Pipeline under NWP 12 directly effects whether the environmental impacts will occur. For a project of this magnitude, spread throughout four states and four Corps districts, the Corps' verification decision is thus a major federal action for which the Corps must comply with NEPA.[8] *See also Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 105 (D.D.C. 2006) (applying *Public Citizen* and holding that in making a

---

[6] "In reviewing the PCN for the proposed activity, the district engineer will determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects... For a linear project, this determination will include an evaluation of the individual crossings to determine whether they individually satisfy the terms and conditions of the NWP(s), as well as the cumulative effects caused by all of the crossings authorized by NWP." 77 Fed. Reg. 10,287.

[7] Enbridge could then seek an individual §404 permit for the Project, which would require the Corps to prepare a NEPA analysis, analyze all practicable alternatives to the project, choose the alternative that would cause the least damage to wetlands, and allow the project only if it would be in the public interest. *See, e.g.*, 40 C.F.R. § 230.10(a); 40 C.F.R. §§ 230.5(c).

[8] Plaintiffs do not argue that the Corps must prepare a project-specific NEPA analysis for *all projects* verified under NWP 12. Indeed, the Corps would not necessarily need to prepare NEPA analyses for minor utility projects involving few water crossings, or projects that have undergone a NEPA analysis. *See, e.g.*, *Snoqualmie Valley Pres. Alliance v. U.S. Army Corps of Engineers*, 683 F.3d 1155, 1158 (9th Cir. 2012) (NEPA not required for NWP project verification where FERC had already prepared two EISs examining upstream and downstream impacts and the Corps had prepared an EA).

decision whether to permit directional drilling operations *under* a National Preserve, NEPA required the National Park Service to evaluate impacts from the surface activities of the directional drilling that occurred *outside of* NPS jurisdiction).

In addition, the Corps' Kansas City verification of Flanagan South is a major federal action triggering NEPA due to its implementation of FWS's Biological Opinion and Incidental Take Statement. *In re Consolidated Salmonid Cases*, 688 F. Supp. 2d 1013, 1025 (E.D. Cal 2010) held that the Bureau of Reclamation's (Reclamation) *implementation* of a biological opinion issued by the National Marine Fisheries Service (NMFS) was a major federal action pursuant to 40 C.F.R. § 1508.18. The court reasoned that because the ESA regulations gave Reclamation the discretion to determine "whether and in what manner to proceed with the action" in light of the Biological Opinion, its decision to move forward with the project and implement the BO was a major federal action triggering NEPA. *Id.* at 1022 (quoting 50 C.F.R. § 402.15(a)); *see also San Luis & Delta-Mendota Water Auth. v. Salazar*, 686 F. Supp. 2d 1026, 1049 (E.D. Cal. 2009) ("Reclamation's implementation of the BiOp is major federal action"); *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 546-47 (11th Cir. 1996) (Corps complied with NEPA in issuing a § 404 permit for a landfill that required FWS to issue an incidental take statement).

Here, the Corps requested formal consultation with FWS pursuant to Section 7 of the Endangered Species Act for the threatened decurrent false aster (*Boltonia decurrens*) and the endangered Indiana bat (*Myotis sodalist*), and FWS then issued a Biological Opinion and Incidental Take Statement (BIOP/ITS) for Flanagan South. BIOP, Ex. G at 2. The Corps then decided to issue the verification and incorporate the terms and conditions of the BIOP/ITS

pursuant to 50 C.F.R. § 402.15(a). Kansas City Verification, Ex. E at 2. [9] Therefore, the Corps' verification implementing the BIOP/ITS was a major federal action triggering NEPA.

###        ii.        The Corps' Easements/Rights-of-Way Constitute Major Federal Action Triggering NEPA

In addition to the Corps' verifications of the Project under NWP 12, Flanagan South requires the Corps to grant Enbridge "real estate instruments, 30-year leases, easements for permanent right of-way, and temporary construction easements for construction access where the project crosses government fee property."[10] These required easements are located "where the [Flanagan South] Pipeline crosses the Corps' lands on the Mississippi River, IL/MO and the Arkansas River, OK."[11] The Corps' easements for Flanagan South to cross federal land are major federal actions triggering the NEPA requirements for an EA or EIS on the easements – but no such NEPA analysis was prepared by the Corps.

Section 28 of the Mineral Leasing Act authorizes the Corps to grant rights-of-way for oil pipelines across its Army property. 30 U.S.C. § 185(a). Grants of rights-of-way across federal land pursuant to 30 U.S.C. § 185 are subject to the requirements of NEPA. 30 U.S.C. § 185(h); *see also Hammond v. Kempthorne*, 448 F. Supp. 2d 114, 117 (D.D.C. 2006) (Bureau of Land Management prepared an EIS for an oil pipeline crossing federal lands); *All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1440 (10th Cir. 1992) (Bureau of Indian Affairs prepared EIS for an electric transmission line across federal lands pursuant); *Harrison v. U.S. Dep't of Army*, CIV.A. 3:08CV-105-H, 2009 WL 3347109 (W.D. Ky. Oct. 14, 2009) (Corps complied with NHPA/NEPA in granting an easement for a transmission line to cross Army property). The Corps regulations require the Corps to comply with all federal environmental

---

[9] The Kansas City verification is the only one Plaintiffs have managed to obtain.
[10] Flanagan South BIOP, Ex. G, at 10.
[11] *Id.*

review requirements when granting easements across Army property, and allow the Corps to grant easements only where the "use of real property, water or other natural resources [does not conflict] with the goals and intent of overall Federal policy on environmental quality and historical preservation." Dep't of Army Reg. 405-80(4-8), attached as Ex. T.

In *Spiller v. Walker*, the court was also faced with the Corps approval of an oil pipeline, both through verifications under a Nationwide Permit and through the granting of easements across federal lands. [12] The court held that "[t]he Army's role in granting permits for construction over navigable waters and granting a right-of-way over [Army property] combine to have such a crucial impact on the construction of the [pipeline] at so many points along the pipeline that it can only be described as 'major Federal action.'" [13] The same is true here. However, to the best of Plaintiffs' knowledge, the Corps has not prepared any NEPA document for the Flanagan South easements before construction commenced. [14]

### iii. The NWP 12 Decision Document Does Not Excuse the Lack of NEPA Analysis for the Corps' Verifications, Easements or the Project Overall.

Here, the only NEPA document that the Corps prepared was its "Decision Document" that it prepared prior to issuing NWP 12 in 2012. Ex. O. However, the Decision Document was limited to an analysis of 1/2-acre fills of U.S. waters. It did not analyze all of the direct, indirect, and cumulative environmental impacts associated with massive crude oil pipelines that would use NWP 12 hundreds or even thousands of times, as with Flanagan South. For example, the

---

[12] *Spiller v. Walker,* No. A-98-CA-255-SS, 1998 U.S. Dist. LEXIS 18341, *40-41 (W. D. Texas, Aug. 25, 1998), attached as Ex. N.

[13] *Id.*

[14] Since there has been no public process, Plaintiffs are not aware if the Corps has actually granted the easements yet. However, the Corps has violated NEPA and the APA, either by granting the easements for Flanagan South before preparing any NEPA analysis; or by allowing Enbridge to proceed with construction before the easements have been granted and before required environmental review has been completed in violation of 40 C.F.R. § 1506.1.

Decision Document never addressed the adverse environmental impacts of permanently clearing a 100 foot-wide right-of-way for 593 miles, or the likelihood and risks of tar sands oil spills in U.S. waters or in communities located along the pipeline route.

Because no NEPA analysis was done at the verification level, neither the Corps nor any other agency ever analyzed the risks of oil spills from this pipeline. Courts have repeatedly held that this constitutes a NEPA violation. In *Stop the Pipeline v. White*, 233 F. Supp. 2d 957, 967 (S.D. Ohio 2002), the Corps was required to analyze oil spills in issuing a §404 permit for an oil pipeline. In both *Sierra Club v. Sigler*, 695 F.2d 957, 962 (5th Cir. 1983) and *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 867 (9th Cir. 2005), the Corps issued §404 permits that were limited to the dredging of U.S. waters, yet the Corps was required to analyze the risk of oil spills from oil tankers operating in U.S. waters, which the dredging would allow. Likewise in this case, the Corps must analyze potential oil spills from pipelines transporting crude oil through U.S. waters, which the Corps' §404 approval will allow.

In fact, the Decision Document recognized its limited scope and specifically contemplated further project-specific NEPA analysis for projects approved under NWP 12: "NEPA requires consideration of all environmental impacts, not only those to aquatic resources, so there may well be situations where aquatic impacts are minimal even though environmental impacts more generally are not. *These other environmental impacts would be addressed by the lead agency preparing the environmental impact statement*." Decision Document, Ex. O at 10 (emphasis supplied). However, neither the Corps nor any other agency is acting as the "lead agency" or "preparing the environmental impact statement" for Flanagan South.

### iv.     The Corps Must Analyze the Impacts of the Entire Project in its NEPA Analysis

The Corps must analyze the entire Flanagan South Pipeline under NEPA. Corps NEPA regulations require it to analyze "the impacts of the specific activity requiring a [§404] permit *and those portions of the entire project* over which the district engineer has sufficient control and responsibility to warrant Federal review." 33 C.F.R. § 325 App. B (emphasis added). "These are cases where the environmental consequences of the larger project are essentially products of the Corps permit action." *Id.*

One factor that indicates whether the Corps has "control and responsibility" over the uplands portion of the pipeline is "the extent of cumulative Federal control and responsibility." 33 C.F.R. § 325 App. B(7)(b)(4). The cumulative federal control and responsibility over Flanagan South is extensive: the Corps must approve the Pipeline's 1,950 water crossings under CWA § 404 and must grant easements across Corps properties; the Fish and Wildlife Service must prepare a Biological Opinion and authorize the "take" of endangered species pursuant to ESA § 7; PHMSA must approve the oil spill response plan pursuant to 33 U.S.C. § 1321(j)(5)(E),(F); the Bureau of Indian Affairs must grant easements across Indian lands; and EPA must approve a spill prevention, control, and countermeasure plan that covers Project construction under CWA § 311. The extensive federal regulation and oversight of this Pipeline means that the Corps has "control and responsibility" over the entire pipeline pursuant to 33 C.F.R. § 325 App. B(7)(b)(4).[15]

---

[15] *See also Spiller*, Ex. N at *52-53 (holding that an oil pipeline was a major federal action triggering NEPA because "the federal government controls the entire pipeline process: construction, operation and safety inspection, sales of the petroleum products, and accident cleanup.").

Other factors that determine "control and responsibility" include the "extent to which the entire project will be within Corps jurisdiction"; and "whether or not the regulated activity comprises 'merely a link' in a corridor type project…" 33 C.F.R. § 325 App. B(7)(b)(3),(1).

The regulation itself provides illustrative examples for this factor. The Corps would likely not have "control and responsibility" over an entire 50-mile electric transmission line where the line crosses only one U.S. waterway.[16] 33 C.F.R. § 325 App. B(7)(3). However, the Corps *would* have "control and responsibility" over the entire project if it requires Corps approval "for a major portion" of its length- for example, "if 30 miles of the 50–mile transmission line crossed wetlands or other 'waters of the United States'…" *Id.*

Flanagan South includes 1,950 crossings of United States waterways spread along its entire 593-mile length, such that *no section* of the project avoids federal jurisdiction. The regulated activity is not merely a link in a corridor type project- it is 1,950 links. Because the project requires Corps approval "for a major portion" of the pipeline, the Corps' NEPA review must analyze the entire project, including the uplands or non-wetlands portions of the project.

Furthermore, the Corps must analyze the entire Flanagan South project in a NEPA document because the entire Pipeline is "functionally inseparable" from the portions in Corps jurisdiction. *Mainella*, 459 F. Supp. 2d at 105 (NEPA required National Park Service ("NPS") to analyze the impacts of a project occurring outside NPS jurisdiction where it was "functionally inseparable" from the NPS-regulated part of the project); *White Tanks Concerned Citizens, Inc. v. Strock*, 563 F.3d 1033, 1040-41 (9th Cir. 2009) (Corps' NEPA analysis must analyze extra-jurisdictional parts of a project where none of the project could not proceed without Corps permits); *Save Our Sonoran, Inc. v. Flowers,* 408 F.3d 1113, 1121-24 (9th Cir. 2005) (Corps'

---

[16] This scenario describes the facts of *Winnebago Tribe of Nebraska v. Ray*, 621 F.2d 269, 270 (8th Cir. 1980), which preceded the promulgation of this regulation.

NEPA analysis was improperly limited to jurisdictional waters that ran through 5% of construction site); *Wyoming Outdoor Council,* 351 F. Supp. 2d at 1242 (Corps was responsible for analyzing uplands impacts of a general §404 permit for oil and gas development because its approval was "essential to completion of the project") (citing *Utahns for Better Transp. v. U.S. Dept. of Transp.,* 305 F.3d 1173 (10th Cir. 2002) (NEPA required where water crossings were "so interdependent that it would be unwise or irrational" to complete the project without a discharge permit.)). Therefore, the law is clear: the Corps cannot limit its NEPA analysis to the discharges into U.S. waters; rather, it must analyze the impacts of the entire Pipeline.

### b. The Fish and Wildlife Service's Biological Opinion and Incidental Take Statement Constitute Major Federal Action Requiring NEPA Analysis

The Fish and Wildlife Service issued a Biological Opinion ("BIOP") and Incidental Take Statement ("ITS") for Flanagan South, authorizing Enbridge to "take" three threatened and endangered species in connection with the construction and operation of the Pipeline: the Indiana bat (*Myotis sodalis*), the American burying beetle (*Nicrophorus americanus*), and the decurrent false aster (*Boltonia decurrens*). BIOP, Ex. G at i. [17]

In *Ramsey v. Kantor*, the court squarely held that an ITS was a major federal action triggering NEPA. At issue in *Ramsey* was a NMFS BIOP/ITS that permitted salmon fishing regulations consistent with that take statement. *Ramsey*, 96 F.3d at 441-445. The court held that "[i]t is clear,… both from our cases and from the federal regulations, *see* 40 C.F.R. § 1508.18, that if a federal permit is a prerequisite for a project with adverse impact on the environment, issuance of that permit does constitute major federal action and the federal agency involved must

---

[17]The Service issued a revised Incidental Take Statement on August 12, 2013. Ex. G at 87.

conduct an EA and possibly an EIS before granting it." *Id.* at 444 (citations omitted); *see also Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1276 (10th Cir. 2004) (recognizing *Ramsey*'s holding that an ITS requires at least an EA pursuant to NEPA); *Humane Soc. of U.S. v. Bryson*, 924 F. Supp. 2d 1228 (D. Or. 2013) (NMFS's issuance of an ITS constituted a major federal action that triggered NEPA). The Flanagan South BIOP and ITS were federal approvals that were prerequisites to project moving forward, and thus FWS had a duty to prepare a NEPA analysis.

Similarly, in *Westlands Water Dist. v. U.S. Dep't of Interior, Bureau of Reclamation*, 850 F. Supp. 1388, 1422 (E.D. Cal. 1994), the court held that a BIOP issued by NMFS was a major federal action triggering NEPA because it was "part of a systematic and connected set of agency decisions" that allowed a program and its environmental impacts to occur.  The same is true here. The Flanagan South BIOP/ITS was one part of a set of connected agency decisions by the FWS, the Corps, PHMSA, the BIA, and EPA that allowed the project to occur. Therefore, it is a major federal action triggering NEPA. However, neither the FWS nor any other federal agency prepared any NEP analysis for the Flanagan South Incidental Take Statement.

### c.   PHMSA's Approval of Response Plan Constitute Major Federal Action Requiring NEPA Analysis

PHMSA's review and approval of the Flanagan South oil spill response plan is another level of federal oversight and approval that requires a NEPA analysis. Under the Oil Pollution Act, Enbridge must "prepare and submit to the President a plan for responding, to the maximum extent practicable, to a worst case discharge, and to a substantial threat of such a discharge, of oil or a hazardous substance" for Flanagan South. 33 U.S.C. §

1321(j)(5)(A)(1).[18] The facility response plan ("Response Plan") must describe, *inter alia*, the "private personnel and equipment necessary" to respond to and mitigate a worst case discharge, fire, or explosion, and "describe the training, equipment testing, periodic unannounced drills, and response actions" to be carried out under the plan. *Id.* at § 1321(j)(5)(D)(iii),(iv). PHMSA must then promptly review the Response Plan, and Enbridge may not operate until PHMSA has approved it. 33 U.S.C. § 1321(j)(5)(E),(F).

PHMSA's approval of the Response Plan is a prerequisite to the operation of Flanagan South, and it is a major federal action pursuant to 40 C.F.R. § 1508.18 (*i.e.*, it is "regulated, or approved by federal agencies," including construction projects that are "approved by permit or other regulatory decision. . . ."); *Spiller*, Ex. N at *49 ("DOT's extensive and intricate oversight and approval of the Longhorn Pipeline's safety and emergency-response plan constitutes major Federal action significantly affecting the human environment.").

While 33 U.S.C. § 1321(j)(5)(F) requires PHMSA to approve the Response Plan before the pipeline can begin operation,[19] PHMSA is free to approve it sooner, and in fact NEPA *requires* PHMSA to approve the Response Plan before the pipeline can begin construction. 42 U.S.C. § 4332(C) (NEPA review must occur before an irreversible and irretrievable commitment of resources); *Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C. Cir. 1983)

---

[18] The President has delegated these review and approval responsibilities to the Secretary of the United States Department of Transportation, who has in turn delegated them to PHMSA. Exec. Order 12,777 (Oct. 18, 1991). PHMSA has promulgated regulations implementing the Oil Pollution Act's spill planning requirements. *See* 49 C.F.R. pt. 194.

[19] In certain circumstances, PHMSA can authorize a pipeline to operate for up to two years before approval of a Response plan. 33 U.S.C. § 1321(j)(5)(G). However, Enbridge would have to seek the two-year waiver from PHMSA, and PHMSA could approve it only if it is satisfied that Enbridge has in place "private personnel and equipment necessary to respond, to the maximum extent practicable, to a worst case discharge or a substantial threat of such a discharge." *Id.* Thus, PHMSA's §1321(j)(5)(G) waiver would constitute major federal action pursuant to 40 C.F.R. § 1508.18, also requiring a NEPA analysis that was not done here.

("the appropriate time for preparing an EIS is *prior* to a decision, when the decisionmaker retains a maximum range of options."); 40 C.F.R. § 1506.1 (prohibiting any action on a proposal that would have adverse environmental impacts or limit the choice of alternatives until the NEPA process is concluded). Therefore, PHMSA must prepare a NEPA document analyzing the environmental impacts of Flanagan South Project *before* funds are expended to construct and operate Flanagan South.

PMHSA has allowed the construction of Flanagan South to commence before preparing any NEPA analysis. In fact, to the best of Plaintiffs' knowledge and belief, PHMSA has failed to even require Enbridge to submit a Response Plan prior to construction of the Project.  This is arbitrary and capricious and/or constitutes agency action unlawfully withheld that must be judicially compelled under the APA. 5 U.S.C. § 706(1) and/or (2).

> **d.   The Cumulative Federal Involvement Constitutes Major Federal Action**

The Gulf Coast Pipeline is approved and regulated by federal agencies in nearly every respect, which makes it a federal action pursuant to 40 C.F.R. § 1508.18. In response to various federal agencies attempting to avoid NEPA compliance in *Spiller*, the court held:

> [T]he federal government controls the entire pipeline process: construction, operation and safety inspection, sales of the petroleum products, and accident cleanup. It is not only arbitrary and capricious to assert this *combination of actions* is not major Federal action, but it blatantly flies in the face of common sense.

*See Spiller*, at *52-53, Ex. N (emphasis added).[20] Therefore, the *Spiller* court held that the cumulative federal involvement in the approval and regulation of the pipeline rendered it a major federal action requiring an EA or EIS for the entire pipeline. *Id*. at *51-53.

---

[20] As the *Spiller* court noted in a later opinion, it is "not only arbitrary and capricious, but ridiculous" to assert that this is not a major federal action. *Spiller v. Walker*, A-98-CA-255-SS, 2002 WL 1609722, *2 (W.D. Tex. July 19, 2002).

The federal government is involved to an even greater extent here: the Corps must approve the Pipeline's 1,950 water crossings under CWA § 404 after evaluating the environmental effects of the Project; both the Corps and the Bureau of Indian Affairs must grant easements across numerous federal properties; the Fish and Wildlife Service must prepare a Biological Opinion pursuant to ESA § 7 and authorize the "take" of three endangered species; PHMSA prescribes minimum safety standards for pipeline construction and operation, regulates the qualifications of pipeline operators, and oversees pipeline maintenance, among other things, under the Pipeline Safety Act, 49 U.S.C. § 60102(a)(2), (a)(3), (e),[21] and must approve the oil spill response plan pursuant to the Oil Pollution Act, 33 U.S.C. § 1321(j); and the EPA must approve a spill prevention, control, and countermeasure plan that covers Project construction under CWA § 311. Each of these federal approvals is absolutely essential to the Pipeline's construction and operation.

Nonetheless, federal Defendants have each taken the narrowest possible view of their individual approval actions to avoid preparing an EIS in violation of NEPA. *Flint Ridge Development Co. v. Scenic Rivers Ass'n of Oklahoma,* 426 U.S. 776 (1976) (no agency "shall utilize an excessively narrow construction of its existing statutory authorization to avoid [NEPA] compliance."); *Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior*, 344 F. Supp. 2d 108, 134 (D.D.C. 2004) (NEPA's strong language "is neither accidental nor hyperbolic," but "is a deliberate command that the duty NEPA imposes upon the agencies to consider environmental factors not be shunted aside in the bureaucratic shuffle.*") (citing *Flint Ridge Dev. Co.,* 426 U.S.

---

[21] PHMSA also has the authority to determine the "frequency and type of inspection and testing . . . on a case-by-case basis." *49 U.S.C. § 60108(b),* and has issued regulations that include extensive reporting requirements, as well as technical requirements covering all aspects of design, construction, and operation and maintenance of pipelines. *See* 49 C.F.R. pt. 195.

at 787); *Westlands Water Dist.*, 850 F. Supp. at 1422 (NEPA was required where there was a "systematic and connected set of agency decisions which result in the commitment of substantial federal resources"). As such, Defendants have individually and collectively violated NEPA.

Further, NEPA regulations make clear that agencies must analyze the environmental impacts resulting from the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7; *see also* 40 C.F.R. § 1508.27(b)(7) (Agencies cannot avoid preparing an EIS "by terming an action temporary or by breaking it down into small component parts."). In *Spiller v. Walker*, the court applied 40 C.F.R. § 1508.7 and held that agencies "wholly failed to consider the cumulative effects of the numerous actions by the various federal agencies in determining whether they have taken major Federal action." *See Spiller*, at *25-26, 51 (Exhibit N). Similarly here, Defendant agencies have failed to consider the cumulative effects of their numerous, concurrent agency approvals of this project in determining whether there is a major federal action.

Other oil pipelines comparable to Flanagan South have undergone a NEPA analysis prepared by some federal agency that included an analysis of oil spills. For example, the Department of State ("DOS") is acting as the lead agency in the evaluation of the Keystone XL pipeline under NEPA, despite the fact that DOS's jurisdiction over international pipelines is limited to the actual "border crossing facilities at the U.S.-Canadian border." 75 Fed. Reg. 20,654 (April 20, 2010). Nonetheless, DOS recognized that Keystone XL was a major federal action, and acted as the lead agency in preparation of an EIS for the entire pipeline since its

border crossing permit was essential to their completion.[22] 75 Fed. Reg. 20,654; *see also Sierra Club v. Clinton*, 689 F. Supp. 2d 1123, 1156-57 (D. Minn. 2010) (DOS acted as lead agency for the Alberta Clipper pipeline). Major crude oil pipelines involving multiple aspects of federal agency involvement, such as Keystone XL and Flanagan South, are major federal actions pursuant to 40 C.F.R. § 1508.18 that trigger NEPA.

### e.   The Federal Defendants Individually and Collectively Violated NEPA

### i.   Failure to Pick a Lead Agency

Defendant agencies violated NEPA by failing to choose a lead agency for the preparation of a NEPA analysis for Flanagan South, but none did. Where, as here, one or more federal agency is involved in the approval and/or regulation of a project, a lead agency "shall" supervise the NEPA analysis.  Factors used to determine the proper lead agency include: (1) the magnitude of agency's involvement; (2) the agency's project approval/disapproval authority; (3) the agency's expertise concerning the action's environmental effects; (4) the duration of agency's involvement; and the (5) the sequence of agency's involvement. 40 C.F.R. §1501.5(c). The record demonstrates that Defendant agencies coordinated their approvals of Flanagan South for at least sixteen months. *See, e.g.,* the Biological Opinion, Exhibit G, at 4-9 (documenting agencies' "consultation history" between February of 2012 and June of 2013). However, none of the Defendant agencies ever chose a lead agency as required by 40 C.F.R. §1501.5(c).

---

[22] Exec. Order 13,337 requires the DOS to issue permits for pipelines and other border crossing facilities if it determines that they would "serve the national interest," but contains no criteria for that determination. Thus, DOS was required to analyze the full range of environmental impact of the entire Keystone XL project pursuant to NEPA, not Exec. Order 13337 itself.

ii.     **Failure to Prepare an EA and/or EIS that Analyzed the Impacts of the Entire Pipeline**

The Corps' and other Defendants' approvals of the Flanagan South Pipeline, individually and collectively, violated 40 C.F.R. § 1508.25(a)(1)(iii), which requires all connected actions to be considered in a single NEPA document. Individual components of a project can be analyzed separately only if they would have "independent utility." *Wilderness Workshop v. U.S. Bureau of Land Management,* 531 F.3d 1220, 1228-31 (10th Cir. 2008). All parts of this pipeline, including the 1,950 crossings of U.S. waterways, the multiple parts that cross federal properties, and all non-federal portions, are connected actions because none would have independent utility.

Nonetheless, Defendants have independently authorized various connected aspects of the pipeline without preparing a comprehensive NEPA document. For example, the Corps has treated this Pipeline as 1,950 "single and complete projects," verifying each under NWP 12, apparently reasoning that the NWP 12 Decision Document satisfies NEPA for each crossing. In other words, the Corps has attempted to use its NEPA analysis for 1/2-acre utility projects 1,950 times to approve a 593-mile oil pipeline as if each crossing had "independent utility." However, none of these water crossings would have independent utility.

Thus, despite whether CWA §404 allows the Corps to piecemeal its permitting of the Flanagan South, ***NEPA unquestionably does not.*** The Corps violated NEPA by improperly segmenting Flanagan South into 1,950 "projects" so as to avoid a NEPA analysis of the overall project.

Moreover, Courts have consistently interpreted NEPA to require that, where the private and public portions of a project cannot exist independently of each other, their impacts must be evaluated in the same NEPA analysis. *See, e.g.*, *Wyoming Outdoor Council,* 351 F. Supp. 2d at 1242 (Corps was responsible for analyzing entire project because its approval was "essential to

completion of the project") (citing *Utahns for Better Transp.* 305 F.3d at 1173 ); *Save Our Sonoran, Inc.,* 408 F.3d at 1121-24 (Corps' NEPA analysis was improperly limited to jurisdictional waters that ran through 5% of construction site).

### iii.   Allowing an Irretrievable Commitment of Resources

All Defendant agencies, individually and collectively, violated NEPA and the APA by allowing Enbridge to begin construction before any agency analyzed the impacts of Flanagan South pursuant to NEPA. The purpose of NEPA is to "insure that ... environmental amenities and values may be given appropriate consideration in decisionmaking ...." 42 U.S.C. § 4332(2)(B). "NEPA requires an agency to evaluate the environmental effects of its action at the point of commitment...., [so] the appropriate time for preparing an EIS is *prior* to a decision, when the decisionmaker retains a maximum range of options." *Sierra Club v. Peterson*, 717 F.2d at 1414; 40 C.F.R. § 1501.2 ("Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values…"). Therefore, NEPA requires agencies to comply with NEPA when the "critical agency decision" is made which results in "irreversible and irretrievable commitments of resources" to an action which will affect the environment. *Id. (citing Mobil Oil Corp. v. F.T.C.,* 562 F.2d 170, 173 (2d Cir.1977); *see also Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 229 (D.D.C. 2003).

NEPA regulations prohibit any action on a proposal, until an agency issues a record of decision, that would either "[h]ave an adverse environmental impact" or "[l]imit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a). If an agency becomes aware that a non-federal project applicant is about to take such action before the agency concludes its NEPA process, "the agency shall promptly notify the applicant that the agency will take appropriate action to insure that the objectives and procedures of NEPA are achieved." 40 C.F.R. § 1506.1(b). Construction of Flanagan South would clearly have adverse environmental impacts. *See* pages 32-36, *supra*. It

would also limit the choice of reasonable alternatives, such as alternative routes that would have less impacts to waterways and endangered species, as well as the "no-action" alternative. Therefore, by allowing Enbridge to begin construction prior to the completion of any NEPA analysis, Defendants have violated 40 C.F.R. § 1506.1 and their inaction constitutes agency action unlawfully withheld and unreasonably delayed contrary to the APA, 5 U.S.C. § 706(1).

### 3.   The Corps' Verification of Flanagan South Violates Nationwide Permit 12 and was Arbitrary and Capricious and Violated the CWA

The Corps' verification of Flanagan South under NWP 12 was arbitrary and capricious because it did not include a determination that the cumulative adverse environmental effects of the overall project would be minimal. *Maryland Native Plant Soc'y v. U.S. Army Corps of Engineers*, 332 F. Supp. 2d 845, 858-59 (D. Md. 2004) (Corps "remains accountable for its [verification] decision under the arbitrary and capricious standard"). NWP 12 requires the Corps' verification of a project to include a cumulative effects determination:

> *D. District Engineer's Decision*
>
> 1. In reviewing the PCN for the proposed activity, the district engineer will determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects... For a linear project, this determination will include an evaluation of the individual crossings to determine whether they individually satisfy the terms and conditions of the NWP(s), as well as the cumulative effects caused by all of the crossings authorized by NWP... When making minimal effects determinations the district engineer will consider the direct and indirect effects caused by the NWP activity.

77 Fed. Reg. at 10,287.  The cumulative effects determination at the project level is crucial to ensure that projects authorized by NWP 12 are within the minimal environmental effects threshold of CWA 404(e).

However, the Corps did not analyze the Flanagan South Pipeline's cumulative effects on the environment, let alone make a determination that they would be minimal or explain that

determination. The Kansas City verification does not contain a single reference to the "cumulative impacts" or "cumulative effects" of the entire pipeline, discuss the pipeline's impacts in the other two Corps districts, or discuss any consultation with the other Corps Districts on cumulative effects. That renders the verifications arbitrary and capricious and in violation of NWP 12.

In *Maryland Native Plant Soc'y,* 332 F. Supp. 2d at 851, 856-57, the Corps' verification of a housing development under a general §404(e) permit was struck down as arbitrary and capricious where the verification letter stated that the project met the terms of the general permit but failed to set forth any reasoning. The court held the verification must include a unitary decision document with "at least a semblance of findings of fact and law and a statement of the reasons for the decision." *Id*. at 857. The court explained that it "can hardly give deference to the agency's authority and expertise if it cannot find the decision it is supposed to defer to." *Id*. The same is true here. The Corps utterly failed to make the required determination *at all*, so there is nothing to which this Court can defer. *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 715 (*quoting Or. Natural Desert Ass'n v. Bureau of Land Management,* 531 F.3d 1114, 1142 (9th Cir. 2008)) ("We cannot defer to a void.").

Furthermore, the Corps' Tulsa district informed Sierra Club on or about August 13, 2013 that the Kansas City, Rock Island, and St. Louis districts had issued verifications decisions while the Tulsa district office would not issue its verification until late August. Meanwhile, Enbridge began construction activities in the other three districts. The fact that three of the Corps districts have issued verifications and allowed construction to proceed while Tulsa is still evaluating the project's impacts in its district demonstrates the extent to which the Corps has ignored its

obligation to analyze the cumulative effects of the entire pipeline project. Instead, each Corps district appears to have evaluated its section of the pipeline in isolation.

Finally, the Corps' verification of Flanagan South also violates General Condition 7, which prohibits any NWP 12 activity "in the proximity of a public water supply intake." 77 Fed. Reg. 10,283. Flanagan South requires the construction and operation in United States waters in the proximity of at least four public water supply intakes. Ex. U; *see also* Declaration of Danny Ferguson, Ex. R, at ¶ 6 (describing two public water supply intakes located in the proximity of the Flanagan South route). The Corps' verification failed to make any mention of these public water intakes or make any finding as to whether it considered Flanagan South would be "in the vicinity" of them. As such, the verification violates NWP 12.

### B.  Immediate and Irreparable Harm in the Absence of an Injunction

Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. at 22 (emphasis in original). In this case the injury is not only likely, it is underway. Enbridge began construction of the Flanagan South pipeline on or about August 14, 2013.  Ex. F.  The Service's Biological Opinion states that "spread clearing" was "planned to begin August 7, 2013, and it is anticipated that approximately 6,300 ft. of ROW will be cleared per day." Ex. G at 22.

According to the Service, "construction generally proceeds as a moving assembly line" along the 593 mile length of the pipeline right-of-way ("ROW") and includes pipeline and pump-related facility construction, grading, excavation, clearing trees, vegetation and ground cover, dragging, chipping, burning, topsoil stripping, digging, blasting, dewatering, water withdrawal and discharge, permanent road building and stream crossings. Ex. G at 21. The entire ROW will be cleared of vegetation and obstacles and the pipe will be placed in a trench 8 to 12 feet deep.

Ex. G at 23. Enbridge's initial construction will take place over a nine month period from August to April, and clean-up and restoration are projected to be complete by the end of summer 2014. Ex. G at 58.

The Service's Biological Opinion and Incidental Take Statement allow the federal agencies and Enbridge to kill and harm certain endangered and threatened species. The Service states that endangered America burying beetles ("ABB") "may be disturbed or killed during FS Pipeline construction and related ground disturbance activities"; and the project will "potentially kill 19" endangered Indiana bats. Ex. G at 3.  The ABBs "are susceptible to death or injury by crushing and excavation/exposure" during construction. Ex. G at 60.  Direct and indirect effects during construction are "likely to adversely affect Indiana bats" by several means, including "removal of occupied roost tree resulting in death or injury of individuals." Ex. G at 66.  The Service states that a threatened plant, the decurrent false aster, "may be affected by the construction, operation and maintenance," and admits that it does not know the extent of this harm since it has not surveyed for the plant. Ex. G at 58.  The Service describes the effects on these species and "critical habitat" as "primarily short term, although long-term and permanent effects are anticipated as well." Ex. G at 58.  The Service's Incidental Take Statement exempts the Corps, the Bureau and Enbridge from the prohibitions of taking under Section 9 of the Endangered Species Act, to allow the disturbance of habitat and "mortality, harassment and harm" to the species during pipeline construction, operation and maintenance. Ex. G at 3.

In addition to the harm to threatened and endangered species and their habitat, there would be permanent, irreparable environmental harm from construction in the ROW generally. The ROW will be up to 135 ft. wide, or 110 ft. wide in "emergent wetlands and heavily forested uplands," and 85 ft. wide in "scrub/shrub and forested wetlands."  A "50-ft permanent ROW will

be established and maintained upon completion of construction and during operation," and Enbridge will prevent trees from re-growing in the ROW for the next 50 years. Ex. G at 14, 27. The project will involve the "total permanent disturbance of 3,577.8 acres." Ex. G at 24. In Missouri alone, approximately 208 miles of pipeline would be installed, and construction is estimated to "permanently and temporarily impact approximately 62,840 linear feet of stream [nearly 12 miles] equaling an area of 24.91 acres and approximately 38.23 acres of wetland," the Missouri Department of Natural Resources said in a letter to Enbridge on April 12, 2013. Ex. E at 30 *et. seq.*

All of this is precisely the kind of harm that courts have long held sufficient to obtain preliminary injunctive relief. *See, e.g., Humane Soc. of U.S. v. Kempthorne,* 481 F. Supp. 2d 53, 69 (D.D.C. 2006), *vacated on other grounds,* 527 F.3d 181 (D.C. Cir. 2008) (granting a preliminary injunction to stop the killing of wolves in Wisconsin, pursuant to permit issued by Fish and Wildlife Service). In *Fund for Animals v. Espy*, 814 F. Supp. 142, 151 (D.D.C. 1993), the court enjoined the U.S. Department of Agriculture from capturing and killing bison. *See also Humane Soc.*, 481 F. Supp. 2d at 69 ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.") (*quoting Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545 (1987)).

The NEPA procedural violations in this case also constitute irreparable harm since they are combined with a showing of environmental or aesthetic injury. *Fund for Animals v. Norton*, 281 F. Supp. 2d at 221; *Fund for Animals v. Clark*, 27 F.Supp.2d 8, 14 (D.D.C. 1998); *and see Sierra Club v. Marsh,* 872 F.2d 497, 500 (1st Cir. 1989) (Breyer, J.)("[W]hen a decision to

which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered.").  "[T]he 'risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation' by the action federal agency." *Catron Cty. Bd. of Commissioners v. United States Fish & Wildlife Serv.,* 75 F.3d 1429, 1433 (10th Cir.1996) (quoting *Marsh,* 872 F.2d at 504).

In this case, these risks are very real.  No federal agency has analyzed the environmental impacts of the construction or operation of Flanagan South, including the risk of oil leaks and spills, which is a major oversight considering the hundreds of pipeline spills that occur each year. Ex. J, K and L. Enbridge itself is responsible for the catastrophic tar sands oil spill into the Kalamazoo River in 2010. Ex. H. The recent tar sands pipeline spill in Arkansas serves as another example of the serious risk and impacts involved. Ex. I.

The lack of monetary damages available in this case further establishes the irreparable nature of the harm. *See, e.g.,  Sierra Club v. Martin*, 933 F. Supp. 1559, 1570–71 (N.D. Ga. 1996) ("[T]he question of irreparable injury does not focus on the significance of the injury, but rather, whether the injury, irrespective of its gravity, is irreparable—that is whether there is any adequate remedy at law ... [Once] migratory birds are killed, they cannot be returned ... [and] no monetary award can recompense Plaintiffs for the birds' deaths."). An injury is "irreparable" if damages are not adequate to compensate the injury. *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003). Because monetary damages are not available to Plaintiffs in this case, the injuries are irreparable.

In sum, Plaintiffs easily satisfy the irreparable harm part of the test for "maintaining the status quo during the pendency of this action." *Fund for Animals v. Norton,* 281 F. Supp. 2d at 222.

### C.      The Balance of Equities Decidedly Tips in Plaintiffs' Favor

Where a Plaintiff has shown environmental injury is "sufficiently likely," the Supreme Court has held, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co*., 480 U.S. at 545.  That principle applies in this case since the threatened injury to Plaintiffs and the environment outweighs any harm that a preliminary injunction may cause the Corps, the other federal defendants, or Enbridge. For example:

1)      The National Transportation Safety Board report on the 2010 Enbridge tar sands oil pipeline spill into the Kalamazoo River in Michigan shows 834,444 gallons of oil saturated wetlands, creeks and rivers and caused evacuations and sickness. Clean-up efforts continue and have exceeded $767 million. Ex. H at 13.[23]  The NTSB found that PHMSA contributed to this incident through its "ineffective oversight of pipeline integrity management programs." *Id.* This incident demonstrates that tar sands crude is even more dangerous and difficult to clean up than conventional oil and poses serious threats to communities, land and water resources for the length of the pipeline.

2)      PHMSA's Corrective Action Order on the 2013 tar sands oil pipeline spill in Arkansas documents the release of 3500 to 5000 barrels of oil from a 20 inch pipeline into a

---

[23] Enbridge's official estimate of the Kalamazoo spill's cost is even higher, $1,039,000,000.  See table 7853.0270-3 on pdf page 61 in Enbridge's application to expand another of its pipelines, which also includes a list of the laws Enbridge violated.
https://www.edockets.state.mn.us/EFiling/edockets/searchDocuments.do?method=showPoup&documentId={F1B13575-3D71-4CAA-A86A-05CE1EBBCA38}&documentTitle=20138-90363-03.

neighborhood, and PHMSA found a failure "to require immediate corrective action would result in the likelihood of serious harm to life, property, or the environment." Ex. I.

3)    The U.S. Department of State's Environmental Impact Statement ("EIS") for the proposed Keystone XL oil pipeline summarizes 13 oil pipeline leaks and spills in another recent tar sands oil pipeline known as "Keystone I," which required PHMSA to shut it down for remediation. PHMSA found that such events are "not unusual start up issues that occur on pipelines and are not unique," hence they can be expected in this case as well. Ex. M at 47-49.

4)    These are not isolated incidents. PHMSA data shows that the 10 year average for national hazardous liquid pipeline incidents is 364 spills per year, *i.e.* nearly one spill per day for 10 years. Ex. J. PHMSA's report shows a 3 year average for 2010-2012 of 353 spills per year, totaling $516,647,485 in property damage and 121,112 barrels spilled (5,086,704 gallons). *Id.* Enbridge's own data shows that in 2011 alone it had 58 reportable spills totaling 2,284 barrels (95,928 gallons). Ex. K. A report by Plaintiff National Wildlife Federation shows Enbridge's pipelines had 804 total spills of 6,781,950 gallons from 1999-2010.  Ex. L.

5)    Construction of the Flanagan South pipeline will destroy forests and plants, kill fish and wildlife, and cut through thousands of streams and wetlands. The Service's Biological Opinion documents harm to threatened and endangered species and their habitat. Ex. G. The Missouri DNR states the pipeline would cross 568 streams and 239 wetlands with "open cutting," and nine streams that already fail to meet federal Clean Water Act standards. Ex. E at 30, *et. seq*. Although no agency prepared an EIS for this project, the EIS prepared by the State Department for the proposed Keystone XL pipeline describes the significant harm to soils and sediments, surface water and groundwater, wetlands, vegetation, wildlife, fisheries, land use, recreation and special interest areas, visual areas, air quality and noise, risks from spills, and

cumulative impacts from the construction, operation of maintenance of a major tar sands oil pipeline. Ex M at 1-36. That EIS covers the entire length of that pipeline and several of the defendants in the instant case were cooperating agencies on the EIS. *Id.* at 1. That demonstrates that these agencies can and should designate a lead agency and do a comparable NEPA analysis for the impacts of the *entire* Flanagan South pipeline. *Id.*

6)      The standing declarations of plaintiffs' members filed herewith show concrete harm to their business, scientific, property, recreational and public participation interests. For example, Megan Corrigan uses a federal and state Wildlife Refuge in Kansas that would be traversed by the pipeline. Helen Woerner describes how construction will disrupt numerous waters and wetlands, and describes the effects an oil spill would have. Danny Ferguson is on the city council of a Missouri town that would have its water supply threatened and describes how a spill would devastate his farming community. Mary Blackmore's property will be crossed by Enbridge with an easement she granted, and she explains that she is relying on the federal agencies to ensure that her property is protected through full compliance with the environmental laws. *See* Exhibits P – S attached. [24]

Although the Corps has withheld from Sierra Club the documents that would show the full number of water crossings and extent of the harm from the pipeline, it cannot dispute that the pipeline impacts include the clearing, grading, and trenching of the pipeline right of way, which requires the filling of U.S. waters and the risk of contamination of water resources from spills of

---

[24] These declarations also demonstrate Plaintiffs' standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992)(member of public living near site for a proposed dam would have procedural standing to challenge the agency's failure to prepare an EIS); *Int'l Broth. of Teamsters v. U.S. Dept. of Transp.*, 714 F.3d 580 (D.C. Cir. 2013); *Ouachita Watch League v. Jacobs*, 463 F.3d 1163,1170-72 (11th Cir. 2006)(cognizable procedural injury exists when NEPA not followed and Plaintiffs' interests are threatened by the action).

heavy tar sands crude oil. Furthermore, the environmental impacts of pipeline construction and the noise, emissions and visual blight associated with this major industrial construction project will occur on hundreds of miles of private property, including that of Plaintiffs' members.

Plaintiffs and the public will be further harmed by the lack of project-specific environmental review and review of the pipeline as a whole and complete project, as required by the NEPA. This "risk of uninformed decisionmaking regarding … delicate and intertwined natural resources outweighs any potential harm accruing to Defendants." *San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.*, 657 F. Supp. 2d 1233, 1242 (D. Colo. 2009) (finding harm to applicant not compelling because a "delay in drilling the exploratory wells is not irreparable…").

The public's right to participate in the federal agency decision-making processes also weighs in favor of an injunction.  Under 40 C.F.R. § 1500.1(b) "public scrutiny [is] essential to implementing NEPA." The NEPA regulations mandate that the agencies "shall involve . . . the public to the extent practicable." 40 C.F.R. § 1501.4(b). These minimum standards for public review and comment were not met because the Corps arbitrarily failed to disclose material information to the public before issuing its verifications and easements.  Because no agency has performed a NEPA analysis that covers the length of the pipeline, there has been no public notice or opportunity for comment to the federal agencies on this subject.

Here, the Corps provided *no* public notice of the preconstruction notifications ("PCNs") nor was there any opportunity for the public to learn of or weigh in on the individual and cumulative effects of this particular project. To Plaintiffs' knowledge, the Corps did not allow for interagency review of the PCNs or its verifications. The NEPA document for NWP 12 relied on the cumulative impacts analysis to be made by the district engineer in a later, hypothetical

site-specific NEPA process on applications, but that did not occur in this case. The result is that Plaintiffs and the public have had no notice or opportunity to comment on the verifications or easements for this Pipeline, including commenting on its impacts, alternatives or mitigation measures.

Meanwhile, there would be no injury to the Corps from an injunction, and any injury to Enbridge would be economic. Economic harm is not irreparable and does not provide an adequate basis for denying injunctive relief. *See e.g., Sampson v. Murray*, 415 U.S. 61, 90 (1974) (potential monetary injury is not irreparable). The fact that if Plaintiffs prevail on the merits the project might be delayed for NEPA analysis is no injury to Enbridge. *See Alaska Center for the Environment v. West,* 31 F.Supp.2d 711, 723 (D. Alaska 1998) (noting longer permit processing time was "not of consequence sufficient to outweigh irreversible harm to the environment").

Because an injunction would be the product of the decisions of the Corps, the Service, the other Federal Defendants, and Enbridge to proceed without the required environmental reviews, any injury from an injunction essentially would be "self-inflicted," which weighs against defendants in a preliminary injunction. *See Davis v. Mineta,* 302 F.3d 1104, 116 (10th Cir. 2002). In addition, "there is no reason to believe that the delay in construction activities caused by the court's injunction will reduce significantly any future economic benefit that may result from the [project's] operation." *See Alaska Conservation Council v. U.S Army Corps of Eng'rs*, 472 F.3d 1097, 1101 (9th Cir. 2006), *rev'd on other grounds*, 129 S. Ct. 2458 (2009).

Any harm to Enbridge from delaying the project sufficiently to ensure compliance with the law is temporary at best. There is no reason why a delay of a few months to "ensure vindication of the public's interest in compliance with NEPA," *Fund for Animals v. Norton,* 281 F. Supp. 2d at 223, should outweigh the public's interest in federal agencies meeting their

statutory duties. Granting preliminary injunctive relief here would only serve to preserve the *status quo* until such time as the parties have briefed their claims on the full administrative record. This modest request, as compared to the alternative—allowing Enbridge to clear a right of way of nearly 600 miles across thousands of waterways—overrides any arguable harm that the agency could possibly offer in advocating against such relief.

### D.     The Public Interest Favors Issuance of a Preliminary Injunction

For all of these reasons, granting the relief requested is unquestionably in the public's interest because it would ensure that the Federal Defendants scrupulously comply with NEPA as well as their various statutory duties under FOIA, the APA, the Clean Water Act, the Oil Pollution Act and the Hazardous Liquid Safety Act. *See Fund for Animals v. Espy,* 814 F. Supp. at 152 (finding "meticulous compliance with the law by public officials," as relevant to the public interest); *Fund for Animals v. Clark,* 27 F.Supp. 2d at 15 (finding the public interest "served by having the federal defendants address the public's expressed environmental concerns, as encompassed by NEPA"); and *Fund for Animals v. Norton,* 281 F. Supp. 2d at 237 (finding a public interest in "compliance with NEPA").

Congressional intent and statutory purpose can be taken as a statement of public interest. *Johnson v. U.S.D.A.,* 734 F.2d 774, 788 (11th Cir. 1984). The purpose of NEPA is essentially to force "federal agencies to document the potential environmental impacts of significant decisions before they are made, thereby ensuring that environmental issues are considered by the agency and that important information is made available to the larger audience that may help to make the decision or will be affected by it." *Wilderness Watch v. Mainella*, 375 F.3d 1085, 1094 (11th Cir. 2004); *see also Marsh*, 872 F.2d at 504 (enjoining construction of marine cargo terminal for failing to comply with NEPA); and *Davis,* 302 F.3d at 1114 ("In mandating compliance with

NEPA's procedural requirements as a means of safeguarding against environmental harms, Congress has presumptively determined that the failure to comply with NEPA has detrimental consequences for the environment").

The purpose of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Corps' regulations themselves define wetland protection as a paramount public interest: "Most wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b)(1); *Utahns For Better Transp. v. U.S. Dept. of Transp.*, 2001 WL 1739458 (10th Cir. Nov. 16, 2001) ("The concern for wetlands expressed by the Clean Water Act and its implementing regulations demonstrates a strong public interest in their preservation and maintenance…. [and] the public has an interest in ensuring that all alternatives to the destruction of wetlands have been considered and that unavoidable impacts on such areas are minimized."); *Rapanos v. United States*, 547 U.S. 715, 777 (2006) ("Important public interests are served by the [CWA]… and by the protection of wetlands in particular.").

The public has an interest in preventing Defendants from acting in a manner inconsistent with the applicable law. As the court stated in *Colo. Wild Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1223 (D. Colo. 2007), "[t]he public has an undeniable interest in the Corps' compliance with the CWA and NEPA's environmental review requirements and in the informed decision-making that the statutes are designed to promote." Compliance with law "is especially appropriate in light of the strong public policy expressed in the nation's environmental laws." *Citizen's Alert Regarding Env't v. U.S. Dep't of Justice*, 1995 WL 748246, *11 (D.D.C. 1995) (citation omitted); *see also Seattle Audubon Society v. Evans,* 771 F. Supp. 1081, 1096 (W.D.

42

Wash. 1991), *aff'd,* 952 F.2d 297 (9th Cir. 1991), "[t]his invokes a public interest of the highest order: the interest in having government officials act in accordance with the law."

Indeed, the Federal Defendants' opposition to an injunction in this case is somewhat inconsistent with its position in the *Spiller v. Walker* case cited above. There, the federal agencies agreed to an injunction on oil transport through the pipeline until the NEPA process ordered by the court could be completed. *Spiller v. White*, 352 F.3d 235, 239 (5th Cir. 2003). Courts have held that the purpose of NEPA is to make informed choices about pipelines, and fashioning a remedy that restores that choice as much as possible is necessary and appropriate. *Montana Wilderness Ass'n v. Fry*, 310 F.Supp.2d 1127, 1156-57 (D.Mont. 2004). An injunction in this case gives effect to NEPA's requirement that a full and complete analysis occur *prior* to the project, before alternatives are foreclosed by the construction, "*including the option of taking 'no action.'*" *Silverton Snowmobile Club v. U.S. Forest Serv.,* 433 F.3d 772, 780 (10th Cir. 2006)(quoting 42 U.S.C. § 4332(2)(C)(emphasis supplied); 40 C.F.R. § 1502.14(d)); 40 C.F.R. § 1501.2 ("Agencies shall integrate the NEPA process with other planning at the earliest possible time . . ."); *Kern v. BLM,* 284 F.3d 1062, 1072 (9th Cir. 2002) ("NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment. Rather, it is designed to require such analysis as soon as it can reasonably be done."). An injunction in this case also enforces NEPA's prohibition on the "irretrievable commitment of resources" before the NEPA analysis is complete. 42 U.S.C. § 4332(2)(C)(v); 40 C.F.R. §§ 1501.2, 1502.22; *Pennaco Energy Inc. v. U.S. Dept. of Interior*, 377 F.3d 1147, 1159 (10th Cir. 2004)("Agencies are required to satisfy the NEPA 'before committing themselves irretrievably to a given course of action, so that the action can be shaped to account for environmental values.'")

The purpose of NEPA is to ensure that the agency's decision and EIS will be premised on the fullest possible canvassing of environmental issues, and that environmental factors will be taken into account before the "irreversible momentum" of agency approval. *Jones v. Dist. of Columbia Redevelopment Land Agency*, 499 F.2d 502, 511 (D.C. Cir. 1974). Therefore, "the presumption is that an action proceeding in violation of NEPA should be enjoined, so that the momentum of additional work and investment does not serve further to bind the agency to its initial decision." *Realty Income Trust v. Eckerd*, 564 F.2d 447, 457 (D.C. Cir. 1977). An injunction stops the "bureaucratic steamroller"; for once an agency proceeds with implementation of part of a project "before the environmental analysis is complete a serious risk arises that the analyses of alternatives required by NEPA will be skewed toward completion of the entire Project." *Davis*, 302 F.3d at 1115, n.7.

In this case, the risk of oil spills, harm to the environment, Plaintiffs' injuries, and the public interest in having the Corps and other federal defendants comply with the law and take into account the environmental impacts of their actions *before* the project all outweigh the temporary economic harm an injunction may inflict on Enbridge. Accordingly, the various federal approvals should be enjoined and the Project should be halted until the Court has an opportunity to review and resolve all of Plaintiffs' claims based on the full administrative record. *See Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 326-27 (D.C. Cir. 1987) (affirming district court's finding that an injunction was in the public interest to "protect against further illegal action pending resolution of the merits" and to "protect[] the environment from any threat of permanent damage").[25]

---

[25] Plaintiffs request that the Court waive the bond requirement or impose a nominal bond under the public interest exception to Fed. R. Civ. P. 65(c). *See e.g. Kansas v. Adams*, 705 F.2d 1267, 1269 (10th Cir. 1983); *Colo. Wild v. U.S. Forest Serv.*, 299 F. Supp. 2d 1184, 1191 n.31 (D.

## V.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request this Court issue a Preliminary Injunction enjoining the Corps' verifications and easements, the Service's Incidental Take Statement, PHMSA's approval of and/or exception to the Response Plan, the authorizations of the Bureau and EPA, and construction and operation of the Flanagan South Pipeline, pending a final judgment on the merits. A proposed order is filed herewith.


DATED:  September 4, 2013

Respectfully submitted,


*/s/ Joshua Stebbins*                        */s/ Douglas Hayes*
JOSHUA STEBBINS,                    DOUGLAS HAYES, Colo. Bar No. 39216
D.C. Bar No. 468542                      (admitted *pro hac vice*)
SIERRA CLUB                              ERIC HUBER, Colo. Bar No. 40664
50 F Street NW, 8th Floor              (admitted *pro hac vice*)
Washington, DC 20001                   SIERRA CLUB
(202) 675-6273                             1650 38th Street, Suite 102W
josh.stebbins@sierraclub.org         Boulder, Colorado 80301
                                                  (303) 449-5595
JAMES MURPHY, Vt. Bar No. 3367   (303) 449-6520 (fax)
NATIONAL WILDLIFE                   doug.hayes@sierraclub.org
FEDERATION                             eric.huber@sierraclub.org
149 State Street
Montpelier, VT 05602
(802) 552-4325
jmurphy@nwf.org
                            *Attorneys for Plaintiffs*

---

Colo. 2004). Courts have long declined to impose anything more than a minimal bond in order to avoid frustrating "public-interest" litigation. *See California ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325-26 (9th Cir. 1985); *Natural Resources Defense Council v. Morton*, 337 F. Supp. 167, 168-69 (D.D.C. 1971). Plaintiffs' likelihood of success should "tip[] in favor of a minimal bond or no bond at all." *California ex rel. Van De Kamp*, 766 F.2d at 1326.