# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

)
SIERRA CLUB, *et al.*,                 )
)
      Plaintiffs,              )
)
      v.                          )      Civil Action No. 13-cv-1239 (KBJ)
)
UNITED STATES ARMY              )
CORPS OF ENGINEERS, *et al.*,    )
)
      Defendants.             )
)

## MEMORANDUM OPINION

      The Sierra Club and the National Wildlife Federation ("Plaintiffs") have brought this action for a declaratory judgment against several federal agencies and their executive officers in their official capacity (the "Federal Agencies") regarding construction of the Flanagan South Pipeline, a domestic oil pipeline running from Illinois to Oklahoma (the "FS Pipeline").[1] Plaintiffs allege that the Federal Agencies have failed to assess adequately the environmental impacts of this privately-owned pipeline, in violation of the National Environmental Protection Act ("NEPA"), the Clean Water Act ("CWA"), and the Administrative Procedure Act ("APA"). In addition, Plaintiffs have now filed a motion for a preliminary injunction that asks the Court to enjoin the actions of the Federal Agencies in relation to the FS Pipeline, and to

---

[1] The specific defendants are: the United States Army Corps of Engineers and its officers Lt. Gen. Thomas P. Bostick, Col. Richard A. Pratt, Col. Mark Deschenes, Col. Andrew D. Sexton, and Col. Christopher Hall; the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration and its officers Anthony Foxx and Cynthia L. Quartermain; the United States Fish and Wildlife Service and its officer Daniel M. Ashe; the United States Department of Interior Bureau of Indian Affairs and its officers Sally Jewell and Kevin K. Washburn; and the United States Environmental Protection Agency and its officer Gina McCarthy. In addition, the pipeline's owner, Enbridge Pipelines (FSP) LLC, has been granted intervenor status on the defendants' side pursuant to Federal Rule of Civil Procedure 24. (*See* Minute Order of Sept. 5, 2013.)

enjoin construction and operation of the entire pipeline (which is in the process of being constructed mostly on privately-owned land) pending a final ruling on the merits of the case.

This Court has considered the parties' briefs on the motion for a preliminary injunction, the arguments made at the preliminary injunction hearing, the portions of the record that the parties have submitted in support of and in opposition to the motion, and the complex web of statutes and regulations that Plaintiffs' allegations implicate. Although Plaintiffs have drafted a complaint that attacks the pipeline-related actions of the several government agencies separately, Plaintiffs' central contention in this case is that the Federal Agencies had a collective statutory obligation to perform an in-depth environmental review of the entire FS Pipeline before any construction on the pipeline could commence. At least on the current record, however, Plaintiffs have significantly overstated the breadth of federal involvement in the pipeline project and have failed to establish sufficiently that applicable federal statutes and regulations would require the extensive environmental review process that Plaintiffs seek. Moreover, Plaintiffs have fallen short of demonstrating that irreparable harm will result if the current construction proceeds during the pendency of this litigation, and the Court is not convinced that the balance of harms and public interest factors weigh in Plaintiffs' favor.

Consequently, as explained further below, the Court concludes that Plaintiffs' motion for a preliminary injunction must be **DENIED**.

## I. BACKGROUND

### A. The Flanagan South Pipeline

The FS Pipeline is a proposed 589-mile domestic oil pipeline that, once constructed, will transport tar sands crude oil from Pontiac, Illinois, through the states of Missouri and Kansas, and ultimately into Cushing, Oklahoma.  Enbridge Pipelines (FSP) LLC ("Enbridge"), one of the leading energy transportation companies in North America, owns the planned pipeline.  Enbridge began construction of the pipeline on August 14, 2013, and expects to complete the pipeline in the summer of 2014.

At least 560 miles of the 589 miles of pipe that will comprise the FS Pipeline will traverse land that is entirely privately owned.  According to Enbridge, the company has identified 2,368 tracts owned by 1,720 separate landowners along the course of the pipeline and has secured 96% of the land rights along the entire route.  Thus, with respect to the vast majority of the pipeline, no federal permission or authorization is required for construction.  However, it is undisputed that the FS Pipeline will at times cross federal lands and waterways at various points along its planned route through the heart of the country.  Three types of federal crossings will occur and are at issue in this litigation:  (1) 13.68 total miles of "waters of the United States" (as defined in the CWA and its implementing regulations) that are primarily located on private land but are subject to the jurisdiction of the Army Corps of Engineers (the "Corps") under the CWA[2]; (2) 12.3 miles of Native American land that is subject to the jurisdiction of the Bureau of Indian Affairs ("BIA"); and (3) 1.3 miles of land that the federal government

---

[2] The statutory definition of "waters of the United States" includes, in addition to interstate waters and wetlands, "[a]ll other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce."  33 C.F.R. § 328.3 (2013).

owns and that is also under the Corps's jurisdiction. To construct and operate the portion of the pipeline that traverses these 27.28 total miles, Enbridge must have federal approval, and a separate statutory and regulatory scheme, discussed below, governs each type of land or water crossing.

**B. Alleged Federal Involvement With The Flanagan South Pipeline**

Because Congress has not authorized the federal government to oversee construction of a domestic oil pipeline, Plaintiffs' complaint relies on a series of federal environmental laws and regulations that require federal agencies with some involvement in domestic pipeline construction to follow certain procedures. The applicable statutes and regulations are set forth in Part C below. The following description of Plaintiffs' allegations regarding federal involvement with the FS Pipeline provides the necessary context.

1. The Corps's "Verifications" Under the Clean Water Act and Nationwide Permit 12

When constructed, the FS Pipeline will cross approximately 1,950 wetlands or waters under the jurisdiction of the Corps—an area that, as noted above, totals 13.68 miles. To undertake the portions of the FS Pipeline construction project that may impact these waterways, Enbridge is required by law to seek federal approval, as mentioned above and explained further below. In August and September of 2012, Enbridge filed a formal notice under the CWA's general permitting system requesting Corps district engineers from each of the four Corps districts through which the proposed FS Pipeline runs to verify that construction of the FS Pipeline project is

consistent with a pre-existing general permit that the Corps had previously issued.[3]

Enbridge's notice included specific plans for mitigating any potential adverse impacts

from the FS Pipeline construction project, as the general permitting system requires.

One year later, in August and September 2013, each of the four Corps districts issued a

verification letter to Enbridge, confirming that the FS Pipeline's water crossings were

consistent with an applicable general permit, provided Enbridge undertook the

mitigation plans outlined in its notice.

2. The Corps's Consideration Of Easements For Construction On Federal
    Lands

In addition to the wetlands under the Corps's jurisdiction, the FS Pipeline passes

through approximately 1.3 miles of other federal land under the jurisdiction of the

Corps, consisting of 0.7 miles of land at the Mississippi River near Quincy, Illinois, and

0.6 miles of land at the Arkansas River near Tulsa, Oklahoma. Congress has

empowered federal agencies to grant rights-of-way across lands "for pipeline purposes

for the transportation of oil, natural gas, synthetic liquid or gaseous fuels[,]" 30 U.S.C.

§ 185(a) (2012), and the governing statute expressly places numerous responsibilities

on an agency considering whether to permit construction on federal land, including

safety requirements, notice requirements, and reporting requirements (including

reporting to specific Congressional committees), *id.* § 185(g), (k), (w). An agency must

---

[3] As Part I.C.2, *infra*, explains, the CWA offers two routes for getting federal approval to affect the nation's waterways with construction activities: either an individualized permitting process, or a mechanism for having one's project verified as consistent with pre-existing general permits that apply to a given geographical area (including nationwide). 33 U.S.C. § 1344(a), (e) (2012). Enbridge chose the latter. Enbridge requested that the district engineers verify that the construction activities related to the FS Pipeline were consistent with Nationwide Permit 12, a general permit that the Corps reissued in 2012 and that authorizes "[a]ctivities required for the construction, maintenance, repair, or removal of utility lines and associated facilities in the waters of the United States, provided the activity does not result in a loss of more than ½-acre of water for each single and complete project." Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184, 10,271 (February 21, 2012).

also comply with applicable environmental statutes and regulations, such as the National Environmental Protection Act, discussed below. *Id.* § 185(h).

In April and May of 2013, Enbridge applied to the relevant Corps districts for easements to construct the 1.3 mile segment of the FS Pipeline that runs over federal land. Enbridge submitted its applications using a standard form for the construction of transportation and utilities systems on federal lands—an application process that the Corps subjects to the same review procedures as any third-party request for the use of Corps lands. As of the writing of this Opinion, the Corps had informed the relevant Congressional committees (the House and Senate Committees on Natural Resources) about Enbridge's easement applications, and had begun an environmental assessment of the project, but had not yet reached a decision about whether or not to grant Enbridge's applications.

### 3. The BIA's Consideration Of Easements For Construction On Indian Land That The Federal Government Holds In Trust

Under 25 U.S.C. § 323, the BIA "is empowered to grant rights-of-way for all purposes, subject to such conditions as [the Secretary of the Interior] may prescribe, over and across any lands now or hereafter held in trust by the United States for individual Indians or Indian tribes." The BIA has promulgated regulations governing the granting of easements over Indian land. *See generally* 25 C.F.R. Part 169 (2013). These regulations include specific guidelines for, among other things, applications, surveying, and providing consideration to landowners. *Id.* The regulations also include specific provisions pertaining to easements for oil or gas pipelines. *See id.* § 196.25.

The proposed FS Pipeline crosses over 34 parcels of privately-owned Indian land subject to the BIA's jurisdiction, comprising a total of 12.3 miles. As of the writing of

this Opinion, Enbridge had applied to the BIA for easements over these parcels, and the BIA was in the process of conducting an environmental assessment of the impact of the pipeline on those areas. The BIA had not yet determined whether to grant or deny Enbridge's requested easements.

    4.  <u>The Fish and Wildlife Service's Biological Opinion And Incidental Take Statement</u>

As a part of the process for evaluating Enbridge's request for easements to construct portions of the FS Pipeline on the federal lands as described above, the Corps and the BIA consulted the Fish and Wildlife Service ("FWS") about the potential impact of the FS Pipeline on animal life in the area. Under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544 (2012), all federal agencies must consult with the FWS to ensure that "any action authorized, funded, or carried out by such agency" is unlikely "to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species[.]" 16 U.S.C. § 1536(a)(2). The agency or agencies must engage in formal consultations with the FWS, and the ESA's implementing regulations contain detailed guidelines that govern these consultations. *See, e.g.*, 50 C.F.R. § 402.14(c) (2013). Moreover, at the conclusion of the required consultation, the FWS must issue a written opinion "detailing how the agency action affects [any endangered] species or its critical habitat" and if any issues are identified, "suggesting . . . reasonable and prudent alternatives" that the FWS believes would not run afoul of the ESA's mandate to protect such species. 16 U.S.C. § 1536(b)(3)(A). If the FWS believes that the agency action might result in the "taking" (*i.e.*, killing) of some members of an endangered species, but is not likely to jeopardize that species' existence or adversely affect its environment in

violation of section 1536(a)(2), the FWS will issue an "incidental take statement" that sets out measures that the FWS considers "necessary or appropriate to minimize [the] impact" of the agency action on any endangered species. 16 U.S.C. § 1536(b)(4).

Pursuant to this statutory and regulatory scheme, in May and June of 2013, both the Corps and the BIA requested that the FWS evaluate the impact of the construction of the FS Pipeline on certain endangered or threatened species. (FWS Biological Opinion on Enbridge Pipelines (FSP) LLC's Flanagan South Pipeline Project ("Biological Opinion"), ECF No. 14-8, at i.) The Corps specifically requested the FWS's opinion regarding the effects of the pipeline on both the decurrent false aster plant and the Indiana bat, while the BIA's consultation request included both of those species and also the American burying beetle. (*Id.*)

The FWS issued its Biological Opinion on July 24, 2013. With respect to the decurrent false aster, the FWS found that the effects from the FS Pipeline would be "small[, and] temporary, and recovery will be rapid." (*Id.*) For the American burying beetle, the Biological Opinion concluded that the pipeline construction might modify approximately 200 acres of species habitat, and that some beetles may be disturbed or killed, but that "most of the effects [of construction on the beetle] are expected to be infrequent, of short duration, and reversible." (*Id.* at i-ii.) Finally, regarding the Indiana bat, the FWS predicted that the construction would "potentially" kill 19 non-reproductive bats and "harm or harass" no more than 120 other bats, but that "these impacts are not likely to cause maternity colony impacts" and therefore "it is unlikely that the anticipated effects [of the pipeline] will affect the likelihood of achieving the recovery needs of the species[.]" (*Id.* at ii.) Additionally, because the FWS found that

it was possible that the pipeline construction would result in the death of some endangered beetles and/or bats, it issued an incidental take statement that exempted the Corps, the BIA, and Enbridge from the prohibitions against "taking" endangered species found in the ESA, provided that any such taking was done in compliance with the terms of the incidental take statement.  (*Id.*)

> 5. <u>The Pipeline and Hazardous Materials Safety Administration's Failure To Act On The Not-Yet-Filed Oil Spill Response Plan</u>

Finally, as discussed further below, Plaintiffs rest one claim in the complaint on the *in*action of a federal agency regarding an assessment of the risks involved with transporting oil through the FS Pipeline.  The Oil Pollution Act of 1990, 33 U.S.C. §§ 2701-2762, mandates that operators of oil facilities (which include pipelines) "prepare and submit to the President a plan for responding, to the maximum extent practicable, to a worst case discharge, and to a substantial threat of such a discharge, of oil or a hazardous substance."  33 U.S.C. § 1321(j)(5) (2012).  The Pipeline and Hazardous Materials Safety Administration ("PHMSA"), a division of Department of Transportation, has authority to promulgate regulations governing these response plans. *See* Exec. Order No. 12,777 § (2)(d)(2), 56 Fed. Reg. 54,757 (Oct. 22, 1991).  PHMSA regulations permit pipeline operators to submit spill response plans based on "response zones," such that more than one pipeline may be covered by a single plan if they are in the same geographic region.  49 C.F.R. §§ 194.5, 194.107 (2013).  Moreover, the required response plan must be submitted before an operator can "handle, store, or transport oil in that pipeline," but the operator does not need to submit a plan prior to the pipeline's construction.  *Id.* § 194.7(a).  In addition, so long as the operator has submitted a plan to the PHMSA and has certified that there is adequate personnel and

equipment to deal with an oil spill, a pipeline may be in operation for up to two years without PHMSA approval of a plan. *Id.* §§ 194.7(c), 194.119(e).

As the owner and future operator of the proposed FS Pipeline, Enbridge is required to submit a response plan to the PHMSA before the pipeline begins operating. The FS Pipeline is still under construction, however. At the time of the writing of this Opinion, Enbridge had not yet submitted any oil spill response plan for PHMSA review.

### C. Plaintiffs' Interests And Specific Claims

Plaintiffs are the Sierra Club, one of the oldest and largest environmental organizations in the country, which currently has approximately 600,000 members and traces its roots back to 1892; and the National Wildlife Federation, the nation's largest conservation advocacy and education organization. (First Amended Complaint ("Compl."), ECF No. 7, ¶¶ 12, 16.) Some of the Sierra Club's members live in each of the regions through which the FS Pipeline is planned to run. (*Id.* ¶ 13.) Plaintiffs allege that the construction and operation of the FS Pipeline without proper environmental review will injure them, both because they rely on such environmental reviews for information used in planning their activities and disseminating information to their members, and because they and their members have aesthetic, scientific, recreational, business, and property interests in the areas where pipeline construction and operation will occur. (*Id.* ¶¶ 17-18.)

Based on the complaint and the statements made during the preliminary injunction hearing, Plaintiffs' primary concern appears to be that the proposed FS Pipeline will damage the environment and that the federal government has not adequately assessed the environmental impact of this pipeline proposal. However, as

noted above, there is no federal statute that requires or permits federal oversight of an entirely domestic oil pipeline such as the one at issue here. Consequently, Plaintiffs have brought this action in federal court in reliance on various federal laws that, when applicable, require agencies and individuals to comply with certain standards prior to undertaking construction projects that may impact the environment.

Plaintiffs have organized the allegations in their complaint into six separate claims, five of which arise under National Environmental Protection Act, the Clean Water Act, and the Administrative Procedure Act. (*See generally* Compl. ¶¶ 143-93.)[4] As promised, the statutory schemes that these claims implicate are discussed in more detail below.

### 1. The National Environmental Protection Act ("NEPA")

The bulk of Plaintiffs' complaint arises under NEPA, 42 U.S.C. §§ 4321-4347 (2012). (*See* Compl. ¶¶ 155-89 (Counts II – V).) As a general matter, Congress enacted NEPA as a call to the federal government to consider the environmental consequences of its actions, *see* 42 U.S.C. § 4331(b)(1), and the regulations implementing NEPA describe it as the country's "basic national charter" for environmental protection. 40 C.F.R. § 1500.1 (2013).

NEPA is, in essence, a "procedural statute" designed to ensure that federal agencies make fully-informed and well-considered decisions. *New York v. Nuclear*

---

[4] One of Plaintiffs' six claims (Count I) invokes the Freedom of Information Act ("FOIA") and alleges that the Corps violated FOIA by denying certain document requests and missing the deadlines to produce responsive documents. (Compl. ¶¶ 143-54.) This claim has a distinct procedural history: on September 30, 2013, the Court stayed the FOIA portion of the complaint and effectively severed it from the remaining claims at issue in the preliminary injunction motion, based on the Federal Agencies' representations that they were in the process of producing documents responsive to Plaintiffs' FOIA requests. (*See* Minute Order of Sept. 30, 2013; Defs.' Response to Order to Show Cause, ECF No. 30, at 4.)

*Regulatory Comm'n*, 681 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Vermont Yankee*

*Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978) (internal quotation marks

omitted)).  To this end, before a federal agency undertakes a "major federal action[]

significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C),

NEPA requires the agency to evaluate the environmental consequences of that proposed

action.  The required evaluation involves preparing a detailed environmental impact

statement ("EIS") that describes the impact of the proposed action on the environment

and any alternatives to the proposed action, which the agency must publish for public

review and comment.  *Id.*[5]

    To determine whether a particular agency action qualifies as a "major federal

action significantly affecting the quality of the human environment" such that an EIS is

required, an agency may opt to prepare a less-detailed environmental assessment

("EA"), which is a "concise public document" that briefly provides evidence and

analysis to assist an agency in deciding whether the action in question requires an EIS.

40 C.F.R. § 1501.4(a)-(c); *id.* § 1508.9 (defining an EA).  Based on the information

contained in the EA, the agency may proceed to prepare an EIS; alternatively, the

---

[5] An agency's preparation of an EIS is an extensive undertaking that is generally prepared in two stages, both a draft and a final stage, and the agency is required to invite comments on the draft statement before preparation of the final EIS.  *See* 40 C.F.R. § 1502.9 (2013); 40 C.F.R. Part 1503 (2013).  When preparing an EIS, the agency is required to, among other things, consult with other federal agencies that may have special expertise with respect to the environmental effects of the project, 42 U.S.C. § 4332(2)(C) (2012), and the EIS must not only detail the unavoidable adverse environmental consequences of the proposed project and alternatives to the project, but also address the extent to which the project's adverse effects can be avoided through possible mitigation measures.  *Id.* § 4332(2)(C)(i)-(iii); *see also* 40 C.F.R. §§ 1502.14 (2013) (describing as the "heart" of the EIS the section comparing description of the proposed action to reasonable alternatives), 1502.15 (requiring the EIS to include a section describing the affected environment), 1502.16 (requiring a section that discusses the environmental consequences, which forms the "scientific and analytic basis" for the comparison of the proposed action to reasonable alternatives), 1508.25 (describing the scope of an EIS).

agency may conclude that its action will not have a significant effect on the human environment such that an EIS is not warranted.  40 C.F.R. § 1501.4(e).[6]

NEPA is relevant to this case because most of Plaintiffs' claims allege that, in myriad respects, the Federal Agencies have failed to abide by their NEPA review obligations with respect to the FS Pipeline.  These claims generally fall into two categories:  first, that the individual actions of certain Federal Agencies regarding the FS Pipeline were "major federal actions" requiring those agencies to prepare an EIS or at least undertake an EA under NEPA (Compl. ¶¶ 155-79 (Counts II-IV)); and second, that the combined actions of all the Federal Agencies gave rise to an unfulfilled NEPA obligation to conduct a detailed environmental analysis of the entire 589-mile pipeline as a whole (Compl. ¶¶ 180-89 (Count V)).

   2. <u>The Clean Water Act And Nationwide Permit 12</u>

Plaintiffs maintain that the Corps' actions in regard to the proposed FS Pipeline water crossings violate the CWA, 33 U.S.C. §§ 1251-1387 (2013), both because the Corps was required to conduct a NEPA review prior to providing the requested CWA verifications (Count II), and because the Corps erred in concluding that the construction project at issue here satisfied the requirements of the pre-existing general permit known as Nationwide Permit 12 ("NWP 12") (Count VI).  (*See* Compl. ¶¶ 155-64; 190-93.) Plaintiffs' claims in this regard relate generally to the stated purpose of the CWA—to "restore and maintain the chemical, physical, and biological integrity of the Nation's

---

[6] If the agency concludes that no EIS is warranted after preparing an EA, the agency will make a finding of no significant impact ("FONSI"), which is reflected in a document that details the agency's conclusion that its action will not have a significant effect on the human environment.  *See* 40 C.F.R. §§ 1501.4(e), 1508.13 (2013).

waters," 33 U.S.C. § 1251—a goal that Congress has generally sought to accomplish by prohibiting the discharge of any pollutant, including dredged or fill material, into the "waters of the United States."  *See* 33 U.S.C. §§ 1311, 1362(6), (7), (12).  Section 404 of the CWA allows for limited exceptions to this general prohibition against discharges, however; in this regard, the statute specifically authorizes the Secretary of the Army (acting through the Corps) to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites."  33 U.S.C. § 1344(a).[7]

Significantly for present purposes, two alternative types of discharge permits are available under Section 404:  (1) individual permits that the Corps provides with respect to a particular project, and (2) general permits that are issued for a given activity within a certain geographical area, *i.e.*, a state, a region, or (as relevant here) nationwide.  33 U.S.C. §§ 1344(a), (e).  Individual permits are subject to detailed application and processing instructions, and before the Corps can issue an individual permit, it must conduct a case-specific review of each application, including preparation of an EA or EIS pursuant to NEPA.  *See generally* 33 C.F.R. Parts 323, 325 (2013) (setting forth the application and review guidelines for individual permits).  General permits, on the other hand, are designed to streamline the permitting process for certain, pre-approved "categor[ies] of activities," namely, those activities that the Corps determines are "similar in nature," "will cause only minimal adverse environmental effects when performed separately," and "will have only minimal cumulative adverse effect on the environment."  33 U.S.C. § 1344(e)(1); *see generally* 33 C.F.R. Part 330 (2013) (setting forth the purposes of and procedures relating to the

---

[7] "Navigable waters" means "the waters of the United States," which includes certain types of wetlands such as those over which the FS Pipeline intermittently traverses.  *See* 33 U.S.C. § 1362(7); *see also* footnote 2, *supra*.

general permit program).  A general permit is valid for five years, and can be reissued

for subsequent five-year periods.  *See* 33 U.S.C. § 1344(e)(2).  Moreover, once the

Corps has issued or reissued a general permit, regional Corps officials known as

"division engineers" retain "discretionary authority to modify, suspend, or revoke

[general permit] authorizations for any specific geographic area, class of activities, or

class of waters within" a given geographical location.  33 C.F.R.  § 330.5(c)(1).

Notably, general permits—including the nationwide permit at issue here—

undergo a stringent pre-approval evaluation process that involves a comprehensive

environmental assessment under NEPA and also public notice and comment.

Consequently, once a general permit is issued or reissued, the requisite environmental

analysis for any conforming project is considered to have been completed, and persons

who seek to engage in activities that the general permit covers may ordinarily "proceed

with activities authorized by [general permits] without notifying the [Corps]."  *Id.* §

330.1(e)(1).  In some cases, however, a prospective permittee must seek specific

verification that the relevant general permit covers the activity, *id.* § 330.1(d), which is

accomplished when a prospective permittee files a "pre-construction notice" ("PCN")

with the relevant Corps district engineer.  After reviewing a PCN, the district engineer

may choose to verify that the general permit is applicable by sending the permitee a

verification letter immediately, or the district engineer "may add activity-specific

conditions to ensure that the activity complies with the terms and conditions of the

[general permit] and that the adverse impacts . . . are individually and cumulatively

minimal."  *Id.* § 330.1(e)(2).  Alternatively, in response to a PCN, the district engineer

may determine that the adverse effects of the activity are more than minimal and, as a

result, either notify the prospective permittee that an individual permit is required, or permit the permittee to propose "measures . . . to reduce the adverse impacts to minimal." *Id.* § 330.1(e)(3).[8]

This case concerns Nationwide Permit 12, a nationwide permit that the Corps reissued in 2012. NWP 12 specifically authorizes discharges into federal waterways as required for

> the construction, maintenance, repair, and removal of utility lines and associated facilities in waters of the United States, provided the activity does not result in the loss of greater than 1/2-acre of waters of the United States for each single and complete project.

Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184, 10,271 (Feb. 21, 2012). The definition of a "utility line" in NWP 12 includes "any pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance, for any purpose[.]" *Id.* Moreover, for "linear" projects, such as the FS Pipeline,[9] each crossing of a water body at a separate and distant location is considered a "single and complete project" for the purpose of NWP 12. 77 Fed. Reg. at 10,290.

Prior to the reissuance of NWP 12 in 2012, the Corps followed the extensive evaluation process that the regulatory scheme requires for issuance of a general permit,

---

[8] If a permittee proposes additional measures to mitigate the environmental impact of the proposed activity involving discharge, the district engineer must review the proposed mitigation strategy and "shall add activity-specific conditions to ensure that the mitigation will be accomplished." 33 C.F.R. § 330.1(e)(3) (2013). If the district engineer concludes that the mitigation strategy is insufficient, he "will instruct the prospective permittee on procedures to seek authorization under an individual permit." *Id.* On the other hand, if the district engineer concludes that the activity in question, coupled with any mitigation measures and activity-specific conditions, is qualified to proceed under the relevant NWP, he will send a "verification" letter to the permittee.

[9] A "linear project" is "a project constructed for the purpose of getting people, goods, or services from a point of origin to a terminal point, which often involves multiple crossings of one or more waterbodies at separate and distant locations." 77 Fed. Reg. at 10,195. "Roads and pipelines are examples of linear projects." *Id.* at 10,263. The parties do not dispute that the FS Pipeline is a linear project.

including preparation of a comprehensive EA pursuant to NEPA. 42 U.S.C.

§ 4332(2)(C). The Corps also conducted an "impact analysis" under the Environmental

Protection Agency's CWA Section 404(b)(1) guidelines, *see* 40 C.F.R. Part 230

Subparts C-F, and performed a "public interest review" of the factors set forth in 33

C.F.R. § 320.4(a)(1) (2013).[10] After conducting the relevant reviews and assessments,

the Corps then produced a "decision document" that incorporated all of the information

it gathered and the conclusions it drew from the reviews of the proposed reissuance of

NWP 12. The Corps released this document (along with a notice in the Federal

Register) for public notice and comment. *See* 33 C.F.R. § 330.1(b); Proposal to Reissue

and Modify Nationwide Permits, 76 Fed. Reg. 9,174 (Feb. 16, 2011). The Corps

subsequently published a final version of the NWP 12 decision document, which

authorized certain discharges in relation to utility projects as described, along with the

Corps's responses to any public comments.

In the instant case, as noted in Part I.B.1 above, Enbridge filed PCNs in August

and September of 2012, in order to seek verifications from four district engineers that

the FS Pipeline construction project was consistent with NWP 12. Enbridge's PCNs

included extensive mitigation plans to offset the impact the construction might have on

the environment, including requirements that existing flow rates be maintained; that in-

stream excavation activities be limited in duration; that the contours of waterbody beds

and banks be restored and stabilized within 24 hours; and that specific drilling

---

[10] The regulations governing proposed general permits required the Corps to assess "[a]ll factors which may be relevant to the proposal" including "conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people." 33 C.F.R. § 320.4(a)(1).

techniques be employed to avoid any impact (even of a temporary nature) on certain large and select water bodies. (*See, e.g.*, Decl. of Joseph McGaver, ECF No. 27-2, ¶¶ 19-23.)

In August and September of 2013, Enbridge received verifications from each of the four district engineers stating that discharges and other activities that impact waterways in relation to the construction of the FS Pipeline were consistent with NWP 12, provided that Enbridge complied in all respects with the environmental mitigation measures outlined in its PCNs. (*Id.* ¶ 12.) The district engineers further conditioned their verification on Enbridge's purchasing wetland bank credits as compensation for some temporary and permanent changes of forested wetlands to emergent wetlands, at a cost of approximately $4 million. (*Id.* ¶ 26.)

Despite these measures, Plaintiffs contend that the CWA requires the Corps to have done more to evaluate the environmental impact of the FS Pipeline before verifying that the water crossings were consistent with NWP 12; in particular, Plaintiffs maintain that the Corps should have conducted a NEPA review and should have produced either an EA or an EIS that took into consideration the overall environmental effect of the entire FS Pipeline project, including those portions that were to be constructed on privately owned land. (*See* Compl. ¶¶ 155-60 (Count II).) Plaintiffs also argue that the district engineers erred in verifying the project's 1,950 water crossings under NWP 12 for two reasons: first, because they failed to take into account the "cumulative" effect of the project, and second, because they verified certain water crossings that are or will be closer to public water supply intakes than is permitted

under the general permitting system.  (*See* Compl. ¶¶ 190-93 (Count VI).)

Significantly, Plaintiffs have eschewed any facial challenge to NWP 12 itself.

3.   The Administrative Procedure Act

 Plaintiffs' complaint alleges that, insofar as none of the Federal Agencies have

completed an EA and EIS with respect to the FS Pipeline, the Federal Agencies have

not only violated NEPA, they have also violated the APA.  This coupling of the NEPA

requirement with APA review arises primarily from the fact that "NEPA does not

provide a separate cause of action for plaintiffs seeking to enforce its EIS

requirements."  *Nat'l Coal. to Save Our Mall v. Norton*, 161 F. Supp. 2d 14, 19 (D.D.C.

2001), *aff'd,* 269 F.3d 1092 (D.C. Cir. 2001).  Therefore, Plaintiffs must bring their

NEPA claims under a separate statutory scheme, typically the general review provision

of the APA.  *See, e.g.*, *City of Williams v. Dombeck*, 151 F. Supp. 2d 9, 25 (D.D.C.

2001).

Under the APA, a court reviews an agency action to determine whether it is

"arbitrary or capricious."  5 U.S.C. § 706(2)(A) (2012).  An agency acts arbitrarily or

capriciously if it "relie[s] on factors which Congress has not intended it to consider,

entirely fail[s] to consider an important aspect of the problem, [or] offer[s] an

explanation for its decision that runs counter to the evidence before the agency[] or is

so implausible that it could not be ascribed to a difference in view or the product of

agency expertise."  *Stephens v. U.S. Dep't of Labor*, 571 F. Supp. 2d 186, 191 (D.D.C.

2008).

 Courts considering an APA claim in the NEPA context often draw a distinction

between, complaints about the scope of an agency's NEPA analysis, on the one hand,

claims that an agency has erred in determining that it is not required to perform a NEPA analysis, and on the other. In the first category, courts review an agency's decision to conduct a limited NEPA review under the typical APA "arbitrary and capricious" standard because the question presented for review is generally a factual, not legal, dispute. *See, e.g.*, *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377 (1989) (explaining that, when a question presented for review involves a factual dispute, the court must defer to "the informed discretion of the responsible federal agencies."). In the second category, where an agency concludes that NEPA does not apply to its actions at all, the agency's decision is "not entitled to the deference that courts must accord to an agency's interpretation of its governing statute and is instead a question of law, subject to de novo review." *Sierra Club v. U.S. Dep't of Agric.*, 777 F. Supp. 2d 44, 54 (D.D.C. 2011) (internal quotation marks omitted).

Here, in addition to making several APA claims that derive from the Federal Agencies' alleged failure to comply with NEPA (*see* Compl. ¶¶ 155-89 (Claims II-V)), Plaintiffs also contend that the Corps violated the APA insofar as that agency's district engineers verified that the water crossings at issue in this action satisfied the standards set forth in NWP 12 (*see id.* ¶¶ 190-93 (Claim VI)). This latter claim is reviewed under the familiar arbitrary and capricious standard applicable to claims arising under the APA. *See* 5 U.S.C. § 706(2)(A).

### 4. The Instant Complaint

The aforementioned statutory and regulatory regimes loom large in any consideration of Plaintiffs' complaint, and this is especially so where, as here, Plaintiffs have filed a motion for a preliminary injunction, thereby requiring the Court to assess

the likelihood of their success on the merits.  (*See infra*, Part II.)  The Court notes that Plaintiffs' complaint is not a model of clarity with respect to what conduct is being alleged as a violation of which statute, however; hence, repeated reminders of the specific claims and the implicated statutes are required.

To summarize what has already been described, the instant complaint contains six claims, five of which are relevant to the pending motion.[11]  Claim II alleges that the Corps violated NEPA and the APA, and references both the Corps's verifications that the water crossings satisfy NWP 12, which were made pursuant to the CWA, and the requested easements over federal land, which the Corps is apparently still considering pursuant to their authority to grant easements for construction projects that traverse land over which the Corps has jurisdiction.  In this claim, Plaintiffs maintain that the Corps violated federal law when it issued the NWP 12 verifications without performing an environmental assessment of the pipeline (Compl. ¶¶ 156-60), and also when it "allow[ed] Enbridge to proceed with construction before the easements have been granted and before [the] required environmental review has been completed[.]" (*Id.* ¶ 161.)

Claim III alleges that the FWS violated NEPA and the APA when, without conducting a comprehensive environmental assessment, it issued the required Biological Opinion and incidental take statement in response to the other agencies' formal request for a consultation regarding the potential impact of the proposed pipeline construction project on certain species.  (*Id.* ¶¶ 165-71.)

---

[11] As noted in footnote 4, *supra*, Claim I has been effectively severed from the instant motion and therefore is not currently at issue.

Claim IV alleges that the PHMSA violated NEPA and the APA when it failed to approve an oil spill response plan pursuant to the Oil Pollution Act prior to the beginning of pipeline construction, even though no such plan has been prepared or submitted to the agency. (*Id.* ¶¶ 172-79.)

Claim V alleges that all of these federal agency actions or inactions—including the actions of the BIA in considering Enbridge's request for easements over Indian land (which are not the subject of a separate claim)—gave rise to an obligation on the part of the Federal Agencies to conduct a full-scale NEPA review of the entire FS Pipeline, and to select a "lead agency" primarily responsible for preparing the report. (*Id.* ¶¶ 180-89.)

Finally, Claim VI alleges that the Corps violated NWP 12, the CWA, and the APA both when it allegedly failed to include consideration of the cumulative effect of all the verifications issued in connection with the FS Pipeline in its analysis of whether the verifications satisfied NWP 12, and also when it verified certain water crossings that are purportedly outside the scope of NWP 12 because they are in the proximity of a public water supply intake. (*Id.* ¶¶ 190-193.)

As a result of all of these alleged violations of federal law, Plaintiffs' complaint asks this Court for "a declaratory ruling" that contains the following specific findings:

> (a) the Corps should have prepared an EA or an EIS for its verifications and easements; (b) the [FWS] should have prepared an EA or EIS for its Biological Opinion and Incidental Take Statement; (c) PHMSA should have prepared an EA or an EIS for the [FS Pipeline's] emergency response plan; (d) the Corps or one of the other federal agencies involved should have prepared an EA or an EIS for the *entire* [FS] Pipeline project, or at a minimum designated a lead agency for that comprehensive NEPA analysis; and

> (e) the Corps' verifications of the [FS Pipeline] were
> contrary to the Clean Water Act and [NWP 12].

(Compl. ¶ 8.)  Moreover, as mentioned previously, Plaintiffs have now filed a motion

for a preliminary injunction asking the Court to suspend all actions of the Federal

Agencies related to the FS Pipeline and to "enjoin[] Enbridge Pipelines LLC and all of

its agents, officers, employees and anyone acting in concert with it, from construction

and operation of the [FS Pipeline] pending a final ruling on the merits."  (Plaintiffs'

Opening Brief ("Pl. Br."), ECF No. 14, at 1.)

## II.    PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded

upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res.

Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  A party seeking a preliminary injunction

"must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to

suffer irreparable harm in the absence of preliminary relief, [3] that the balance of

equities tips in [its] favor, and [4] that an injunction is in the public interest."  *Id.* at 20.

In conducting an inquiry into these four factors, "[a] district court must 'balance the

strengths of the requesting party's arguments in each of the four required areas.' . . . If

the showing in one area is particularly strong, an injunction may issue even if the

showings in other areas are rather weak."  *Chaplaincy of Full Gospel Churches v.

England* ("*CFGC*"), 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *CityFed Fin. Corp. v.

Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).  However, "a movant

must demonstrate 'at least some injury' for a preliminary injunction to issue." *Id.* (citation omitted). [12]

## III.  ANALYSIS

### A. Likelihood Of Success On The Merits

1. Plaintiffs' NEPA Claims

Four counts of Plaintiffs' complaint directly implicate NEPA, as previously explained.  Although Plaintiffs have opted to plead substantially similar NEPA allegations in separate counts, Plaintiffs have repeatedly summarized their overarching NEPA contention as the argument that as a result of the Federal Agencies' participation in various aspects of the FS Pipeline construction project, the agencies had a statutory obligation to prepare an EIS, or at least to conduct an EA, of the entire pipeline, even those portions that are being constructed on private land and that would otherwise not be subject to federal oversight.  (*See, e.g.*, Pl. Br. at 19-21; Plaintiffs' Reply Brief ("Pl. Reply"), ECF No. 34, at 19-21; Hr'g Tr. (Sept. 27, 2013), at 10:9-11 (statement of Plaintiffs' counsel that "[t]he question [in this case] is whether any federal agency has to look at the entire oil pipeline.").)  There is no dispute that the NEPA duty to prepare

[12] This approach to analyzing the preliminary injunction factors is traditionally used in this Circuit and is often referred to as a "sliding scale."  The D.C. Circuit has recently suggested that this sliding scale approach may no longer be applicable after the Supreme Court's decision in *Winter* and that, instead, a more stringent test applies.  *See Sherley v. Sebelius,* 644 F.3d 388, 393 (D.C. Cir. 2011) (likelihood of success on the merits and irreparable harm may be "independent, free-standing requirement[s] for a preliminary injunction" (internal quotations marks and citation omitted)); *see also Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh & Henderson, JJ., concurring) ("[U]nder the Supreme Court's precedents, a movant cannot obtain a preliminary injunction without showing *both* a likelihood of success *and* a likelihood of irreparable harm, among other things.").  However, in the absence of a precedential ruling to this effect, this Court will apply the more lenient sliding scale standard to the injunction at issue here.  *Cf. Kingman Park Civic Ass'n v. Gray*, No. 13-cv-990, 2013 WL 3871444, at *3 (D.D.C. Jul. 29, 2013) ("[A]bsent . . . clear guidance from the Court of Appeals, the Court considers the most prudent course to bypass this unresolved issue and proceed to explain why a preliminary injunction is not appropriate under the 'sliding scale' framework. If a plaintiff cannot meet the less demanding 'sliding scale' standard, then it cannot satisfy the more stringent standard alluded to by the Court of Appeals.").

an EIS or to conduct an EA—hereinafter collectively referred to as an "environmental review" under NEPA—only arises when a federal agency undertakes "major federal action[] significantly affecting the quality of the human environment[.]"  42 U.S.C. § 4332(2)(C).  For the reasons that follow, the Court concludes that Plaintiffs have not demonstrated that they are likely to succeed on the merits of their contention that the participation of any of the Federal Agencies, alone or in combination, triggered a NEPA obligation to conduct an environmental review of the FS Pipeline before construction on the pipeline project commenced.

a. *The Corps's Verifications Were Issued Under NWP 12 And Thus An Individualized Environmental Review Under NEPA Was Not Required*

Plaintiffs' myriad allegations and assertions regarding the Corps's CWA verifications appear to boil down to two basic contentions:  (1) the verifications themselves "[c]onstitute [m]ajor [f]ederal [a]ction[s]" that triggered a duty on the part of the Corps to conduct an environmental review under NEPA (Pl. Br. at 13), and (2) the fact that the verifications in this case involved many water crossings spread out throughout the entire pipeline transformed the otherwise private construction project into a major federal action such that the Corps should have conducted an environmental review of the pipeline pursuant to NEPA (*id.* at 19).  Neither of these assertions is likely to be successful on the merits.

First of all, the linchpin of these related arguments is the mistaken assumption that the verifications are the equivalent of a permit insofar as they effectively *authorized* the FS Pipeline to proceed.  (*See, e.g.*, *id.* at 13 (stating that "[t]he Corps'[s] verifications under NWP 12 permit the construction of the Pipeline" and that "Corps'[s] approval is 'essential to completion of the project'" (citation omitted)); *see also id.*

("No part of Flanagan South could operate without the verifications.").) To be sure, some courts have held that "'if a federal permit is a prerequisite for a project with adverse impact on the environment, issuance of that permit does constitute a major federal action'" for NEPA purposes, as Plaintiffs argue here. (Pl. Br. at 13 (quoting *Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir. 1996)); *see also id.* (citing *Wyoming Outdoor Council v. U.S. Corps of Eng'rs*, 351 F. Supp. 2d 1232, 1242 (D. Wyo. 2005)).) But such courts generally were not assessing verifications under the CWA, and to characterize the verifications here as "allowing" or "approving" the FS Pipeline project is inaccurate—the record suggests that Enbridge evaluated the risks and started construction of portions of the pipeline on private land even before it had secured all of the necessary federal rights-of-way—and also manifestly inconsistent with the fact that no federal approval or permission is required for construction of a domestic oil pipeline such as this one.[13]

Moreover, and even more important, the law quite clearly distinguishes between "verifications" and "permits" in the CWA context, *compare* 33 C.F.R. Part 325 (establishing procedures for individual permits), *with* 33 C.F.R. Part 330 (detailing procedures for verification under general permitting system), and the entire point of the general permitting system is to avoid the burden of having to conduct an environmental review under NEPA when a verification—as distinguished from an individual discharge permit—is sought. As previously and extensively explained, under the general

---

[13] Notably, as an entirely *domestic* pipeline, construction of the FS Pipeline does not require federal permission, oversight, or approval, and is therefore fundamentally unlike pipelines that bring oil into the United States from other countries. The proposed Keystone XL Pipeline, for example, is an international project that requires the State Department to issue a Presidential Permit finding that it is in the "national interest" before it can be constructed. *See, e.g.*, Final Environmental Impact Statement for the Proposed Keystone XL Project, 76 Fed. Reg. 55,155 (Sept. 6, 2011); *see also* Exec. Order 13,337, 69 Fed. Reg. 25,299 (Apr. 30. 2004). For this reason alone, Plaintiffs' repeated comparisons between the FS Pipeline and the Keystone XL Pipeline (*see, e.g.*, Pl. Br. at 4, 26-27) are misguided.

permitting system, the Corps conducts an extensive environmental review and provides the public with notice and an opportunity to comment regarding categories of construction activity that the Corps seeks to designate as having minimal impact on waterways within specified geographical regions. *See* 33 C.F.R. § 330.1(b). The purpose of the statute that authorizes general permits such as the nationwide permit at issue here is to allow the Corps to designate certain construction projects as eligible for CWA discharge permits "with little, if any, delay or paperwork" because they fit within these pre-cleared categories of activities. *Id.*; *see also Snoqualmie Valley Pres. Alliance v. U.S. Army Corps of Eng'rs*, 683 F.3d 1155, 1164 (9th Cir. 2012) ("The purpose of [the NWP] scheme is to enable the Corps to quickly reach determinations regarding activities that will have minimal environmental impacts[.]"). Courts have found, and this Court agrees, that "[r]equiring an elaborate analysis of the applicable regulations and the facts would defeat th[e] purpose[]" of a general permit. *Snoqualmie Valley*, 683 F.3d at 1163.

Consequently, it makes little sense that, notwithstanding the FS Pipeline project's eligibility for verification under NWP 12, the Corps nevertheless had to conduct a full environmental review under NEPA, as Plaintiffs maintain. In other words, the requisite comprehensive environmental review is done upfront under the general permitting system precisely to avoid a NEPA environmental review regarding certain projects that fit into categories of activity that have been predetermined to have minimal environmental impact. Therefore, once the Corps's district engineers verified that the discharges resulting from the FS Pipeline satisfied NWP 12, no additional environmental review was required.

It is also conceptually mistaken to characterize a CWA verification as qualifying for "major federal action" status when the Corps's actual role in providing a verification letter pursuant to the general permitting process is properly understood. Many projects undertaken pursuant to a general permit do not even need to be brought to the Corps's attention; there is *no* federal action, much less "major" federal action, in regard to such projects. *See* 33 C.F.R. § 330.1(e)(1). Even when a general permit requires that the Corps provide pre-construction verification, such as is the case with NWP 12, the Corps's role is limited to determining whether the project in question does or does not satisfy the terms of the general permit, and if not, what steps the party seeking verification must take to bring their project within the ambit of that authorization. *Id.* § 330.1(e)(3). This type of check-in is far less involved than the probing assessment of the particular facts, circumstances, and environmental consequences of a specific project proposal that precedes a Corps determination of whether or not an individual discharge permit should issue. Put another way, under the nationwide permit system, the Corps has already done an environmental review on a general categorical basis and has already given its imprimatur to discharges that result from the type of construction activity at issue under specified circumstances. When a prospective permittee files a pre-clearance notice, the only thing left to be done is for the Corps's district engineers to verify that the planned project does, in fact, fit within the category of activities that the Corps has already authorized. And given Congress's stated interest in targeting "*major* federal actions" for extensive environmental review under the NEPA statute, 42 U.S.C. § 4332(2)(C) (emphasis added), it is unlikely that this limited verification process is what Congress had in mind.

In sum, Plaintiffs do not, and cannot, dispute that the general permitting system operates on a different track than the individual project-by-project permitting process for construction project discharges that would otherwise apply under the CWA, or that only major federal actions trigger a duty to conduct an environmental review under NEPA. Plaintiffs also disclaim any facial challenge to the general permitting statute or NWP 12 in the context of this action, *see* Hr'g Tr. at 15:8-13, and it is clear that when a project proceeds under a valid general permit, NEPA's environmental review obligation and other permitting requirements that would otherwise apply are irrelevant. *See, e.g.*, *Ouachita Riverkeeper, Inc. v. Bostick*, 938 F. Supp. 2d 32, 35-36, 45-46 & 46 n.7 (D.D.C. 2013) (distinguishing between nationwide and individual permits and finding that no NEPA analysis was required where construction was properly verified under NWP 12); *Snoqualmie Valley*, 683 F.3d at 1164 ("Verifying that permittees may properly proceed under a nationwide permit does not require a full NEPA analysis at the time of the verification."). With all this considered, the Court sees no clear path to victory for Plaintiffs regarding the first aspect of their claim that the Corps violated NEPA when it proceeded to verify that the discharges and other activities related to construction of the FS Pipeline were consistent with NWP 12 without conducting an environmental review.

Plaintiffs' related contention regarding the Corps's verifications—that the large number of water crossings and related verifications involved with the FS Pipeline project makes this project a major federal action for NEPA purposes—fares no better. Plaintiffs take issue with the fact that four different Corps district engineers verified approximately 1,950 separate water crossings related to the FS Pipeline under NWP 12

without undertaking a comprehensive NEPA analysis of the pipeline. (*See, e.g.*, Pl. Br. at 13, 20, 25.) But Plaintiffs have not established that the number of verifications requested in relation to a project does or should have any effect on the general permitting system, much less that a project can be pushed off the general permit track and made to proceed down the alternative individual permit route if more than a certain number of verifications are involved. Nor do Plaintiffs provide any reason why the number of verifications required by a particular project should have any bearing on that project's ability to be verified as consistent with a general permit.[14] Plaintiffs have not identified any authority in the law or in the language of NWP 12 that would allow the Court to graft the NEPA requirement attendant to the individualized permitting system onto the general permitting system whenever the Corps issues a large number of verifications with respect to a linear construction project such as the FS Pipeline, and the Court sees no reason for doing so, especially where, as here, importing an environmental review obligation would undermine the purpose and efficacy of the general permitting system. Moreover, Plaintiffs have also thus far failed to provide an answer to the practical concern that requiring additional environmental review for projects that qualify for a general permit would give rise to significant and untenable uncertainty for *any* construction project—large or small—that seeks to rely on a general permit in lieu of an individual permit and accompanying NEPA review.

Finally, the Court notes that *Spiller v. Walker*, No. A 98 CA 255 SS, 1998 U.S. Dist. LEXIS 18341 (W.D. Tex. Aug. 25, 1998), and the dissenting opinion in *Sierra*

---

[14] By Plaintiffs' logic, one construction project that requires 2,000 verifications for water crossings would be subject to further environmental review under NEPA, while 2,000 separate projects that each require a single verification for a water crossing would not necessarily require additional review, despite the fact that both scenarios theoretically pose the same potential threat to the aquatic environment.

*Club v. Bostick*, No. 12-6201, 2013 WL 5539633, at *9 (10th Cir. Oct. 9, 2013)—upon which Plaintiffs rely—are unpersuasive primarily because the logic of these cases does not sufficiently account for the fact that Congress established a general permitting system as an alternative to the requirement that construction projects with a minimal potential impact on national waterways obtain an individual permit under the CWA. Like the instant case, *Spiller* involved an oil pipeline that crossed both waterways and federal land under the Corps's jurisdiction. Moreover, although the *Spiller* court is not entirely clear on this point, it appears that the pipeline operator in that case applied to have the water crossings verified pursuant to a general permit. *See id.* at *39 ("[The pipeline operator] has requested a nationwide permit under section 404 of the Clean Water Act[.]"). Under the circumstances presented, the *Spiller* court concluded that "[t]he Army's role in granting permits for construction over navigable waters and granting a right-of-way over [federal land] combine to have such a crucial impact on the construction of the [pipeline] at so many points along the pipeline that it can only be described as 'major [f]ederal action.'" *Id.* at *40-41. Of particular note in this passage is the fact that the *Spiller* court invoked the "Army's role in *granting permits*" as indicative of the level of federal involvement in the pipeline, and Plaintiffs point to this language as support for the proposition that the issuance of permits under the CWA where the federally-controlled waters were found throughout the project required NEPA review of the project. (*See* Pl. Br. at 17.)

As explained above, however, the Corps does not grant permits pursuant to the general permitting process; rather, it simply verifies that an application meets the criteria for the pre-existing general authorization. And this difference is not merely

semantic—rather, the process for the Corps's issuing an individual permit is very different, and far more involved, than the process of verifying that a construction project is consistent with the terms of a general permit. The court in *Spiller* failed entirely to consider this crucial distinction; indeed, apart from the single passing reference to a nationwide permit mentioned above, the *Spiller* opinion contains no discussion of the general permitting system at all. Therefore, in addition to the fact that *Spiller* is not binding authority in this jurisdiction, this Court finds that it simply cannot follow *Spiller*'s logic.

Nor does the dissenting opinion in *Bostick* add any additional heft to Plaintiffs' argument that *Spiller* reached the right result. (*See* Plaintiffs' Notice of Supplemental Authority ("Pl. Supp. Br."), ECF No. 42, at 2-3.) *Bostick* is a Tenth Circuit case that was on appeal from the denial of a preliminary injunction where the plaintiffs had launched a facial challenge to NWP 12 (that alone distinguishes it from the instant matter). 2013 WL 5539633, at *1. Although the majority opinion reached only the question of irreparable harm, the dissenting judge evaluated likelihood of success on the merits, and relying extensively on *Spiller*, concluded that the entire pipeline at issue in that case—the nearly 500-mile Gulf Coast Pipeline—should have been subject to NEPA review. *Id.* at *13. The principal factual basis for the dissenter's conclusion was the "number of permits issued by the Corps relative to the overall size of the Gulf Coast Pipeline," and in light of this ratio, the dissenter found it "patently ludicrous" to

maintain that "the Corps' permitting involves only a 'link' in the Gulf Coast Pipeline[]" such that it was not a major federal action for NEPA purposes. *Id.* at *11.[15]

But, like the *Spiller* judge before him, the dissenting judge in *Bostick* inexplicably failed to acknowledge the critical difference between the Corps's role as *permitter*—an authority it exercises when and if an individual discharge permit is requested—and its role as a *verifier*, which it undertakes when a general permit involving construction activity that has already received extensive environmental review requires an applicant to file a pre-clearance notice and to obtain the Corps's verification that its project is consistent with the existing general permit. Rather, the dissenting opinion (mistakenly) asserts that the Corps "issue[d] 2,227 *permits*" regarding the Gulf Coast Pipeline. *Id.* at *11 (emphasis added). And having so mischaracterized the Corps's role with respect to the pipeline project, it is no wonder that the dissenting judge believed that the Corps's verification of the large number of water crossings at issue was a major federal action for NEPA purposes. *Id.* at *12.

The instant Court views the distinction between verifications and permits as making all of the difference as far as a NEPA analysis is concerned, as explained above. Therefore, even setting aside the fact that a dissenting opinion has no precedential value, the *Bostick* dissent's failure to acknowledge that the Corps's verifications are not the functional equivalent of permits renders its analysis wholly unpersuasive.

---

[15] According to the dissenting opinion, "[t]he Gulf Coast Pipeline is 485 miles long, and required the Corps to issue 2,227 permits for water crossings[,]" which "means that the Gulf Coast Pipeline crosses United States waters almost five times in each mile, or about once every 1150 feet." *Bostick*, 2013 WL 5539633, at *11.

*The Fish and Wildlife Service's Biological Opinion and Incidental Take Statement Did Not Trigger A Duty To Undertake A NEPA Review*

Plaintiffs also maintain that the FWS engaged in a major federal action sufficient to give rise to an obligation to perform a NEPA environmental review of the FS Pipeline when it issued the Biological Opinion and incidental take statement in response to formal requests from the Corps and the BIA. (Pl. Br. at 21-22; *cf.* Defendant's Opposition Brief ("Def. Br."), ECF No. 28, at 15-16.) The statute pursuant to which the FWS issued its opinion and take statement (Section 7 of the ESA, 16 U.S.C. § 1536(b)) establishes a "consultation" process whereby other federal agencies considering whether or not to exercise their own permitting authority engage with the FWS—a process that differs significantly from the kind of agency activity that ordinarily counts as major federal action for NEPA purposes. *Compare City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1189 (D.C. Cir. 2007) (FAA regulation expanding airport runway use was "clearly major federal action" requiring NEPA review). The Court's hesitancy to view a Section 7 consultation as a major federal action on the part of the FWS for NEPA purposes is especially justified given that, under Section 7, it is the requesting agency, not the FWS, that ultimately decides what impact the biological opinion and incidental take statement will have on the construction project under consideration. *See* 50 C.F.R. § 402.15(a) (2013) ("Following the issuance of a biological opinion, the Federal agency shall determine whether and in what manner to proceed with the action in light of its section 7 obligations and the Service's biological opinion."). But this is not to say that an FWS opinion and incidental take statement issued pursuant to the Section 7 consultation process can *never* rise to the level of major federal action; in *Ramsey v. Kantor*, 96 F.3d 434 (9th Cir. 1996)—the primary legal precedent Plaintiffs

offer in support of the argument that the FWS's Biological Opinion and incidental take statement constituted a major federal action in this case—the Ninth Circuit held as much.

*Ramsey* involved a legal challenge to two states' plans for the management of their salmon fisheries. The states of Oregon and Washington sought to issue permits for salmon fishing in certain rivers where fishing would otherwise be off limits under the Endangered Species Act because endangered species of salmon mingled with non-endangered salmon. *Id.* at 439. As the Ninth Circuit panel viewed the facts, salmon fishing in those areas as authorized by state law could only proceed consistent with the Endangered Species Act if the federal agency that regulates activities impacting endangered salmon rendered a biological opinion "examining the proposed action and the anticipated effects on the species," *id.* at 440, and if that agency also issued an incidental take statement that effectively waived the otherwise applicable federal penalty for the incidental killing of a certain number of the endangered type of salmon. The issue presented in *Ramsey* was whether issuance of an incidental take statement under such circumstances constituted a major federal action that gave rise to a NEPA duty to conduct an environmental review of the state fishing plans. *Id.* at 443. Emphasizing that "it is all but impossible to fish for [non-endangered] salmon . . . without incidentally taking salmon that are listed [as endangered species,]" the panel held that the federal agency's incidental take statement was a major federal action for the purpose of NEPA. *Id.* at 444.

The *Ramsey* court's conclusion finds no applicability here. *Ramsey*'s holding rested on the court's observation that "the incidental take statement in this case is

*functionally equivalent to a permit* because the activity in question would, for all practical purposes, be prohibited but for the incidental take statement." *Id.* (emphasis added). The project that was under consideration in *Ramsey* was the states' plan to allow fishing for non-endangered salmon in areas that ensured that endangered salmon would be caught, and under those circumstances, the federal agency's incidental take statement was clearly essential to the adoption of that plan. *See id.* at 444. Here, by contrast, the FWS's Biological Opinion is at best peripheral to the project in question. The FS Pipeline is a private construction project involving the transportation of domestic oil reserves that is by no means aimed at the capture of any species, much less endangered species, and there is no evidence to suggest that the project could not proceed without the FWS's incidental take statement such that the statement is "functionally equivalent to a permit." Put another way, although the FWS's Section 7 consultation responsibilities may sometimes have such a direct impact on a project that the incidental take statement rises to the level of major federal action, this will not always be so, and there is nothing about the FWS's consideration of the Indiana bat, the American burying beetle, and the decurrent false aster in relation to the FS Pipeline that would permit the conclusion that the incidental take statement at issue here had any such impact (at least on the record as it currently exists). Accordingly, Plaintiffs have failed to show a likelihood of success on the merits with respect to their NEPA claim based on the FWS's actions.

c. *Federal Review Of The Requested Easements Is Ongoing And May Yet Result In The Requested NEPA Analysis*

Plaintiffs also argue that the Corps's and the BIA's consideration of Enbridge's requests for easements counts as major federal action for NEPA purposes. Unlike other

36

aspects of Plaintiffs' complaint, it appears that there is no dispute that granting an easement over federal land qualifies as a major federal action under NEPA, at least with respect to the portion of the project that is slated to run over the land under federal control. (*See* Def. Br. at 20-21.) The trouble with this claim is that the requested federal easements for the FS Pipeline are still under consideration by the Corps and the BIA, and there is evidence in the record that indicates that these agencies may even have commenced the environmental review that is the object of Plaintiffs' allegations. (*See, e.g.*, Decl. of Scott L. Whiteford), ECF No. 28-6, ¶ 7; Decl. of Eddie Streater), ECF No. 28-7, ¶ 11.) Under these circumstances, the Court has significant concerns that Plaintiffs' NEPA claims regarding the easements are not yet ripe. *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (citation and internal quotation marks omitted)).

Plaintiffs' briefs in support of the motion for a preliminary injunction do little to allay those concerns. Plaintiffs' primary argument is that, even if an environmental review is currently being performed with respect to the requested easements, the Corps and the BIA nevertheless violated NEPA by allowing construction of other parts of the FS Pipeline prior to the completion of that review. (Pl. Reply at 13.) However, as has been repeated numerous times above, federal agencies do not "allow" or "permit" construction of a domestic oil pipeline on privately owned land. Indeed, it is precisely because domestic oil pipelines do not require federal authorization that Enbridge apparently started building the FS Pipeline even before the federal agencies had determined whether or not to grant the easements in question.

In any event, given the state of the record at this point, Plaintiffs have failed to persuade the Court that an injunction is appropriate when the alleged NEPA violation has not yet occurred and is still in the process of being addressed. Because the Court is not convinced that Plaintiffs will be successful in sustaining their claim that the pending easement requests can be the basis for any cognizable NEPA violation, the Court declines to issue an injunction on this ground at this time.

d. *There Is No Basis For Plaintiffs' Contention That The PHMSA Has A NEPA Obligation To Undertake An Environmental Review*

Plaintiffs also provide no support for their argument that the inaction of the PHMSA with respect to a contingency oil spill plan triggered a NEPA duty to conduct an environmental review of the FS Pipeline, nor can they, because this claim appears to be baseless. It is true that there has been no action on the part of the PHMSA, but that is primarily because the agency has not even been provided with an opportunity to act. To recap what was explained above, under federal law a pipeline owner is only required to prepare and submit a spill response plan before a pipeline begins *operation*—not before it is constructed—and, indeed, Enbridge has yet to submit such a plan to the PHMSA. *See* 49 C.F.R. § 194.7 (2013). To argue here, as Plaintiffs do, that the PHMSA nevertheless somehow has engaged in a major federal action for NEPA purposes defies logic. And unless and until Plaintiffs are able to demonstrate that a federal agency that has *not* been invited to act in any way regarding a project with potential environmental impacts can nonetheless be deemed to have engaged in a "major federal action[] significantly affecting the quality of the human environment"

for NEPA purposes, there is little likelihood that Plaintiffs will prevail on the PHMSA claim.

> e. *Even Viewed Collectively, The Federal Agencies' Actions Do Not Give Rise To Any NEPA Duty To Assess The Environmental Impact Of The Entire FS Pipeline*

Finally, we arrive at what Plaintiffs have conceded is the core of their NEPA-related concern: that the collective actions of the various Federal Agencies triggered an obligation under NEPA for some agency to conduct an environmental review not only of the portions of the pipeline that required that agency's input but also of the *entire* 589-mile domestic pipeline project. (*See* Compl. ¶ 182 (asserting that the federal actions "singly, in combination, and cumulatively constitute major federal action and thus trigger the requirement under NEPA that the Corps prepare an EA and/or EIS for the *entire* [FS Pipeline.]"); *see also* Pl. Br. at 19, 24-27.) Plaintiffs' principal worry appears to be that no such comprehensive environmental review of the entire FS pipeline was undertaken prior to the beginning of pipeline construction. (Pl. Br. at 29-30.) But Plaintiffs cannot deny that the obligation to review a project pursuant to NEPA arises only when there is "major *federal* action." 42 U.S.C. § 4332(2)(C) (emphasis added). In the Court's view, Plaintiffs have significantly overstated the degree of federal involvement in the FS Pipeline in an attempt to shoehorn this essentially private project into the NEPA statute; consequently, at least on the record as it currently stands, Plaintiffs' claim that NEPA requires a comprehensive environmental review is unlikely to be successful.

Plaintiffs' argument is not unprecedented. The question of how much federal involvement is needed to "federalize" an otherwise private project such that NEPA

review is required for the entire undertaking is a dilemma that has vexed courts and commentators for some time. *See, e.g.*, Jeslyn Miller, Note, *Clarifying the Scope of NEPA Review and the Small Handles Problem*, 37 Ecology L.Q. 735, 737 (2010) ("[C]ourts have struggled with the extent to which an environmental analysis under [NEPA] must consider the entirety of a private development or just those components subject to direct federal jurisdiction."); *see also Save Our Sonoran, Inc. v. Flowers*, 227 F. Supp. 2d 1111, 1113 (D. Ariz. 2002) ("The scope of analysis of federal action by the Corps of Engineers under [NEPA] is a topic not without controversy." (citation omitted)). Put in the parlance of NEPA, the issue is when and under what circumstances an otherwise private project is transformed into a "major federal action" requiring a federal agency to undertake an environmental review of the entire project. 42 U.S.C. § 4332(C).[16]

In *Winnebago Tribe of Nebraska v. Ray*, 621 F.2d 269 (8th Cir. 1980), the Eighth Circuit confronted this question in regard to a fact scenario similar to the one before this Court. *Winnebago Tribe* concerned a tribe's attempt to enjoin the construction of a 67-mile power line, 1.25 miles of which crossed waters under the jurisdiction of the Corps. *Id.* at 270. While the Corps prepared an EA with respect to the river-crossing portion of the power line as part of its consideration of a request for an individual permit related to that water crossing, the plaintiff argued that, under NEPA, the Corps was obligated to do an environmental assessment of the entire pipeline. *Id.* at 272. In addressing the question of the scope of the required environmental review, the Eighth

---

[16] This question is apparently common enough to have earned a nickname in the academic literature: the "small handles" problem. *See generally* Elizabeth A. Roche, *The Continuing Saga of Rippling Puddles, Small Handles and Links of Chains: Wetlands Action Network v. United States Army Corps of Engineers*, 13 Vill. Envtl. L.J. 119 (2002); Mary K. Fitzgerald, Comment, *Small-Handles, Big Impacts: When Should the National Environmental Policy Act Require an Environmental Impact Statement?*, 23 B.C. Envtl. Aff. L. Rev. 437 (1996).

Circuit distinguished between a federal agency's "[f]actual or veto control" of a project—that is, where there is some federal involvement necessary in a piece of a project—and an agency's "legal control or 'enablement'" of a project—that is, where "federal action is a legal condition precedent to accomplishment of an entire nonfederal project." *Id.* (citation omitted). In the former situation, the *Winnebago Tribe* court identified three factors "helpful in determining" whether a "project-wide analysis" was required:

> (1) the degree of discretion exercised by the agency over the federal portion of the project; (2) whether the federal government has given any direct financial aid to the project; and (3) whether the overall federal involvement with the project (is) sufficient to turn essentially private action into federal action.

*Id.* (citation omitted). The Eighth Circuit considered these factors in the context presented and ultimately concluded that "the Corps did not have sufficient control and responsibility" over the power line "to require it to study the entire project." *Id.* at 273.

Turning to the instant case, federal action is not a "legal condition precedent" to the construction and operation of the FS Pipeline because there is no comprehensive federal permitting system governing domestic oil pipelines; indeed, just as in *Winnebago Tribe*, federal involvement with the FS Pipeline's construction is purely related to the pipeline's location. Moreover, the Court agrees with the decision in *Winnebago Tribe* that, where federal action is not a legal condition precedent, the inquiry into the scope of NEPA review turns on the degree of federal "control and responsibility" of a given project as a matter of fact. *See id.* at 273. And given the factual similarities between the FS Pipeline and the power line at issue in *Winnebago Tribe*, the Court sees no reason why the two cases should reach different results

regarding the degree of federal control and responsibility. As noted above, the FS Pipeline is essentially a private project, and, like *Winnebago Tribe*, the federal involvement is limited to a very small portion of the overall project. As previously explained, the water crossings were verified under NWP 12 and are thus not subject to NEPA analysis; consequently, the relevant federal involvement with this particular project for the purpose of addressing the extent of federal control and responsibility is limited to the 1.3 miles of federal land under the Corps's jurisdiction and the 13.8 miles of land subject to the jurisdiction of the BIA. In this Court's judgment, these minor pieces of federal involvement in a nearly 600-mile pipeline fall short of imbuing the federal government with "control and responsibility" over the pipeline as a whole. *See id.* at 273 ("[T]he fact that part of the [project] will cross [land under federal jurisdiction] does not suffice to turn this essentially private action into federal action.").

The Corps's regulations outlining the scope of its obligations under NEPA— which expressly incorporate the "control and responsibility" standard articulated in *Winnebago Tribe*—buttress this conclusion. These regulations, entitled "NEPA Implementation Procedures for the Regulatory Program," provide guidance specifically as to the scope of the Corps's NEPA responsibilities for a given project. *See* 33 C.F.R. Part 325, Appendix B. In relevant part, the regulations, which generally apply when the Corps grants permits, provide:

> Typical factors to be considered in determining whether sufficient "control and responsibility" exists include:
>
> (i) Whether or not the regulated activity comprises "merely a link" in a corridor type project (e.g., a transportation or utility transmission project).

(ii) Whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity.

(iii) The extent to which the entire project will be within Corps jurisdiction.

(iv) The extent of cumulative Federal control and responsibility.

A. Federal control and responsibility will include the portions of the project beyond the limits of Corps jurisdiction where the cumulative Federal involvement of the Corps and other Federal agencies is sufficient to grant legal control over such additional portions of the project. These are cases where the environmental consequences of the additional portions of the projects are essentially products of Federal financing, assistance, direction, regulation, or approval[.]

*Id.* Part 325, Appendix B § 7(b)(2) (emphasis added). The regulations go on to provide specific examples of how federal control and responsibility in a corridor project should be measured:

For example, a 50-mile electrical transmission cable crossing a 1 ¼ mile wide river that is a navigable water of the United States requires a [Department of the Army] permit. Neither the origin and destination of the cable nor its route to and from the navigable water, except as the route applies to the location and configuration of the crossing, are within the control or responsibility of the Corps of Engineers. Those matters would not be included in the scope of analysis which, in this case, would address the impacts of the specific cable crossing.

Conversely, for those activities that require a DA permit for a major portion of a transportation or utility transmission project, so that the Corps permit bears upon the origin and destination as well as the route of the project outside the Corps regulatory boundaries, the scope of analysis should include those portions of the project outside the boundaries of the Corps section 10/404 regulatory jurisdiction. To use the same example, *if 30 miles of the 50–mile transmission line crossed wetlands or other "waters of the United*

43

> States," the scope of analysis should reflect impacts of the whole 50–mile transmission line.

*Id.* Part 325, Appendix B § 7(b)(3) (emphasis added).  Here, for the reasons expressed above, there is little doubt that the federal involvement with the FS Pipeline falls under the first of the two examples quoted above.

Undaunted, Plaintiffs attempt to co-opt the regulations to argue that the Corps's involvement with the FS Pipeline does, in fact, extend to a "major portion" of the project based on the significant number of water crossings and the fact that they are spread throughout the length of the pipeline.  (Pl. Br. at 19-20.)  In making this argument, Plaintiffs rely heavily on cases such as *White Tanks Concerned Citizens, Inc. v. Strock*, 563 F.3d 1033 (9th Cir. 2009), and *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir. 2005), in which courts have found that even limited federal involvement in a project can be sufficient to "federalize" the project such that NEPA review of the entire project is warranted.  In the cases Plaintiff cites—both of which concerned individual discharge permits related to waters under the Corps's jurisdiction—the courts based their ultimate conclusions on the fact that the waters in question were found throughout the project sites at issue.  *See White Tanks*, 563 F.3d at 1040; *Save Our Sonoran*, 408 F.3d at 1122.  In Plaintiffs' view, the FS Pipeline presents precisely this scenario because of the Corps's verification of 1,950 water crossings spread throughout the length of the FS Pipeline.

However, two crucial aspects of the instant case distinguish it from cases like *White Tanks* and *Save Our Sonoran*.  First, the cases Plaintiffs rely upon concerned *permits* under the individual permitting system of the CWA, not verifications under the general permitting system.  *See White* Tanks, 563 F.3d at 1037; *Save Our Sonoran*, 408

F.3d at 1118.  For the reasons discussed at length above, the Corps's verifications do not qualify as a major federal action for NEPA purposes, and without those verifications, the requested easements over small pieces of federal land make the facts of this case look much more like *Winnebago Tribe* than *White Tanks* or *Save Our Sonoran*.  Second, neither of the cases that Plaintiffs rely on concerned corridor-type projects such as the one at issue here.  This fact is especially significant because Plaintiffs cite these cases for the proposition that the number of water crossings and the fact that they are spread throughout the length of the pipeline—rather than the total amount of land or water subject to federal jurisdiction relative to the pipeline as a whole—should control the inquiry into what constitutes a "major portion" of the pipeline.  It is true that the Ninth Circuit emphasized the degree to which the federal action in *White Tanks* and *Save Our Sonoran* pervaded the respective construction projects, but those projects were single-location endeavors, not the corridor-type projects that are specifically referred to in the Corps's regulations.  *See White Tanks*, 563 F.3d at 1040; *Save Our Sonoran*, 408 F.3d at 1121.  The scenarios in the regulations, which expressly apply to corridor-type projects, provide the better model for the ratio that governs the "control and responsibility" inquiry, and those examples focus on the total amount of land or water under federal jurisdiction relative to the total length of the project.  *See* 33 C.F.R. Part 325, Appendix B § 7(b)(3).  By that rubric, Plaintiffs are unlikely to be able to demonstrate that the Corps had sufficient "control and responsibility" over the FS Pipeline to require NEPA review of the entire project.

Plaintiffs' final attempt to convince the Court that the entire FS Pipeline was "federalized" for NEPA purposes derives from a legal doctrine that is sometimes

invoked in NEPA cases: the so-called "independent utility" doctrine. (*See* Pl. Reply at 8-10.) This doctrine prevents federal agencies or project operators "from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Natural Resources Def. Council, Inc. v. Hodel,* 865 F.2d 288 (D.C. Cir. 1988) (internal quotation marks and citation omitted). Plaintiffs maintain that the "independent utility doctrine" requires a NEPA review of the entire FS Pipeline, as opposed to a review of just the portions of the pipeline that transect areas of federal jurisdiction, primarily on the basis of *Hammond v. Norton*, 370 F. Supp. 2d 226 (D.D.C. 2005), which concerned the question of whether "an agency preparing an EIS may . . . 'segment' its analysis so as to conceal the environmental significance of the project or projects." *Id.* at 244 (citing *Coal. on Sensible Transp. v. Dole,* 826 F.2d 60, 68 (D.C. Cir. 1987)). However, unlike in *Hammond*, there are no facts here that tend to show that Enbridge sought to circumvent any applicable environmental regulations through creative project management. *Cf. Hammond*, 370 F. Supp. 2d at 244. To the contrary, the evidence indicates that Enbridge has gone out of its way to make sure it has addressed all of its obligations, including complying with numerous state environmental regulations, consulting with dozens of Native American tribes, obtaining rights of way from thousands of individual landowners, conducting a public outreach and consultation program, and preparing extensive mitigation plans. (*See, e.g.*, Decl. of Jerrid Anderson, ECF No. 27-1, ¶¶ 9, 15-17.) In the absence of any record evidence that Enbridge has at any point attempted to hide the ball regarding the environmental impact of the FS Pipeline, the Court believes the independent utility doctrine is inapposite.

Finally, the Court notes its general reluctance to conclude that federal action with respect to a small portion of a pipeline or other "linear" project is sufficient to federalize the entire project in the absence of any statute that permits or requires federal oversight regarding such a project. Because every oil pipeline project of any reasonable length is likely to pass over some segment of federal land or waters of the United States, the practical effect of the result that Plaintiffs seek would be to transform NEPA into a statute that requires federal oversight of all domestic oil pipelines (in the form of an environmental review). Congress has not yet seen fit to enact an environmental statute that federalizes the construction of private, domestic oil pipelines, and Plaintiffs have thus far failed to convince this Court that they will be successful in their bid to have NEPA construed in that expansive fashion.

2. Plaintiffs' Claim That The Corps's Verifications Violated The Terms Of NWP 12

In addition to their NEPA-based arguments, Plaintiffs also maintain that the Corps's decision to issue CWA verifications for the FS Pipeline water crossings was arbitrary and capricious under the specific terms of NWP 12. Plaintiffs offer two grounds for this contention. First, they contend that the Corps's verifications were arbitrary and capricious because they did not include a determination that the overall "cumulative effect" of the FS Pipeline's multiple water crossings on the environment would be minimal. (Pl. Br. at 30.) Second, they assert that some of the water crossings that the Corps verified violated a requirement of NWP 12 that "prohibits any NWP 12 activity 'in the proximity of a public water supply intake.'" (Pl. Br. at 32 (quoting 77 Fed. Reg. at 10,283).)

Plaintiffs' primary support for the first aspect of this APA claim comes from the language of NWP 12, which provides:

> In reviewing the PCN for the proposed activity, the district engineer will determine whether the activity authorized by the NWP will result in more than minimal individual *or cumulative* adverse environmental effects . . . . For a linear project, this determination will include an evaluation of the individual crossings to determine whether they individually satisfy the terms and conditions of the NWP(s), *as well as the cumulative effects caused by all of the crossings authorized by NWP.*

77 Fed. Reg. at 10,287 (emphasis added).

In Plaintiffs' view, this language requires the Corps to evaluate the cumulative impact of all crossings so verified—including the cumulative effect of the 1,950 crossings verified for the FS Pipeline in this case—and to include in its verification letters a statement to that effect. (*See* Pl. Br. at 30-32.) But there is no statutory or regulatory mandate that verification letters contain any such statement. And there is also no reason to believe that the district engineers in the instant case failed to conduct the required analysis of the FS Pipeline's cumulative effects. NWP 12 provides that "district engineers *will* evaluate the cumulative effects of those linear projects when determining whether authorization by NWP is appropriate," 77 Fed. Reg. at 10,260 (emphasis added), and that regulation also permits district engineers to evaluate cumulative effects "on a regional basis" by considering "effects within a wetland, stream reach, or coastal waterbody[.]" 77 Fed. Reg. at 10,261-64. Plaintiffs have done nothing to establish that the district engineers actually failed to follow these prescriptions, and the Court will not assume that the fact that the verification letters lack a statement regarding cumulative effects means that the Corps failed to perform such an analysis, particularly where NWP 12 directs the district engineers to do so.

The current record is also insufficient to sustain Plaintiffs' claim that the Corps violated NWP 12 because it verified pipeline construction in the proximity of a public water supply in violation of General Condition 7 of NWP 12. Plaintiffs have provided a single declaration from a resident of Missouri who maintains that the "intake pumps for the [Missouri cities of] Adrian and Archie water supplies are located only a few miles downstream" from where the FS Pipeline crosses the South Grand River, "which is the sole source of water for these two cities." (Decl. of Danny Ferguson, ECF No. 14-19, ¶ 6.) This statement is unlikely to prevail over record evidence demonstrating that the Corps specifically considered General Condition 7's "proximity" requirement and, in its expert determination, concluded that the relevant pipeline crossings were not in the proximity of any such water supply intakes. (*See* Decl. of Lucius Duerksen, ECF No. 28-1, ¶ 19.) There is no hint of arbitrariness in this conclusion; moreover, the Corps's expert opinion in this regard is entitled to substantial deference. *See, e.g.*, *Colorado Wild, Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1216 (10th Cir. 2006) ("[D]eference to [an] agency is greatest when reviewing technical matters within its area of expertise." (citation omitted)). In any event, it is the Plaintiffs' burden to establish that they are likely to succeed on the merits of their claim that the FS Pipeline is so close to water supplies that the crossings were improperly verified, and the scant evidence that Plaintiffs have offered in this regard is manifestly insufficient.

## B. Irreparable Harm

"[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies[.]" *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (internal quotation marks and citation omitted). Even under the sliding scale approach

that is utilized in this Circuit, Plaintiffs must demonstrate that they will suffer

irreparable harm absent an injunction in order to be eligible for injunctive relief.  *See*

*CFGC*, 454 F.3d at 297 ("A movant's failure to show any irreparable harm is . . .

grounds for refusing to issue a preliminary injunction, even if the other three factors

entering the calculus merit such relief." (citation omitted)); *see also GEO Specialty*

*Chem., Inc. v. Husisian*, 923 F. Supp. 2d 143, 147 (D.D.C. 2013) ("[A] court may refuse

to issue an injunction without considering any other factors when irreparable harm is

not demonstrated.").  Accordingly, it is well established that "perhaps the single most

important prerequisite for the issuance of a preliminary injunction is a demonstration

that if it is not granted the applicant is likely to suffer irreparable harm before a

decision on the merits can be rendered."  11A Charles Alan Wright, Arthur R. Miller &

Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 2013).

The concept of irreparable harm is not easily defined, but there is no doubt that

"[t]he irreparable injury requirement erects a very high bar for a movant."  *Coalition for*

*Common Sense in Government Procurement v. United States*, 576 F. Supp. 2d 162, 168

(D.D.C. 2008).  "[S]everal well-known and indisputable principles" guide the inquiry

regarding irreparable injury.  *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir.

1985). The party seeking injunctive relief must demonstrate that the claimed injury is

"both certain and great" and that the alleged harm is "actual and not theoretical."  *Id.*

Moreover, because "the court must decide whether the harm will *in fact* occur," a party

seeking injunctive relief must "substantiate the claim [of] irreparable injury" and "must

show that the alleged harm will directly result from the action which the movant seeks

to enjoin."  *Id.*  Furthermore, because "[i]njunctive relief will not be granted against

something merely feared as liable to occur at some indefinite time[,]" the movant "must show that [t]he injury complained of [is] of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (citations and internal quotation marks omitted) (second alteration in original). And the certain and immediate harm that a Plaintiff alleges must also be truly irreparable in the sense that it is "beyond remediation." *CFGC*, 454 F.3d at 297.

In the instant case, Plaintiffs point to two distinct types of harm that they claim will occur if construction of the FS Pipeline is not halted during the pendency of their legal challenges. First, Plaintiffs insist that the environment will be irreparably injured because the ongoing pipeline construction involves clearing trees and plants to create a right-of-way in a manner that, Plaintiffs argue, will both kill fish and wildlife and endanger critical wetlands. (*See* Pl. Br. at 32-33.) Second, Plaintiffs insist that "[t]he NEPA procedural violations in this case also constitute irreparable harm since they are combined with a showing of environmental or aesthetic injury." (*Id.* at 34.)

Neither of these contentions clears the "irreparable harm" hurdle. First of all, notwithstanding Plaintiffs' bald allegations of concrete injury to flora and fauna, the record does not clearly establish that the FS Pipeline construction will have a significant or substantial impact on the wildlife in the pipeline's path. Enbridge has purposely designed its construction plan so that 82% of the FS Pipeline will be "co-located" (*i.e.*, constructed along the same right of way) with Enbridge's already existing Spearhead Pipeline (Enbridge Br. at 42), a fact that Plaintiffs do not rebut. Enbridge also submitted extensive mitigation plans along with its applications for the

verifications.[17]  This suggests that the environmental impact of the pipeline construction may be minimal, and the Corps has already verified that the seemingly troublesome water crossings will have little or no ultimate environmental effect.  That is not to say that there will be *no* impact on the forest when trees that surround the pipeline project fall.  But Plaintiffs' sound and fury regarding the land that must be cleared and the wetlands that may be altered does not signify that any of these environmental effects will be permanent or irreversible, as the preliminary injunction standard requires.

In short, with respect to their argument that the environment will be irreparably harmed if the FS Pipeline project is permitted to proceed, Plaintiffs have offered little proof of the type of permanent, devastating impact on the environment that has convinced other courts to enjoin construction projects.  In the assessments of myriad agency experts, the impact of the FS Pipeline construction project on the surrounding environment will be both minimal and fleeting.  (*See, e.g.*, Kansas City District Mem. for Record, ECF No. 28-13, at 2 ("Avoidance, minimization, and compensatory mitigation will be used . . . to ensure the project will have a minimal adverse effect on the aquatic environment."); Biological Opinion at i (concluding that "the construction, operation and maintenance of the FS Pipeline may affect, but are not likely to adversely affect" any of the 18 species the FWS examined).)  Therefore, the Court concludes that Plaintiffs have not established the requisite "great" harm.

It is also apparent that Plaintiffs have significantly overstated the certainty and imminence of some of the injuries they predict.  For example, Plaintiffs assert that

---

[17] Enbridge's plans include, among other things, strict time limits for instream excavation activities, use of horizontal directional drills to avoid any impact to larger rivers and water bodies identified during consultations with federal and state agencies, and a team of environmental inspectors responsible for overseeing and implementing Enbridge's environmental commitments.  (*See* Decl. of Joseph McGaver, ECF No. 27-2, ¶¶ 20-25.)

"[c]onstruction of the [FS Pipeline] will destroy forests and plants, [and] kill fish and wildlife[.]" (Pl. Br. at 37.) But Plaintiffs provide no independent proof of this allegation. And the FWS's Biological Opinion and incidental take statement regarding the American burying beetle, the decurrent false aster plant, and the Indiana bat says only that "[s]ome [American burying beetles] *may* be disturbed or killed," that the decurrent false aster plant "*may* be affected," and that "Indiana bats *may* be killed or injured" during construction of the pipeline. (*See* Biological Opinion at 58, 59, 62 (emphasis added).) The FWS also significantly downplays the ultimate impact of these possibilities on the ultimate survival of the species. (*See id.* at 62 ("[T]he FS Pipeline will not jeopardize the continued existence the American burying beetle[.]"); 61 (the effects on the decurrent false aster will be "small, temporary, and recovery will be rapid"); 65 (any "anticipated take is not likely to result in jeopardy to the Indiana bat").)

In a similar vein, Plaintiffs appear to have exaggerated the extent and effect of the pipeline right-of-way building process, which, according to Plaintiffs, includes "pipeline and pump-related facility construction, grading, excavation, clearing trees, vegetation and ground cover, dragging, chipping, burning, topsoil stripping, digging, blasting, dewatering, water withdrawal and discharge, permanent road building, and stream crossings." (Pl. Br. at 32.) And even if such alteration of the environment qualifies as harm, Plaintiffs have not established that it is *irreparable*, as the Federal Agencies point out. (Def. Br. at 49 ("Plaintiffs have not shown that any disruption caused by construction could not be restored if the Court ultimately required such relief.").) In this respect, Enbridge's arguments about the efficacy of its "post-

construction restoration plan" remain unrebutted; Enbridge says its plan is designed "to restore the temporary construction [right-of-way] to pre-existing conditions through soil restoration management, seeding and plantings, consistent with the Project construction plans and as required by state and federal authorizations." (Defendant-Intervenor Enbridge's Opposition Brief ("Enbridge Br."), ECF No. 27, at 5; *see also id.* at 42-43.) What is more, Plaintiffs cannot deny that, in regard to the allegedly affected wetlands, NWP 12 itself requires that the construction activity in question must not "result in the loss of greater than ½-acre of waters of the United States," 77 Fed. Reg. at 10,271, and federal law expressly authorizes courts "to order restoration of jurisdictional wetlands that have been unlawfully filled." (Def. Br. at 49 (citing 33 U.S.C. § 1319(b).) This reality calms the winds of irreparability that might otherwise have kept Plaintiffs' lofty claims of "irreparable harm" afloat.

Plaintiffs' second argument—that a NEPA violation constitutes irreparable harm in and of itself—does not advance the ball because it begs the very question at issue in this action: whether the Federal Agencies' failure to conduct an environmental review prior to construction of the FS Pipeline violates NEPA. Although Plaintiffs are correct that an *established* NEPA violation might rise to the level of irreparable harm when coupled with sufficient evidence of environmental injury, *see, e.g.*, *Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 220 (D.D.C. 2003); *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989), Plaintiffs have thus far failed to demonstrate that they are likely to succeed with their arguments that the Federal Agencies have violated any duty to conduct an environmental review under NEPA, as discussed above. Surely, after having missed the mark with respect to that prerequisite, Plaintiffs cannot expect that

the alleged but unproven procedural violation will carry the day on the issue of irreparable harm.

Finally, a few words about Plaintiffs' suggestion that operation of the FS Pipeline risks a devastating oil spill that would be damaging to nearby communities, and that *that* harm is sufficient to warrant an injunction.  (*See* Pl. Br. at 37-38; *see also* Pl. Reply at 3-4, 14-15, 37-38.)   The Court acknowledges and accepts that some of the people who live in areas near the pipeline project are sincerely worried about the harm that an oil spill might cause.[18]  As genuine as these concerns may be, Plaintiffs have not shown that a damaging oil spill is *likely* to occur, and it is bedrock law that injunctions "will not issue to prevent injuries neither extant nor presently threatened, but only merely feared."  *Comm. in Solidarity With People of El Salvador (CISPES) v. Sessions*, 929 F.2d 742, 745-46 (D.C. Cir. 1991) (internal quotation marks and citations omitted).  In other words, the harms that an oil spill might potentially someday cause—however fearsome—are not certain, and therefore are not sufficient to satisfy the "irreparable harm" standard.

---

[18] These fears are explained in detail in the declarations Plaintiffs have submitted.  For example, Declarant Danny Ferguson opines that "[t]he Flanagan South pipeline poses an unacceptable risk to the municipal water supplies for the cities of Adrian and Archie, Missouri" because a spill from the pipeline "would contaminate [the cities'] drinking water for years and threaten [the] community's survival."  (Decl. of Danny Ferguson, ECF No. 14-19, ¶¶ 6-7.)  Declarant Mary Blackmore speculates that "the construction of a toxic tar sands oil pipeline will contaminate" her family's organic farm "due to the operation of construction equipment, [and] spills and leaks from either the pipeline itself or from the construction equipment[.]"  (Decl. of Mary Blackmore, ECF. No. 14-20, ¶ 9.)  And Declarant Megan Corrigan states that "a spill in the wetlands of the Marais des Cygnes State Wildlife Area" in Kansas "would be and environmental disaster" and that "the area would be ruined for birdwatchers like me."  (Decl. of Megan Corrigan, ECF No. 14-17, ¶ 11.)

**C. Balance Of Harms And Public Interest**

The final two factors that a court in this circuit must consider when deciding whether to grant a preliminary injunction are the balance of harms and the public interest. *See Arkansas Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 821 (D.C. Cir. 2009). Although allowing challenged conduct to persist certainly may be harmful to a plaintiff and the public, harm can also flow from enjoining an activity, and the public may benefit most from permitting it to continue. When "balanc[ing] the competing claims of injury," *Winter*, 555 U.S. 7, 24 (2008), the Court must "consider the effect on each party of the granting or withholding of the requested relief." *Id.* (citations omitted). Additionally, "courts of equity should [have] particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (internal quotation marks and citations omitted).

Plaintiffs maintain that the balance of harms clearly weighs in favor of granting an injunction. In their view, the environmental harms they have identified far exceed the minimal or non-existent harms that Enbridge and the Federal Agencies face. (Pl. Reply Br. at 38.) Plaintiffs reiterate the damaging construction effects, the risks to wildlife, and the potential for devastating oil spills that motivated their claims of irreparable harm, and they maintain both that the Federal Agencies will suffer *no* injury as a result of an injunction and that the harm Enbridge may suffer would be purely economic—and largely "self-inflicted"—and thus is not an adequate basis for denying injunctive relief. (*Id.* at 40.)

For its part, Enbridge has identified the harms to its business that might follow from the issuance of an injunction, including up to $262 million in additional

construction costs if it is required to "de-mobilize" and then "re-mobilize" its construction efforts. (Enbridge Br. at 46-47.) Enbridge notes that relationships with its suppliers and customers, and by extension its business operations, would suffer as a result of delays in construction. (*Id.* at 47.) Enbridge also asserts that delaying pipeline construction could increase the environmental impact of the project rather than prevent it, because current construction plans are tailored to the calendar (*i.e.*, Enbridge has coordinated construction with the planting and harvest schedules of farmers along the pipeline's path), and this timing was intentionally established to minimize environmental effects. (*Id.* at 47-48.) In evaluating harms in the balance, Enbridge also maintains that the injuries that would be inflicted on its bottom line as a result of project delay are a near certainty, while the environmental harms that Plaintiffs identify are speculative and thus should be discounted in the balancing test. (*Id.* at 43-45.)

The Federal Agencies' arguments about the comparative harms stem primarily from their assessment of the public's interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that the balance of harms and public interest factors "merge when the Government is the opposing party"). In the Federal Agencies' view, continued construction of the FS pipeline will serve the public's interest in several respects. First, the public has an interest in the development of stable North American energy sources. (Def. Br. at 54; Enbridge Br. at 49.) Second, the public has a strong interest in the jobs and economic growth that construction and operation of the FS pipeline will create. (Enbridge Br. at 49 (claiming that the FS pipeline will generate 3,000 jobs in the immediate future).) Additionally, according to the Federal Agencies, the public has an interest in avoiding the unnecessary costs that would be incurred if, as a result of an

injunction in this matter, the Corps was required to eschew the NWP 12 permitting process and thereby made to devote scarce resources to conducting extensive environmental reviews of projects that would otherwise conform to NWP 12 standards and consequently have minimal environmental impact. (Def. Br. at 53-54.)

In the Court's view, Enbridge and the Federal Agencies have the better of these arguments. With respect to the balance of harms, the record as it currently stands shows that Enbridge has committed major resources to the FS Pipeline project over the last 18 months, including engaging in an intensive effort to comply with the myriad state and federal environmental regulations that the pipeline project implicates. The evidence of the time and effort that Enbridge has already put in to the project lends credence to Enbridge's argument that it will suffer harm if the pipeline is indefinitely delayed. Plaintiffs, by contrast, have failed to demonstrate the harms that they allege with specificity in regard to the FS Pipeline in particular, relying instead on general harms they have identified by analogizing this project to other pipelines. (*See* Pl. Br. at 36-37.) While the Court is aware of the potential negative environmental consequences that can accrue from the construction and operation of a large oil pipeline, it is also hesitant to weigh these possibilities too heavily without more evidence linking them to this particular pipeline project. Consequently, the Court finds that the balance of harms tips in favor of Enbridge.

The Federal Agencies also are on firmer footing than Plaintiffs with respect to the public interest factor. The Court deems particularly compelling the Federal Agencies' argument that the public has an interest in regulatory efficiency with respect to projects that fall within the rubric of the general permitting system that the Clean

Water Act expressly authorizes. This system is carefully designed and administered to minimize the costs of approving projects that the Corps has already determined will not adversely impact the environment. The general permitting system also has the added benefit of incentivizing project sponsors to conform their construction activities to existing general permits, thereby further reducing the administrative burden while at the same time decreasing the potential negative environmental consequences of those projects. Overall, then, it is difficult for this Court to see how halting the FS Pipeline project, and thereby casting doubt on the general permitting process, is in the public's interest.

Plaintiffs argue that, because federal agencies have a statutory duty to conduct analyses that prevent substantive environmental harms, the public's interest is clearly aligned with enjoining harmful construction projects that proceed without such an analysis, no matter the cost. (Pl. Br. at 41- 42 (quoting *Colo. Wild Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1223 (D. Colo. 2007) ("The public has an undeniable interest in the Corps' compliance with the CWA and NEPA's environmental review requirements and in the informed decision-making that the statutes are designed to promote.")).) This may be so, but this contention is circular where, as here, the Federal Agencies' statutory duty to conduct an environmental review under NEPA has not been firmly established. Indeed, Plaintiffs' argument that there is a significant public interest in ensuring that federal agencies comply with their statutory duties (Pl. Br. at 41) brings the Court right back to where it started: examining Plaintiffs' claim that the Federal Agencies here failed to comply with a NEPA duty to conduct an environmental review of the FS Pipeline. Plaintiffs' public interest arguments are thus

derivative of their merits arguments and depend in large part on the vitality of the latter. This Court has already concluded that Plaintiffs are not likely to succeed on the merits of their claim that the Federal Agencies violated a statutory duty, and the public interest in the Federal Agencies' compliance with their statutory duties must be weighed accordingly. *See, e.g.*, *Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) ("The final preliminary injunction factor, the public interest, also offers [plaintiff] no support because it is inextricably linked with the merits of the case. If, as we have held, [plaintiff] is not likely to establish [a likelihood of success in the merits], then public interest considerations weigh against an injunction."); *ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 29-30 (D.D.C. 2012) (where plaintiff was unlikely to establish that agency action did not comply with the law, the public interest factor weighed against granting an injunction). Consequently, the Court finds that the public interest factor also weighs against granting a preliminary injunction in this case.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs have failed to carry their burden with respect to any of the four preliminary injunction factors, and the Court concludes that their motion for a preliminary injunction must be **DENIED**. A separate order will follow.


DATE: November 13, 2013

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge