# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SIERRA CLUB, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-cv-1239 (KBJ) |
| | ) | |
| UNITED STATES ARMY | ) | |
| CORPS OF ENGINEERS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiffs Sierra Club and the National Wildlife Federation ("Plaintiffs") have sued several federal agencies and their officers ("Federal Defendants") in an attempt to enjoin the construction of the Flanagan South Pipeline (the "FS Pipeline"), a domestic oil pipeline that, as planned, will transport tar sands crude oil from Pontiac, Illinois, through the states of Missouri and Kansas, and ultimately into Cushing, Oklahoma. Because a private company is constructing the 589-mile pipeline on mostly privately-owned land that is entirely within the territorial borders of the United States, no federal statute authorizes the federal government to oversee or regulate the construction project. Nevertheless, Plaintiffs allege that the Federal Defendants have failed to conduct an assessment of the environmental impact of the entire FS Pipeline and, as a result, have violated the National Environmental Protection Act ("NEPA"), 42 U.S.C. §§ 4321-4347 (2012), the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387 (2013), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 (2013). Plaintiffs have filed a six-count complaint alleging various statutory violations, but as Plaintiffs

themselves have cogently summarized it, "[t]he central issue in this case is whether any federal agency is required to analyze the impacts of the [nearly] 600-mile long Flanagan South tar sands oil pipeline, including the risks and impacts of oil spills, pursuant to [NEPA] before [the pipeline] can be built and operated."  (Pls.' Mot. to Suppl. & Amend First Am. Compl. ("Pls.' First Mot. to Amend"), ECF No. 83, at 2.)[1]

This Court first addressed the question of whether any federal agency had a duty to conduct an environmental review of the entire privately-constructed FS Pipeline in the context of a motion for a preliminary injunction that Plaintiffs filed on September 4, 2013—a mere 13 days after the August 22nd filing of Plaintiffs' First Amended Complaint.  For the purposes of that preliminary injunction motion, this Court analyzed, among other things, whether or not Plaintiffs had a likelihood of success on the merits of their central argument, and the Court concluded that Plaintiffs were unlikely to be able to establish successfully that the Federal Defendants had violated their obligations under NEPA, the CWA, or the APA.  *See Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 25-38 (D.D.C. 2013) ("PI Opinion"); *see also id*. at 33-44 (finding, additionally, that Plaintiffs had failed to demonstrate irreparable harm, and that the balance of harms and public interest did not necessarily weigh in Plaintiffs' favor).

Before this Court at present are several motions that focus this Court's attention on the merits of this matter once again.  The Federal Defendants and authorized

---

[1] This quotation, which encapsulates succinctly the gravamen of Plaintiffs' complaint, appears on the second page of Plaintiffs' First Motion to Supplement and Amend the First Amended Complaint (ECF No. 83).  Plaintiffs have now filed a *second* motion to amend the complaint (ECF No. 93); however, as explained in a separate order on the motions to amend that is entered today concurrently with this opinion, this Court concludes that Plaintiffs' proposed amendment would be futile because, even if the complaint was amended, Plaintiffs' central argument regarding the alleged NEPA violation—which underpins nearly all of Plaintiffs' claims and is carefully considered and disposed of herein—would remain the same.

Intervenor Enbridge Pipelines (FSP), LLC ("Enbridge")—the private company that is constructing the FS Pipeline—have filed motions to dismiss parts of Plaintiffs' first amended complaint on ripeness grounds and for failure to state a claim, seeking dismissal of the complaint's allegations that certain agencies have violated a duty to conduct an environmental review of the pipeline.  Each party has now also filed a cross-motion for summary judgment, with Plaintiffs maintaining that the administrative record conclusively establishes the alleged NEPA, CWA, and APA violations, and the Federal Defendants and the Intervenor arguing that the undisputed facts unquestionably establish the opposite.

Setting aside the ripeness issue in light of subsequent developments in this case, this Court will **GRANT IN PART** the Federal Defendants' and Intervenor's Partial Motions to Dismiss, and will **GRANT** the Federal Defendants' and Intervenor's cross-motions for summary judgment with respect to all remaining claims, because the totality of the record before the Court indicates that there are no genuine issues of material fact regarding Plaintiffs' claims and that Defendants are entitled to judgment as a matter of law.  The Court's reasons for this ruling are explained further below, but the gist of the Court's conclusion is that Plaintiffs are wrong to insist that any federal agency had an obligation under NEPA or any other statute to conduct an environmental review of the impact of the entire FS Pipeline before Enbridge broke ground on the project, given that the Federal Defendants have permitting authority over only small segments of this private pipeline project and none of the defendant agencies, alone or in combination, have authority to oversee or control the vast portions of the FS Pipeline that traverse private land.  Two separate orders—one that implements the Court's

findings herein and another that addresses the Plaintiffs' futile motions to amend the complaint—will issue in conjunction with this Memorandum Opinion.

## I.  OVERVIEW

This Court's PI Opinion contains a lengthy and detailed discussion of the factual background of this case, as well as the complex web of statutes and regulations that undergird Plaintiffs' claims.  *See Sierra Club*, 990 F. Supp. 2d at 13-24.  The Court will not reproduce that discussion in full here; it assumes familiarity with the prior description and expressly incorporates it herein.  What is necessary for present purposes is a short restatement of the key facts and a review of the complaint's basic claims.  In addition, the instant opinion includes a brief recitation of the procedural history that followed the PI Opinion.

### A.  Basic Facts That Underlie Plaintiffs' Core Complaint

As noted, Enbridge is a private company that constructs oil pipelines.  *Sierra Club*, 990 F. Supp. 2d at 13.  Congress has not authorized the federal government to oversee the construction of private domestic oil pipelines; consequently, Enbridge has undertaken to build the planned FS Pipeline largely on its own, primarily by securing easements from the landowners who own the property over which the pipeline will operate.  At the time of the PI Opinion, Enbridge had already approached more than 1,700 private land owners, and had "secured 96% of the land rights" along the 589-mile FS Pipeline route.  *Id.*

Enbridge has also sought federal approval for constructing the FS Pipeline over the 27.28 total miles of federal land and waterways that the FS Pipeline route traverses.

*Id.* To this end, the Army Corps of Engineers (the "Corps") has verified pursuant to the National Permitting System that the 13.68 total miles of FS Pipeline water crossings—which incorporate extensive mitigation measures—are consistent with a pre-existing national permit that pertains to construction projects that are likely to have "minimal" separate or cumulative adverse effects on the environment. 33 U.S.C. § 1344(e)(1); *see also* Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184, 10,271 (Feb. 21, 2012). The Corps is also the agency responsible for considering Enbridge's request for an easement to construct and operate the pipeline over 1.3 total miles of federal land along the proposed route, including at points along the Mississippi River in Illinois and Missouri and the Arkansas River in Oklahoma. Because NEPA mandates that an agency evaluate the environmental consequences of any "major federal action [] significantly affecting the quality of human environment," 42 U.S.C. § 4332(2)(C), the Corps has assessed the environmental impact of permitting Enbridge to construct the FS Pipeline over that small portion of federal land and has granted Enbridge construction easements over that property. (*See* Notice of Issuance of Easements by the Army Corps of Engineers, ECF No. 90.)[2] For its part, the Bureau of Indian Affairs ("BIA") has entertained a similar Enbridge request for an easement regarding the 12.3 total miles of Native American land that the pipeline crosses, and has also issued easements for the FS Pipeline to be constructed across those lands after conducting an Environmental

---

[2] Under NEPA, an agency may fulfill its obligation to conduct an environmental impact review by first preparing a "concise public document"—called an Environmental Assessment ("EA")—that "briefly provides evidence and analysis to assist an agency in deciding whether the action in question requires" a more searching review, known as an Environmental Impact Statement ("EIS"). *Sierra Club*, 990 F. Supp. 2d at 18 (citing 40 C.F.R. §§ 1501.4(a)-(c), 1508.9). Here, the Corps completed an EA with respect to the requested easements, and thereafter made a finding of no significant impact ("FONSI"). *See id.* at 19 n.6 ("If the agency concludes that no EIS is warranted after preparing an EA, the agency will make a finding of no significant impact ('FONSI'), which is reflected in a document that details the agency's conclusion that its action will not have a significant effect on the human environment." (citing 40 C.F.R. §§ 1501.4(e), 1508.13)).

Assessment ("EA") and making a Finding of No Significant Impact ("FONSI"). (*See* Notice of Issuance of Easements by the Bureau of Indian Affairs, ECF No. 81.) Moreover, both the Corps and the BIA consulted the Fish and Wildlife Service ("FWS") as a required part of their respective easement-request review processes, and as a result, the FWS issued a Biological Opinion and incidental take statement related to potential impacts of the construction of the FS Pipeline on certain endangered species.

Notably, to date, although some of the federal agencies that have considered Enbridge's requests regarding aspects of the FS Pipeline have reviewed the environmental impact of the pipeline's construction and operation over the particular geographical areas that are under the agency's jurisdiction—*e.g.*, the BIA has issued an EA/FONSI regarding the 12.3 miles of Native American lands over which the pipeline will cross—*no* federal agency has interpreted NEPA as a mandate that it undertake a comprehensive environmental impact study of the *entire* 589-mile FS Pipeline.

Plaintiffs' currently operative First Amended Complaint contains six claims, each of which, in essence, points to the same underlying contention: that *some* federal agency, if not all of them collectively, had a statutory duty to conduct a NEPA review of the entire FS Pipeline.[3] The complaint's Claims II(a), II(b), and III address individually certain federal agencies that Plaintiffs believe had such a NEPA duty, homing in on the particular agency activities that Plaintiffs allege were major federal actions that should have prompted the subject agency to conduct an environmental review of the entire FS Pipeline pursuant to that statute. These agency activities consist

---

[3] The First Amended Complaint contains claims numbered I-VI. Claim I is a Freedom of Information Act claim that the parties have settled. (*See* Stip. of Dismissal & Settlement, ECF No. 78.) Because Claim II of the complaint is split into two parts, labeled herein as Claims II(a) and II(b), there are still six live claims that the pending motions to dismiss and summary judgment motions address, when the substance of Plaintiffs' claims is taken into account.

of the Corps's verifications of the FS Pipeline's water crossings pursuant to Nationwide Permit 12 ("NWP 12") (Claim II(a)) (*see* Am. Compl., ECF No. 7, ¶¶ 156-160); the Corps's consideration (and eventual issuance) of easements for construction over the federal land under its jurisdiction (Claim II(b)) (*see id.* ¶¶ 161-164); and the FWS's issuance of a Biological Opinion and incidental take statement (Claim III) (*see id.* ¶¶ 165-171).  In addition, Plaintiffs contend that the Pipeline and Hazardous Materials Safety Administration ("PHMSA") eventually will be called upon to approve an oil spill response plan that Enbridge will be required by law to submit with respect to the FS Pipeline at some point in the future, and that this potential future determination of the PHMSA should also be considered a major federal action that triggered a NEPA obligation on the part of that agency to conduct an environmental review of the pipeline prior to its construction (Claim IV) (*see id.* ¶¶ 172-179).[4]  In Claim V, Plaintiffs' complaint approaches the same target from a different angle, by expressly maintaining that, whether or not each individual agency's actions triggered a duty for any particular agency to conduct an environmental review of the entire FS Pipeline under NEPA, the *combined* actions of all of the federal agencies that had some connection to the FS Pipeline *collectively* constitute major federal action giving rise to an obligation to conduct a NEPA review of the FS Pipeline as a whole and to appoint a "lead agency" to undertake that responsibility (*id.* ¶¶ 180-189).  Finally, in Claim VI, Plaintiffs make the

---

[4] Although Plaintiffs have chosen to separate their allegations regarding the conduct of each of the federal agencies into separate counts as explained, Plaintiffs' argument is actually the same with respect to each agency's activity regarding the pipeline:  that by virtue of that activity (whatever it was), the agency had an obligation to conduct an environmental review of the impact of all 589 miles of the FS Pipeline construction project.  In this respect, with another drafter, the allegations in Counts II (a) and (b), Count III, and Count IV might all have been contained within a single count, one that asserted that agencies within the federal government have engaged, or will engage, in activities with respect to the FS Pipeline that qualify as "major federal actions" for the purpose of NEPA and thus these agencies had an obligation to conduct a NEPA-related review of the entire pipeline.

ancillary argument that the Corps's verification determinations violated the CWA and NWP 12 because the agency failed to evaluate the cumulative effects of the FS Pipeline's water crossings (*id.* ¶¶ 190-193).

### B.    Post-Preliminary Injunction Procedural History

As noted above, this Court issued an opinion denying Plaintiffs' motion for a preliminary injunction on November 13, 2013.  More or less contemporaneously with this Court's issuance of that opinion, both the Federal Defendants and Enbridge filed motions to dismiss Plaintiffs' easement claims against the Corps and the BIA, as well as Plaintiffs' claim against the PHMSA, based on the fact that those agencies, at that time, had not yet taken any action regarding the easements or the not-yet-filed oil spill response plan.  The motions to dismiss also argued that the claim against the FWS was subject to dismissal because that agency's issuance of the Biological Opinion and incidental take statement was non-discretionary.  (*See* Mem. in Supp. of Fed. Defs.' Mot. to Partially Dismiss the Compl. ("Fed. Defs.' MTD Br."), ECF No. 47-1 (filed on Nov. 8, 2013); Mem. in Supp. of Intervenor's Mot. to Partially Dismiss the Compl. ("Enbridge MTD Br."), ECF No. 50-1 (filed on Nov. 19, 2013).)

On December 9, 2013, while these partial motions to dismiss were still pending (and indeed, before those motions were even fully briefed), Plaintiffs filed a Motion for Summary Judgment, largely reasserting the same arguments put forth in their unsuccessful preliminary injunction motion.  (Pls.' Mot. for Summ. J. ("Pls.' MSJ Br."), ECF No. 61.)  The Federal Defendants and Enbridge responded with motions for summary judgment of their own, which were filed by January 10, 2014.  (Fed. Defs.' Cross-Mot. for Summ. J. ("Fed. Defs.' MSJ Br."), ECF No 70; Intervenor's Cross-Mot.

for Summ. J. ("Enbridge MSJ Br."), ECF No 71.) The cross-motions for summary judgment were fully briefed on February 10, 2014, and on February 21, 2014, this Court held a motion hearing on the pending partial motions to dismiss and motions for summary judgment, at the conclusion of which the Court took all of the pending motions under advisement.

Significantly, the Federal Defendants thereafter filed two notices alerting the Court to certain developments in the case. In particular, on April 23, 2014, the Federal Defendants informed the Court that the BIA had granted easements to Enbridge, and on July 18, 2014, the Federal Defendants notified the Court that the Corps had done the same with respect to the land under its jurisdiction. (*See* Notice of Issuance of Easements by BIA, ECF No. 81; Notice of Issuance of Easements by Corps, ECF. No. 90.) Thus, the BIA and the Corps have apparently completed the environmental assessments of the impact of constructing the pipeline over the land under their jurisdiction and have made final determinations that the easements over the federal land under the control of those agencies should be granted, giving Enbridge the go-ahead to begin construction on those portions of the pipeline. In addition, according to Plaintiffs in a motion filed subsequent to the parties' briefing of the motions to dismiss and cross-motions for summary judgment, the Environmental Protection Agency ("EPA") has commented on proposed plans for the construction of portions of the pipeline, concluding that the entire FS Pipeline "[should] be analyzed as a 'connected action' in a single NEPA document." (Pls.' First Mot. to Amend at 4.) Despite these new

developments, neither the BIA nor the Corps, nor any other federal agency, has

conducted an environmental review of the entire FS Pipeline.[5]

* * *

The instant opinion will proceed as follows.  First, this Court will consider

whether and to what extent any of the claims in Plaintiffs' complaint must be dismissed

based on the arguments made in the Federal Defendants' and Intervenor's partial

motions to dismiss.  By and large, the Federal Defendants' and Intervenor's ripeness

arguments have been overtaken by events; therefore, this Court will consider them moot

and will not address them.  What remains of the motions to dismiss is the argument that

the Plaintiffs' claim against the PHMSA must be dismissed for lack of any "final

agency action," and also the contention that the FWS's preparation of a Biological

Opinion and incidental take statement can never give rise to a NEPA obligation under

the circumstances presented here and thus must be dismissed—both of which the Court

addresses below.

Next, the Court will turn to the parties' cross-motions for summary judgment.

The opinion evaluates the extent to which the record supports Plaintiffs' contentions

that both the Corps's verifications and the FWS's preparation of a Biological Opinion

and incidental take statement are "major federal actions" giving rise to environmental

review obligations under NEPA.  The opinion also addresses Plaintiffs' core contention

that, in any event, the record establishes that some federal agencies undertook one or

---

[5] As noted, Plaintiffs have filed two motions to amend the complaint in order to account for these new events.  (*See* Pls.' Mot. to Suppl. & Amend First Am. Compl., ECF No. 83; Pls.' Unopposed Mot. to Suppl. & Amend First Am. Compl., ECF No. 93; *see also supra* n.1.)  However, as explained in the separate order filed today addressing those motions, Plaintiffs' proposed amendments would not alter this Court's analysis in any way, and thus would be futile.  *See, e.g.*, *Willoughby v. Potomac Elec. Power Co.*, 100 F.3d 999, 1003 (D.C. Cir. 1996) (noting that leave to amend should generally be granted "unless there is a good reason, such as futility, to the contrary").

more "major federal actions" with respect to aspects of the FS Pipeline, and that this federal involvement—whether viewed alone or cumulatively—gave rise to an obligation on the part of the federal government to conduct a comprehensive environmental review of the entire pipeline. Finally, the opinion discusses this Court's conclusions regarding Plaintiffs' claim that the Corps violated the CWA by arbitrarily and capriciously failing to take into account the "cumulative effects" of the water crossings when it verified those crossings under NWP 12.

## II.     FEDERAL DEFENDANTS' AND INTERVENOR'S PARTIAL MOTIONS TO DISMISS

The Federal Defendants and the Intervenor have moved to dismiss parts of Plaintiffs' complaint on two overarching bases: first, that "Plaintiffs have challenged numerous actions that may be undertaken by the Corps, PHMSA, BIA, and EPA that have not yet occurred and may never occur" (Fed. Defs.' Mot. to Partially Dismiss Pls.' Compl., ECF No. 47, at 2); and second, that "Plaintiffs have not stated a claim against PHMSA, EPA, and FWS because the[ir] . . . actions are not major federal actions requiring NEPA review" (Fed. Defs.' MTD Br. at 12). There is no need to flesh out the details of the Federal Defendants' and Intervenor's ripeness-related arguments with respect to the complaint's easement claims against the Corps and the BIA because both sides now agree that these agencies have done an environmental assessment of the federal land over which the FS Pipeline will run, and have, in fact, issued the easements in question. With respect to Defendants' and Intervenor's similar contention that the PHMSA has not yet taken any "final agency action" and thus that this Court lacks jurisdiction over the claim against the PHMSA under the APA, it is well-established that the APA's final agency action requirement is not jurisdictional, *see Reliable*

*Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732

(D.C. Cir. 2003); thus, the final agency action argument provides no basis for dismissal

of the PHMSA under Federal Rule of Civil Procedure 12(b)(1). Furthermore,

Defendants' argument that this Court should dismiss Plaintiffs' claims against the BIA

and EPA are unavailing for the very simple reason that the current complaint contains

no "claim" against the EPA or BIA that can be subjected to dismissal.[6] This leaves for

analysis only the Federal Defendants' and Intervenor's contention that Plaintiffs' claims

against the PHMSA and FWS must be dismissed because they fail to state a claim upon

which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).

### A. Dismissal For Failure To State A Claim Under Federal Rule Of Civil Procedure 12(b)(6)

"A Rule 12(b)(6) motion tests the legal sufficiency of a complaint[.]" *Browning*

*v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). "To survive a motion to dismiss, a

complaint must contain sufficient factual matter, accepted as true, to state a claim to

relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(internal quotation marks and citation omitted). "The plausibility standard is not akin

to a 'probability requirement,' but it asks for more than a sheer possibility that a

---

[6] No stand-alone claim against the EPA or the BIA appears in Plaintiffs' complaint; rather, those agencies are mentioned only in the context of Plaintiffs' Claim V, which alleges that the combined actions of all federal agencies gave rise to an obligation to perform a NEPA analysis covering the entire FS Pipeline. (*See* Compl. ¶ 181(f).) Consequently, although Defendants and Intervenor include arguments in their motions to dismiss that Plaintiffs' "claim" against the EPA should be dismissed both for lack of jurisdiction and for failure to state a claim (*see, e.g.*, Fed. Defs.' MTD Br. at 8, 12), there is no claim against the EPA to be dismissed. Notably, with respect to the BIA, Plaintiffs' subsequently-filed motions to amend the complaint seek, in part, to add a claim relating specifically to the BIA's issuance of easements. (*See, e.g.*, Pls.' First Mot. to Amend at 4.) *See also* supra n. 4. But there appears to be no dispute that a federal agency's decision regarding whether to grant an easement over federal land triggers a NEPA duty to consider the environmental impact of that action, and in fact, both the Corps and the BIA have now satisfied this requirement. Therefore, as set forth in the separate order accompanying this opinion, this Court has denied Plaintiffs' motion to amend the complaint to set forth a separate claim on this ground.

defendant has acted unlawfully." *Id.* (citation omitted).  Although a plaintiff may survive a Rule 12(b)(6) motion even where "recovery is very remote and unlikely[,]" the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56 (2007) (internal quotation marks and citation omitted).  Moreover, a pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action[.]" *Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted).

If the facts as alleged, which must be taken as true, fail to establish that a plaintiff has stated a claim upon which relief can be granted, the Rule 12(b)(6) motion must be granted. *See, e.g.*, *Am. Chemistry Council, Inc. v. U.S. Dep't of Health & Human Servs.*, 922 F. Supp. 2d 56, 61 (D.D.C. 2013).  Notably, in deciding a Rule 12(b)(6) motion, a court may "consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

**B.**     **Plaintiffs' Claim Against The FWS Is Not Susceptible To Dismissal On Rule 12(b)(6) Grounds, But The Claim Against The PHMSA Is Dismissed On This Basis**

The complaint maintains that the FWS and PHMSA have engaged in "major federal actions" for the purpose of NEPA and thus should have conducted an environmental review of the entire pipeline.  (*See* Compl. ¶¶ 165-171 (FWS); 172-179 (PHMSA).)  The Federal Defendants and Intervenor maintain that no such NEPA claim is possible as a matter of law because neither agency exercises any discretion in determining whether or not to issue a Biological Opinion or approve a submitted oil-

response plan, and in any event, the PHMSA has not yet engaged in *any* action, much less a major federal action, with respect to the FS Pipeline.  (*See* Fed. Defs.' MTD Br. at 16-23; Enbridge MTD Br. at 5-10.)

The Court concludes that it cannot dismiss the claim against the FWS on the proffered lack-of-discretion ground because, as this Court made clear in the PI Opinion, there are circumstances in which the FWS's mandatory issuance of a Biological Opinion and incidental take statement *can* trigger the obligation to conduct a NEPA review.  *See Sierra Club*, 990 F. Supp. 2d at 30 (rejecting the argument that "an FWS opinion and incidental take statement issued pursuant to the Section 7 consultation process can *never* rise to the level of major federal action" (emphasis in original)); *see also Bennett v. Spear*, 520 U.S. 154, 169 (1997) (noting that, in some circumstances, a Biological Opinion can have "a powerful coercive effect on the action agency" and therefore qualify as a major federal action); *Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir. 1996) (finding that a Biological Opinion and incidental take statement that the FWS issued as required pursuant to Section 7 of the Environment Protection Act was a major federal action insofar as it was the "functional equivalent to a permit").  The Federal Defendants and Intervenor have provided no good reason for this Court to reconsider its conclusion in this regard, nor have they provided any basis for concluding that the PHMSA's mandatory approval of an oil spill response plan should be analyzed any differently.  Therefore, this Court declines to find that—as a matter of law—agency actions such as the issuance of a Biological Opinion and incidental take statement or the

approval of a mandated oil spill response plan can never rise to the level of major federal action for NEPA purposes.[7]

The additional argument that the Federal Defendants and the Intervenor make regarding the dismissal of Plaintiffs' claim against the PHMSA has much more traction. The complaint claims that the PHMSA violated a duty to conduct a NEPA review of the entire FS Pipeline before construction began because, at some point in the future, PHMSA will be called upon to approve an oil spill response plan for the FS Pipeline and that such approval will constitute a "major federal action" for NEPA purposes. (Compl. ¶¶ 172-179.) Defendants maintain that this claim should be dismissed because the PHMSA has not yet even been *presented* with such a plan, much less engaged in the process of deciding whether or not to approve one, and thus, the complaint fails to state a claim upon which relief can be granted.[8]

On this point, the Court agrees with Defendants. Although the fact that an agency has not yet affirmatively acted may not preclude a finding that the agency has taken "final agency action" for the purposes of the APA, *see, e.g.*, *Biovail Corp. v. FDA*, 448 F. Supp. 2d 154, 161 (D.D.C. 2006) (under the APA "'agency action' includes, *inter alia,* agency 'failure to act'"), it is readily apparent to this Court that a

---

[7] Of course, the Court's conclusion that, in some circumstances, the preparation of a Biological Opinion and incidental take statement can qualify as a major federal action says nothing about whether it does so on the facts of this case. That question is addressed in Part III.B.1 below, in the context of the parties' cross-motions for summary judgment.

[8] As explained in detail in the PI Opinion, Plaintiffs' PHMSA claim is predicated on the fact that, under the Oil Pollution Act of 1990, the operators of oil pipelines are required to submit to the PHMSA "a plan for responding, to the maximum extent practicable, to a worst case discharge, and to a substantial threat of such a discharge, of oil or a hazardous substance." 33 U.S.C. § 1321(j)(5); *see also Sierra Club*, 990 F. Supp. 2d at 16. In order for an oil pipeline to begin operations, the PHMSA must either approve this plan, or authorize the pipeline to operate without approval for up to two years, provided that the operator has submitted a plan and has certified that it is meeting certain requirements. *Id.* § 1321(j)(5)(F), (G). Plaintiffs assert that the PHMSA's eventual approval of Enbridge's not-yet-submitted oil spill response plan, or its granting Enbridge authority to operate the FS Pipeline without approval, will qualify as a major federal action warranting a NEPA environmental review.

"major federal action" for NEPA purposes must be defined with reference to an agency's *active* consideration of whether or not to act. As was explained in the PI Opinion, Congress wanted to "ensure that federal agencies made fully-informed and well-considered decisions" regarding whether to act in a certain way or refrain from acting, and "[t]o this end," NEPA specifically mandates that, "before a federal agency undertakes a 'major federal action[] significantly affecting the quality of the human environment,' . . . the agency [must] evaluate the environmental consequences of that proposed action." *Sierra Club*, 990 F. Supp. 2d at 18 (quoting 42 U.S.C. § 4332(2)(C)). Regulations implementing NEPA further underscore the point that the NEPA duty is triggered only when an agency is actively considering undertaking a proposed major federal action. Section 1502.5 of Title 40 of the Code of Federal Regulations states that "[a]n agency shall commence preparation of an [environmental analysis under NEPA] as close as possible to the time the agency *is developing or is presented with a proposal*[.]" 40 C.F.R. § 1502.5 (emphasis added). Similarly, section 1506.1(b) provides that "[i]f any agency *is considering an application* from a non-Federal entity," that agency must "promptly notify the applicant that the agency will take appropriate action to insure that the objectives and procedures of NEPA are achieved." 40 C.F.R. § 1506.1(b) (emphasis added).

Here, it is undisputed that the PHMSA has not even received an application from Enbridge for approval of an oil spill response plan (or a request that the pipeline be authorized to operate without such approval); thus, the agency is certainly not engaged in the process of considering any such plan or request. This Court concludes that, insofar as the PHMSA has not even *begun* considering whether or not to take action

with regard to the FS Pipeline, the PHMSA had no duty under NEPA or otherwise to conduct an environmental review of the FS Pipeline as a matter of law, and therefore, Plaintiffs' claim against the PHMSA (Claim IV of the complaint) must be dismissed for failure to state a claim upon which relief can be granted.

## III. THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs' motion for summary judgment maintains that the record here conclusively demonstrates both that an environmental impact study of the entire FS Pipeline was required under NEPA (*see, e.g.*, Pls.' MSJ Br. at 1-3), and also that the Corps violated the CWA and the APA when it allegedly verified that the 1,950 FS Pipeline-related water crossings were consistent with NWP 12 without taking into account the "cumulative effects" of those water crossings (*see* Compl. ¶¶ 190-93; Pls.' MSJ Br. at 41-54).[9] The Federal Defendants and the Intervenor argue with equal vigor in their cross-motions for summary judgment that the undisputed record facts pertaining to the construction of the FS Pipeline establish no such thing. (*See* Defs.' MSJ Br. at 1, 40-42; Enbridge MSJ Br. at 1-3, 41-44.) As explained below, after an evaluation of the complaint's NEPA, CWA, and APA claims in light of the evidence presented, this Court has determined that Defendants are entitled to judgment as a matter of law.

### A. Standard For Summary Judgment In Administrative Action Cases

In most civil cases, summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[9] Plaintiffs' NEPA-related claims are also brought under the APA, presumably because, as explained in the PI Opinion, "NEPA does not provide a separate cause of action for plaintiffs seeking to enforce its EIS requirements." *Sierra Club*, 990 F. Supp. 2d at 22 (internal quotation marks and citation omitted). Here, "Plaintiffs' complaint alleges"—and its summary judgment motion vigorously argues—that "insofar as none of the Federal Agencies have completed an EA and EIS with respect to the FS Pipeline, the Federal Agencies have not only violated NEPA, they have also violated the APA." *Id.*

judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). "Summary judgment is [also] the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citing *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007)); *see also Richards v. INS*, 554 F.2d 1173, 1177 n. 28 (D.C. Cir. 1977). However, due to the limited role a court plays in reviewing the administrative record to evaluate whether an agency has complied with the APA, the typical summary judgment standards are not applicable. *Stuttering*, 498 F. Supp. 2d at 207.

> Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."

*Id.* (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985)). In other words, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote and citations omitted).

Significantly, the APA provides a "default standard" of judicial review of agency actions on summary judgment when the governing statute does not otherwise provide one: "[a] court must set aside agency action it finds to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 736 n. 10 (D.C. Cir. 2001) (quoting 5 U.S.C. § 706(2)(A)). "The

'arbitrary and capricious' standard of review as set forth in the APA is highly deferential," and the Court must therefore "presume the validity of agency action." *Am. Horse Prot. Ass'n v. Yeutter*, 917 F.2d 594, 596 (D.C. Cir. 1990) (citation omitted). Although the "court is not to substitute its judgment for that of the agency[,] . . . the agency must examine the relevant data and articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citations and quotation marks omitted).

**B.     The Record Establishes That No Federal Agency, Alone Or In Combination, Had A NEPA Duty To Evaluate The Entire FS Pipeline**

Plaintiffs' primary contention in this case—which is restated in various ways in different counts of the complaint—is that, under NEPA, one or more agencies of the federal government was legally required to undertake a comprehensive review of the potential environmental impacts of the construction and operation of the entire FS Pipeline before construction on that pipeline commenced.  (*See* Am. Compl. ¶¶ 180-189; Pls.' MSJ Br. at 13-39.)  As previously noted, the NEPA statute requires preparation of an environmental impact study regarding every "major federal action significantly affecting quality of the human environment," 33 U.S.C. § 4332(2)(C), and in relevant part, NEPA regulations define "major federal actions" as "projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies[,]" 40 C.F.R. § 1508.18(a).  Relying on this statutory and regulatory framework, Plaintiffs here point to three bases for their argument that NEPA

unquestionably required the federal government to undertake an environmental review of the entire FS Pipeline.

First, Plaintiffs assert that certain activities that the individual federal agencies named as defendants have undertaken with respect to the FS Pipeline qualify as "major federal actions" that should have prompted those agencies to do an assessment of the entire FS pipeline under NEPA. (*See* Compl. ¶¶ 156-160, 165-171; Pls.' MSJ Br. at 18-30.) *See also Sierra Club*, 990 F. Supp. 2d at 15-16.[10] Second, Plaintiffs argue that, regardless of whether the activity of any particular federal agency standing alone constituted a major federal action that triggered a duty to conduct an environmental review of the entire FS Pipeline under NEPA, the combination of *all* of the federal activities that the myriad federal agencies that have been consulted regarding some aspect of the construction and operation of the pipeline have undertaken—including the PHMSA's potential future approval of the required oil spill response plan—indicates that the federal government has sufficient control over the FS Pipeline that the pipeline itself qualifies as a major federal action, despite being privately owned and overwhelmingly constructed on private land. (*See* Compl. ¶¶ 180-89; Pls.' MSJ Br. at 34-39.)[11] Plaintiffs' third theory of NEPA liability is that if *any* of the activities of the

---

[10] The complaint focuses primarily on the activities of the Corps and the FWS, alleging individual NEPA claims against those agencies separately, and it also puts the PHMSA in this same boat (*see* Compl. ¶¶ 172-180). In light of this Court's conclusion above that Plaintiffs' claim against the PHMSA must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6), *see supra* Part II.B, the Court will focus here on Plaintiffs' NEPA claims against the Corps and FWS, and will not proceed to consider whether summary judgment should be entered in favor of either party on Plaintiffs' individual NEPA claim against the PHMSA.

[11] This Court's conclusion that Plaintiffs have failed to state a claim against the PHMSA does not preclude its consideration of Plaintiffs' allegations about the future actions of that agency to the extent that those allegations relate to Plaintiffs' claim regarding the overall "federalization" of the FS Pipeline. In this same vein, the Court has also considered the complaint's allegations regarding the BIA in its evaluation of Plaintiffs' federalization contention, despite the fact that the complaint contains no separate claim against the BIA and the Court has not granted Plaintiffs leave to amend the

federal agencies qualifies as a "major federal action" triggering environmental review of some aspect of the pipeline project, that acting agency cannot confine its environmental impact assessment to the area under its own jurisdiction; rather, its review must encompass the *entirety* of the FS Pipeline's construction and operation because the pipeline is one "connected action." (*See* Pls.' MSJ Br. at 13-16.)[12] In short, all roads lead to Plaintiffs' core contention that the federal government violated a NEPA duty to assess the environmental impact of the entire FS Pipeline prior to the pipeline's construction. For the reasons that follow, this Court disagrees.

> 1. <u>Neither The Corps's Verifications Nor The Service's</u>
> <u>Biological Opinion And Incidental Take Statement</u>
> <u>Qualify As "Major Federal Actions" Under the</u>
> <u>Circumstances Presented</u>

Plaintiffs' first argument in support of summary judgment on their NEPA-violation claims is that the record indisputably establishes that both the Corps's issuance of four letters verifying the FS Pipeline water crossings, and also the FWS's preparation of a Biological Opinion and incidental take statement, qualify as "major federal actions" that triggered a duty to conduct an environmental impact review under NEPA. Under the regulations implementing NEPA, the term "major federal action" includes "actions with effects that may be major and which are potentially subject to Federal control and responsibility[,]" 40 C.F.R. § 1508.18, and as explained

---

complaint to include any such claim. *See supra* nn.4, 5; *see also* ECF No. 96 (Court's Order denying leave to amend the complaint).

[12] Under this theory, the fact that the Corps and the BIA apparently believed that an environmental assessment pursuant to NEPA was a necessary prerequisite to their decisions regarding whether to grant easements, for example, means that those agencies had an obligation to conduct a review of the entire FS Pipeline, and not just the easement-related areas. (*See, e.g.*, Pls.' First Mot. to Amend at 6.) In this respect, the complaint's claim against the Corps, and also its allegations regarding the BIA, remain relevant, despite the fact that both agencies have already conducted a (limited) environmental impact review.

in the PI Opinion, the relevant case law and authorities establish that, if the federal agency itself is not undertaking or financing the project in question, the agency action qualifies as "major federal action" for NEPA purposes only if the agency's act is tantamount to a permit that allows the project to proceed. *See Sierra Club*, 990 F. Supp. 2d at 25-26; *see also Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1117 (9th Cir. 2000) (finding no major federal action where the project in question "*could* proceed without the permit" issued by a federal agency (emphasis in original)); *Ramsey*, 96 F.3d at 444 (noting that "if a federal permit is a prerequisite for a project with adverse impact on the environment, issuance of that permit does constitute a major federal action"); Daniel R. Mandelker, *NEPA Law & Litig.* § 8:19 (2d ed. 2014) (explaining that "[f]ederal permits, leases and other approvals" are "typical examples" of major federal action triggering NEPA in the context of otherwise non-federal projects). Plaintiffs appear to accept that standard, and argue here that the Corps's verification letters—which collectively certified that the 1,950 instances in which the FS Pipeline impacts waters of the United States were consistent with a preexisting nationwide permit—were effectively "permits" for the purpose of the NEPA definition. (*See* Pls.' MSJ Br. at 24-26.) Plaintiffs make essentially this same argument with respect to the Biological Opinion and incidental take statement that the FWS issued when it consulted with the Corps and BIA. (*See id.* at 19-21.) However, in light of the record evidence, this Court concludes that neither the Corps's verifications nor the FWS's Biological Opinion and incidental take statement satisfy the "major federal action" NEPA requirement.

The PI Opinion discussed at length how the Corps's NWP 12 verification process relates to the overall pipeline project. *See Sierra Club*, 990 F. Supp. 2d at 14, 19-22, 25-30. Briefly, under the CWA, a party seeking to discharge dredged or fill material into wetlands or waters that are under the jurisdiction of the Corps must obtain federal approval to do so. *See* 33 U.S.C. § 1344. The party can seek this approval in one of two ways: either it can apply to the Corps for an individual permit, *id.* § 1344(a), or it can request that the Corps verify that the actions the party seeks to take are already authorized under an existing general permit. *Id.* § 1344(e).[13] The difference between these separate paths to the same destination is significant, because the individual permitting process involves "detailed application and processing instructions" and the Corps's "case-specific review of each application," *Sierra Club*, 990 F. Supp. 2d at 19 (citing 33 C.F.R. Parts 323, 325 (2013)), while under the general permitting system, the Corps has already concluded that covered activities can proceed based on an extensive environmental impact study that the agency does periodically regarding such construction activities on a regional or nationwide basis. *See id.* at 27 (explaining that "under the nationwide permit system, the Corps has already done an environmental review on a general categorical basis and has already given its imprimatur to discharges that result from the type of construction activity at issue under specified circumstances"). Therefore, when a party approaches the Corps under the general permitting scheme (which is not even required for every water-related construction

_____

[13] General permits provide blanket authorization for specified activities within certain geographical areas, including (as relevant here) nationwide. *See* 33 U.S.C. § 1344(e).

project), such party is merely requesting "verification" of their own belief that the proposed construction project satisfies the Corps's previously established requirements. *See id.* ("When a prospective permittee files a pre-clearance notice [under the general permit process], the only thing left to be done is for the Corps's district engineers to verify that the planned project does, in fact, fit within the category of activities that the Corps has already authorized.").

For its construction of the FS Pipeline, Enbridge asked the Corps to verify that each of the 1,950 water crossings that construction of the FS Pipeline might impact was consistent with Nationwide Permit 12, a nationwide permit that specifically authorizes discharges into federal waterways as required for "the construction, maintenance, repair, and removal of utility lines and associated facilities in waters of the United States, provided the activity does not result in the loss of greater than 1/2-acre of waters of the United States for each single and complete project." Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184, 10,271 (Feb. 21, 2012). In August and September of 2013, Corps district engineers from each of the four Corps districts through which the FS Pipeline passes issued letters verifying that the water crossings associated with the FS Pipeline were, in fact, consistent with NWP 12. (*See* Admin. R. ("AR") App. Part 1, ECF No. 79-1, at 5-11 (Kansas City Dist. Verification Letter); AR App. Part 6, ECF No. 79-6, at 5-17 (Rock Island Dist. Verification Letter); AR App. Part 7, ECF No. 79-7, at 5-13 (St. Louis Dist. Verification Letter); AR App. Part 10, ECF No. 79-10, at 5-6 (Tulsa Dist. Verification Letter).)[14] The issuances of these letters are the "actions" that Plaintiffs insist constitute a "major federal action" that, according to Plaintiffs,

---

[14] Page number references in citations to the AR Appendix filed with the Court refer to the page numbers the Court's electronic filing system assigns.

triggered an obligation on the part of the Corps to conduct an environmental review of the entire FS Pipeline consistent with NEPA. (Pls.' MSJ Br. at 24-31.)

This Court explained in detail in the PI Opinion why Plaintiffs would be unlikely to establish that the Corps's verifications were permits for construction of the FS Pipeline such that they would qualify as a major federal action under the regulatory definition. *See Sierra Club*, 990 F. Supp. 2d at 25-30. The PI Opinion noted that "the law quite clearly distinguishes between 'verifications' and 'permits' in the CWA context," and that this distinction manifests itself in the difference between a project that is verified as consistent with an existing general permit, and one that must be subjected to searching scrutiny under the individual permitting system. *Id.* at 26. Most significantly, this Court pointed out that "the entire *point* of the general permitting system is to avoid the burden of having to conduct an environmental review under NEPA when a verification—as distinguished from an individual discharge permit—is sought," *id.* (emphasis added), and that it would therefore "make[] little sense" to accept Plaintiffs' position that "notwithstanding the FS Pipeline project's eligibility for verification under NWP 12, the Corps nevertheless had to conduct a full environmental review under NEPA[,]" *id.* at 26-27.

In their summary judgment motion, Plaintiffs point to no record evidence or any new authorities that would cast doubt on the Court's prior reasoning regarding the proper characterization of the Corps's verifications. Rather, Plaintiffs now seek essentially to sidestep the distinction between general and individual permits altogether, by arguing that the verifications here qualify as a major federal action because, as a result of the verifications, the Corps had "discretion over a substantial part" of the FS

Pipeline. (Pls.' MSJ Br. at 25 (citing *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1297 (D.C. Cir. 2007)).) To the extent that this argument is based on Plaintiffs' contention that the verifications here related to a significant number of water crossings spread throughout the length of the pipeline, *i.e.*, that the Corps's verification process impacted a "substantial part" of the pipeline (*see* Pls.' MSJ Br. at 33-34), they do have a point about scale, but it is a point that, in this Court's view, is not material to the applicable legal analysis.

As the PI Opinion explained, when the Corps undertakes to "verify" the benign nature of a project under the general permit scheme, it is not engaging in an exercise of discretion with respect to that project in the relevant sense, regardless of whether the agency is called upon to verify one water crossing or 1,000. *See Sierra Club*, 990 F. Supp. 2d at 28-29 & n.14. The plain language of NEPA underscores that Congress understood that not all of the activities that an agency undertakes can properly be considered "major federal actions" for NEPA purposes, and courts rightly have concluded that only those agency actions that implicate an agency's decision-making authority qualify as "major federal actions" under NEPA. *See, e.g.*, *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001) ("The touchstone of whether NEPA applies is discretion."). Whereas a request for *an individual permit* to discharge dredged material into waters of the United States requires the Corps to consider such matters as "the location, purpose and need for the proposed activity," as well as the "the type, [source,] composition and quantity of the material to be dredged, the method of dredging, and the site and plans for disposal of the dredged material[,]" 33 C.F.R. § 325.1(d), and to bring its expertise to bear on the

determination of whether or not the particular project satisfies the applicable regional guidelines for such activity, *verifications* under the CWA general permitting system have the entirely different character of "allow[ing] the Corps to designate certain construction projects as eligible for CWA discharge permits 'with little, if any, delay or paperwork' because they fit within [certain] pre-cleared categories of activities." *Sierra Club*, 990 F. Supp. 2d at 26 (quoting 33 C.F.R. § 330.1(b)). The distinction between verifications and permits—coupled with the ever-present realization that the Corps's fully-informed decision to authorize certain activities has been made *ex ante* under the nationwide permitting system such that any requirement that the agency conduct a NEPA analysis in the verification context by no means furthers the purpose of NEPA, *see* 40 C.F.R. § 1500.1(c) (the purpose of NEPA is "to foster excellent decisions")—convinces this Court that Plaintiffs are mistaken to insist that the verifications here constituted a major federal action triggering a NEPA duty to conduct an environmental review.

Accordingly, the Corps's failure to perform a NEPA review as part of its verification process was neither arbitrary and capricious nor contrary to law, and the Court will enter summary judgment in favor of Defendants with respect to Plaintiffs' NEPA-related claim based upon the Corps's verifications (Claim II(a)).

> b.    *The FWS's Biological Opinion And Incidental Take Statement Is Not The Functional Equivalent Of A Permit In This Case*

Both the Corps and the BIA consulted with the FWS pursuant to the Endangered Species Act ("ESA"), as part of the previously described verification process and also as part of the process that both agencies undertook when evaluating the easements that

Enbridge requested in order to construct the small portion of the FS Pipeline that traverses federal land and waterways. (*See* AR Part 1 at 39.) When so consulted, the FWS is required to determine whether "any action authorized, funded, or carried out by [the consulting] agency" is likely "to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species[.]" 16 U.S.C. § 1536(a)(2). Federal agencies considering certain actions (such as the verifications and easements at issue here) are required to consult with the FWS under Section 7 of the ESA, and Plaintiffs' complaint contends that the FWS's preparation of the required Biological Opinion, and also its issuance of a related incidental take statement, constituted a "major federal action" that triggered a duty on the part of the FWS to conduct an environmental review of the entire FS Pipeline pursuant to NEPA. (Compl. ¶¶ 165-171.) In its summary judgment briefing, Plaintiffs also make the related contention that, by accepting and incorporating the FWS's Biological Opinion and incidental take statement into its own analysis of the requested verification letters, the Corps had a NEPA duty to undertake an environmental review of the entire pipeline. (Pls.' MSJ Br. at 26-28.)

With respect to Plaintiffs' claim that the FWS had a NEPA duty to review the entire FS Pipeline as a result of the Biological Opinion and incidental take statement that it issued, this Court previously accepted Plaintiffs' assertion that an FWS Biological Opinion and incidental take statement may sometimes qualify as "major federal action," *see Sierra Club*, 990 F. Supp. 2d at 30; *see also* supra Part II.B, but concluded that the circumstances here were such that it was unlikely that Plaintiffs would be able to demonstrate that the FWS had a duty to conduct a NEPA review as a

result of its issuance of a Biological Opinion and incidental take statement regarding the potential impact of the FS Pipeline on the decurrent false aster plant, the Indiana bat, and the American burying beetle. *Sierra Club*, 990 F. Supp. 2d at 16. Nothing in the Plaintiffs' summary judgment motion points to any different result. This is primarily because a Biological Opinion and incidental take statement that the FWS issues pursuant to Section 7 of the ESA does not, in itself, have any direct effect on the underlying action under consideration; rather, it is the requesting agency (in this case, the Corps and the BIA) that determines what, if any, effect the FWS's Biological Opinion and incidental take statement will have on the agency's actions. *See* 50 C.F.R. § 402.15(a) ("Following the issuance of a biological opinion, the Federal agency shall determine whether and in what manner to proceed with the action in light of its section 7 obligations and the [FWS's] biological opinion."). Consequently, the FWS's Biological Opinion and incidental take statement can only truly function as the equivalent of a permit for NEPA purposes if the underlying federal action would not, and could not, have proceeded without the FWS's imprimatur. Put another way, in the relatively unusual situation in which the underlying federal action *hinges* on the FWS's conclusion that endangered species will not be impacted and/or its issuance of a statement that permits the "taking" of any such species, then one could reasonably conclude that the FWS's opinion or statement is the functional equivalent of a permit allowing the action to proceed. Such was the case in *Ramsey*, where the action in question was a government-sponsored plan to harvest salmon, including certain species that were protected by the ESA, and therefore quite literally could not have progressed without an incidental take statement. *Ramsey*, 96 F.3d at 437-39. Looking at the very

different role that the FWS's report played in the instant case, this Court concluded in the PI Opinion—and reaffirms now—that Plaintiffs have not demonstrated that the FWS's Biological Opinion and incidental take statement had the same practical effect on the Corps's and BIA's consideration of the federal action at issue here. *See Sierra Club*, 990 F. Supp. 2d at 31 (noting that, rather than functioning as a permit, the FWS's Biological Opinion was "at best peripheral to the project in question").

Perhaps as a result of this shortcoming, Plaintiffs have tried a slightly different tack on summary judgment: they argue that the acting agency—in this case, the Corps—had a duty to undertake a NEPA review by virtue of the fact that it "implemented" the terms of the FWS's Biological Opinion and incidental take statement in its own verification letters. (*See* Pls.' MSJ Br. at 26-27.) As an initial matter, it is not clear from the record that the verification letters the Corps divisions sent to Enbridge do, in fact, "implement" the Biological Opinion and incidental take statement: the letters contain boilerplate statements that the FWS documents are "incorporated by reference," but they are also careful to note that the verification letters "do[] not authorize [Enbridge] to take an endangered species" and that in order to do so, Enbridge "must have separate authorization under the Endangered Species Act." (Kansas City Dist. Verification Letter at 6; Rock Island Dist. Verification Letter at 6; St. Louis Dist. Verification Letter at 6.)

Nevertheless, even if the verification letters' language referring to "incorporation" of the FWS's work product were sufficient to support the conclusion that the Corps "implemented" the FWS's Biological Opinion and incidental take statement, Plaintiffs have not established that the Corps's verifications—agency action

30

that is not a major federal action in and of itself, as determined above—were somehow transformed into a "major federal action" by virtue of the incorporation of the FWS documents. Plaintiffs have cited no case which stands for (or even contemplates) this novel proposition, and the case that Plaintiffs do principally rely on for the proposition that "implementation" of a biological opinion can give rise to NEPA obligations is easily distinguishable. The court in *In re Consolidated Salmonid Cases*, 688 F. Supp. 2d 1013 (E.D. Cal. 2010), premised its holding that implementation of a Biological Opinion qualifies as "major federal action" for NEPA purposes on the fact that the federal agency itself was responsible for managing and operating the projects for which the Biological Opinion had been prepared. *Id.* at 1024 (finding that the agency's "*operation of the projects* to comply with the [Biological Opinion] is major federal action under NEPA" (emphasis added)). Here, by contrast, the action that the Biological Opinion and incidental take statement potentially impacts is that of *Enbridge*—not that of the Corps—which brings us back to the original question of whether the Biological Opinion and incidental take statement can reasonably be viewed as a permit that enabled Enbridge's construction to proceed.

Plaintiffs strenuously assert that this is so, relying on the language referencing the Biological Opinion and incidental take statement in the verifications (*see* Pls.' MSJ Br. at 27 (citing Kansas City Dist. Verification Letter at 6; Rock Island Dist. Verification Letter at 6; St. Louis Dist. Verification Letter at 6)), as well as several email conversations that occurred between the FWS, the Corps, and Enbridge regarding the scope of the Biological Opinion (*id.* at 20-21 (citing AR App. Part 5, ECF No. 79-5, at 42-48)). But these references demonstrate only that the agencies were aware of, and

considered, the FWS's opinion, as the law required them to do; they do not establish that the verifications or easements would not have issued had the FWS's findings been different. Indeed, to the contrary, both the verification letters and the Biological Opinion itself make it clear that Enbridge could proceed with construction of the FS Pipeline regardless of what the Corps said about the FWS statements.

What is more, the FWS's Biological Opinion itself does not provide any basis for concluding that the FS Pipeline construction project necessarily would have been halted but for the positive FWS evaluation such that it would be reasonable to maintain that the Biological Opinion and incidental take statement permitted the construction to proceed. In fact, the documents the FWS prepared are rife with conditional language and speculation regarding the potential impact of the FS Pipeline's construction on the endangered species at issue, and indeed, the FWS ultimately concluded that the construction would probably not result in any major impact to any of those species. (*See* AR App. Part 1, ECF No. 79-1, at 39 (Biological Opinion) (concluding that construction was likely to have minimal impact on the species in question).) *See also Sierra Club*, 990 F. Supp. 2d at 40 (discussing the Biological Opinion's conclusions).

In short, although Plaintiffs repeatedly assert that "[w]ithout an [incidental take statement], Enbridge would be prohibited by the ESA from constructing" the FS Pipeline (Pls.' Reply to Pls.' Mot. for Summ. J. & Resp. to Defs.' & Intervenor's Cross-Mots. for Summ. J. ("Pls.' MSJ Reply"), ECF No. 74, at 14), the record does not demonstrate conclusively that issuance of the Biological Opinion and incidental take statement was a necessary prerequisite to construction. Thus, on the record before it, this Court sees no reason to alter its prior conclusion that the FWS's Biological Opinion

and incidental take statement are, at best, "peripheral to the project in question" and therefore are not the "functional[] equivalent" of a permit for NEPA purposes. *Sierra Club*, 990 F. Supp. 2d at 31 (internal quotation marks omitted). Consequently, this Court will enter summary judgment in Defendants' favor on Claim III of the complaint.

2. The Combined Actions Of The Federal Agencies Do Not Constitute "Major Federal Action"

As noted at the outset, Plaintiffs' complaint primarily rests on a core belief that NEPA required *some* federal agency *somehow* to conduct an environmental assessment of the entire 589-mile FS Pipeline before that pipeline could be constructed and operated. Claim V alleges as much, and because the other NEPA-related claims in the complaint address each federal agency individually, Claim V is most reasonably construed as asserting that the actions of the various federal agencies with some connection to the FS Pipeline's construction and operation—taken together—were sufficient to give rise to an obligation for the Federal Defendants to perform a NEPA analysis covering the entirety of the FS Pipeline, and to select a lead agency responsible for the review. (Compl. ¶¶ 180-189 (emphasis added).) This claim boils down to an assertion that, regardless of whether or not any of the individual agency actions meets the threshold for major federal action under NEPA, if there is persistent federal involvement with a given private project, the project is effectively "federalized" for NEPA purposes such that an environmental review is required. (*See, e.g.*, Compl. ¶ 181 (alleging that all of the federal actions "singly, in combination, and cumulatively constitute major federal action"); *see also* Pls.' MSJ Br. at 34-37.)

The "federalization" theory of NEPA responsibility is not new; indeed, as the PI Opinion made clear, the case law and authorities interpreting NEPA have held that an

otherwise non-federal action can become federalized for NEPA purposes, but in order for that to occur, the federal government must exercise substantial control over the otherwise private project. *See, e.g.*, Mandelker § 8:19 (noting that in cases where "the action claimed to fall under NEPA was nonfederal, the question becomes whether the action was federalized and brought under NEPA because a federal agency exercised control over the nonfederal action"); 40 C.F.R. § 1508.18 (defining "major federal action" to include actions "potentially subject to Federal control and responsibility"); *Citizens Alert Regarding the Env't v. EPA*, 259 F. Supp. 2d 9, 20 (D.D.C. 2003), *aff'd* 102 F. App'x 167 (D.C. Cir. 2004) (noting that a non-federal project can be federalized where the federal agencies "have sufficient authority over the local project so as to control or influence its outcome"); *Ross v. Fed. Highway Admin.*, 162 F.3d 1046, 1051 (10th Cir. 1998) (a project may be federalized where "the federal government has actual power to control the project" (internal quotation marks and citation omitted)). This Court has previously explained at length why the cumulative involvement of the various federal agencies here was not likely to be deemed sufficient to federalize the FS Pipeline such that the Federal Defendants were required to perform a NEPA analysis of the environmental impacts of the pipeline as a whole. *Sierra Club*, 990 F. Supp. 2d at 36-37. Moreover, in this regard, this Court noted that "Plaintiffs have significantly overstated the degree of federal involvement in the FS Pipeline in an attempt to shoehorn this essentially private project into the NEPA statute." *Id.* at 40.

Here, in the summary judgment context, Plaintiffs have neither directly rejected the Court's legal conclusion that federal control is a critical component of adequate "federalization," nor pointed to any additional record evidence that establishes that the

federal agencies had the requisite degree of control over the FS Pipeline. Instead, Plaintiffs either seek to advance arguments about the nature of the federal activities that this Court already rejected in the PI Opinion, or they retreat to reliance on conclusory assertions regarding the combined impact of the federal actions in question, or both. For example, Plaintiffs reassert their argument that the Western District of Texas's opinion in *Spiller v. Walker*, No. 98-ca-255, 2002 WL 1609722 (W.D. Tex. July 19, 2002), is dispositive on the federalization issue (*see* Pls.' MSJ Br. at 34-35), and further argue that the federal government effectively had control and responsibility over the project as a whole because the record reflects "both final agency actions and 'major federal actions[,]'" (*id.* at 36-37).

Neither of these arguments provides any basis for this Court to question the reasoning set forth in the PI Opinion regarding Plaintiffs' federalization argument. To begin with, this Court has already noted its disagreement with the conclusion that the *Spiller* court reached—a disagreement that was primarily based on the fact that *Spiller* involved CWA verifications and the *Spiller* court did not "sufficiently account for the fact that Congress established a general permitting system as an alternative to the requirement that construction projects with a minimal potential impact on national waterways obtain an individual permit under the CWA." *Sierra Club*, 990 F. Supp. 2d at 28. In invoking *Spiller* yet again, Plaintiffs have provided no response to this Court's stated view of that opinion.

Similarly, Plaintiffs' assertion that the presence of some major federal actions (*i.e.*, the Corps's and BIA's granting of easements), viewed along with the Corps's verifications and the FWS's issuance of the Biological Opinion and incidental take

statement, "constitutes federal discretion over a substantial part of the project" (Pls.' MSJ Br. at 44) is a conclusory characterization that is at odds with this Court's perception of the case as stated in the PI Opinion, and Plaintiffs have failed to offer any legal argument or record evidence that demonstrates that the Court was wrong to conclude that federal control and responsibility was lacking on the facts of this case. *See Sierra Club*, 990 F. Supp. 2d at 34 (noting that the "minor pieces of federal involvement in a nearly 600-mile pipeline fall short of imbuing the federal government with 'control and responsibility' over the pipeline as a whole"). Thus, Plaintiff has provided no basis for revisiting in any substantial way this Court's conclusion in the PI Opinion that the combined actions of the federal agencies involved with the FS Pipeline (including the Corps's and BIA's issuance of easements and the PHMSA's eventual consideration of an oil spill response plan) do not give rise to a duty to conduct a comprehensive NEPA review of the entire pipeline because the federal government lacks a sufficient degree of "control and responsibility" over the pipeline project, and this Court sees none.

There is, however, one aspect of the Plaintiffs' "federalization" claim that was not addressed in the PI Opinion and is worthy of mention here: the allegation that, "[a]t a minimum, the Corps and the other agencies were required under 40 C.F.R. § 1501.5[] to determine which agency would act as the 'lead agency' and prepare a NEPA analysis for the entire Project[.]" (Compl. ¶ 187.) Even assuming arguendo that Plaintiffs had successfully established that a NEPA duty arose as a result of the federalization of the FS Pipeline, for the following reasons, this Court finds the "lead agency" contention to be plainly inapposite under the circumstances presented.

Section 1501.5(a) of Title 40 of the Code of Federal Regulations provides that "[a] lead agency shall supervise the preparation of an environmental impact statement if more than one Federal agency either:  (1) Proposes or is involved in the same action; or (2) Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity."  But this regulation, which Plaintiffs cite and rely upon in making their "lead agency" argument, appears in the Code *after* a series of provisions that address an agency's preparation of an EA as opposed to an EIS, *see id.* § 1501.3, and that direct the agency regarding the procedures to be followed internally with respect to making the determination of whether or not to prepare an EIS, *see id.* § 1501.4.  As a result, it is clear from context that the "lead agencies" regulation pertains only to the circumstance in which more than one agency has already followed the previous steps and has come to the conclusion that an EIS is appropriate; in other words, the "lead agency" provision merely addresses the proper procedures for avoiding duplicative efforts through the collective designation of a lead agency to perform a single EIS.  *See id.* § 1501.5(c) ("If an action falls within the provisions of paragraph (a) of this section, the potential lead agencies shall determine by letter or memorandum which agency shall be the lead agency and which shall be the cooperating agencies.").  This provision does not on its face pertain to the threshold determination that any particular agency must make regarding whether or not an EIS is warranted, much less mandate that, in a circumstance such as this one (where no agency has decided to do such an environmental review of the entire project), an environmental review is nevertheless required.[15]

_____

[15] Plaintiffs cite an internal Corps email stating that "the Corps does NOT want to be the [Lead Federal

In short, this Court concludes that the combined actions of the various federal agencies did not federalize the FS Pipeline and there was no requirement that a "lead agency" be designated under the circumstances presented in this case. Therefore, summary judgment will be entered in favor of Defendants on Count V of the complaint.

### 3. The "Connected Action" Doctrine Is Not Applicable To The FS Pipeline

Plaintiffs' argument for summary judgment on their core NEPA claim also rests on the contention that the entire FS Pipeline must be analyzed in a single, comprehensive NEPA document because it is one "connected action." (Pls.' MSJ Br. at 13-16.) Plaintiffs' "connected action" characterization, which the EPA allegedly has adopted (*see* Pls.' First Mot. to Amend at 4), is grounded in 40 C.F.R. § 1508.25, a regulation that defines the term "scope" as it appears in the NEPA regulations and provides that "the scope of an environmental impact statement" should include any "[c]onnected actions." 40 C.F.R. § 1508.25. Specifically, and in relevant part, the regulation states that

> [t]o determine the scope of environmental impact statements, agencies shall consider 3 types of action, 3 types of alternatives, and 3 types of impacts. They include:
> (a) Actions (other than unconnected single actions) which may be:
>     (1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:
>         (i) Automatically trigger other actions which may require environmental impact statements[;]

---

Agency]" as evidence that Defendants themselves acknowledge that they were required to select a lead agency. (Pls.' MSJ Br. at 38.) But the email in question does not resolve the threshold legal issue of whether or not Defendants were required to conduct an environmental review of the entire FS Pipeline in the first place. Examined more closely, the email at most reflects that a single Corps employee believed that it is "arguable" that a review was required in this situation, and thus sought to lay down the agency's marker preemptively if the federal agencies did eventually engage in the process of selecting a lead agency. (AR COE-NWK-23600.)

> (ii) Cannot or will not proceed unless other actions are taken
> previously or simultaneously[; or]
> (iii) Are interdependent parts of a larger action and depend
> on the larger action for their justification[.]

*Id.* In Plaintiffs' view, all of the various activities of the federal agencies involved with

the FS Pipeline "are interdependent parts of a larger action" within the meaning of 40

C.F.R. § 1508.25(a)(1)(iii)—namely, the construction and operation of the pipeline

itself—and, thus, if a NEPA environmental review was conducted with respect to any

part of the pipeline then *all* of the pipeline needed to be evaluated as part of that

review. (*See* Pls.' MSJ Br. at 15-16.)

In this respect, Plaintiffs' argument appears to be that, because the Corps and the

BIA had a NEPA duty to conduct an environmental impact review of the part of the FS

Pipeline that traversed the federal land and waterways over which those agencies had

jurisdiction in conjunction with their consideration of whether or not to grant the

requested easements (a major federal action) (*id.* at 31-32), those agencies were

required by law to expand the scope of their review to encompass the entire pipeline

pursuant to the connected action doctrine (*id.* at 13-16). But this argument rests on an

incorrect interpretation of the relevant regulations in light of the context within which

an agency must consider "connected actions."

As has already been stated repeatedly in this Memorandum and in the PI

Opinion, the threshold question that any agency must answer in determining whether

NEPA requires an environmental review is whether there has been, or will be, any

"major Federal action significantly affecting the quality of the human environment." 42

U.S.C. § 4332(1)(C). The regulations implementing NEPA direct each federal agency

to adopt procedures for determining which of its activities qualifies as such a major

federal action, *see* 40 C.F.R. § 1507.3(b)(2); thus, it is the agency's own regulations that govern the initial question of whether or not NEPA applies to a given activity, *see id.* §§ 1501.3 ("Agencies shall prepare an environmental assessment . . . when necessary under the procedures adopted by individual agencies to supplement these regulations[.]"), 1501.4 (directing agencies to use their own regulations to determine whether to prepare an environmental impact statement). It is only after this initial determination has been made that the regulations require agencies to determine the *scope* of any required NEPA analysis. *See id.* § 1501.4(d) (noting that an agency shall "[c]ommence the scoping process [under 40 C.F.R. § 1501.7] *if* the agency will prepare an environmental impact statement" (emphasis added)). And it is only in the context of determining the *scope* of the required environmental review that the mandate to consider connected actions under 40 C.F.R. § 1508.25 comes into play. *See id.* § 1501.7(a)(2) (directing agencies to "[d]etermine the scope [according to 40 C.F.R. § 1508.25] and the significant issues to be analyzed in depth in the environmental impact statement"). Thus, under this regulatory scheme, the "scoping" provisions of the NEPA regulations, which include the "connected action" requirement, are relevant only *after* an agency has already determined that an EA or EIS under NEPA is required for an action of that agency.[16]

---

[16] The parties hotly contest the issue of whether the "connected action" requirements of 40 C.F.R. § 1508.25 relate only to an EIS, or to both an EIS and an EA. (*See, e.g.*, Pls.' MSJ Reply at 8; Fed. Defs.' MSJ Br. at 22.) While the plain language of the regulation appears to apply only to an EIS, *see* 40 C.F.R. § 1508.25 (stating that "[*s*]*cope* consists of the range of actions, alternatives, and impacts to be considered in an *environmental impact statement*" (emphasis added)), and the parties cite conflicting authority on the issue, *compare, e.g.*, *Klamath- Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 998-99 (9th Cir. 2004) (stating that "an agency [must] consider connected actions and cumulative actions within a single EA or EIS" (internal quotations marks, citations, and emphasis omitted)) *with Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096-97 (9th Cir. 2013) (explaining that "[b]y its plain language [Section 1508.25] applies only to environmental impact statements" (citations omitted)), in this Circuit at least, it appears that the connected actions

Moreover, when viewed in context, the scoping regulations clearly direct the agency to determine what the extent of its environmental impact review will be *relative* to the federal action that is the trigger for the required environmental study in the first place. Put differently, the regulatory scheme makes clear that the "scoping" assessment—which is referred to at several different points in various regulations—pertains to the questions and issues that the agency must address within the EA report or EIS that is being prepared under NEPA in order to inform the agency about whether to undertake some particular major federal action. *See id.*; *see also id.* § 1500.1 (explaining that "NEPA documents must concentrate on the issues that are *truly significant to the action in question*" (emphasis added)). Conversely, nothing in the regulations supports Plaintiffs' assertion that the scoping provisions require an agency to expand the EA or EIS to address actions that are completely outside the ambit of that agency's control and responsibility—that is, matters that are *not* the major federal action that originally triggered the agency's NEPA obligations—and to conclude otherwise would fly in the face of the well-established rule that an agency responsible for only a small part of a larger project need not consider aspects of that project outside of its jurisdiction. *See, e.g.*, *Weiss v. Kempthorne*, 580 F. Supp. 2d 184, 189 (D.D.C. 2008) ("In conducting an EA where the proposal being reviewed is but a small piece of a larger project over which the agency has no authority, an agency does not go beyond the scope of its permitting authority to review the area over which it has no jurisdiction." (citations omitted)).

---

requirement is applicable to both an EA and an EIS. *See Del. Riverkeeper Network v. FERC*, No. 13-1015, 2014 WL 2535225, at *8 (D.C. Cir. June 6, 2014) ("[W]hen determining the contents of an EA or an EIS, an agency must consider all 'connected actions,' 'cumulative actions,' and 'similar actions.'" (citing 40 C.F.R. § 1508.25(a))).

Properly understood, then, the "connected actions" regulation requires that the impact on the environment of all aspects of a particular major federal action be evaluated together in a single EA or EIS, meaning that any such major federal action cannot be segmented such that the required NEPA document does not encompass the entire scope of it, but does not mandate that *other* actions (those that are not themselves major federal actions under NEPA) be subjected to environmental impact review solely by virtue of their connection to the federal action. This is the only interpretation that fully explains the logic and structure of the regulations implementing NEPA, and it is also entirely consistent with the leading case law in this Circuit interpreting the connected actions requirement. For example, in *Delaware Riverkeeper Network v. Federal Energy Regulatory Commission*, No. 13-1015, 2014 WL 2535225 (D.C. Cir. June 6, 2014), the owners of a natural gas pipeline that was subject to a federal permitting scheme under the Natural Gas Act submitted four proposed projects related to the pipeline to FERC for its approval, and the D.C. Circuit held that FERC was required to assess the impacts of all four projects together, in a single environmental review because the projects were "connected, closely related, and interdependent[.]" *Id.* at *3. Similarly, in *Hammond v. Norton*—the case Plaintiffs chiefly rely upon in their summary judgment motion—the court concluded that the Bureau of Land Management ("BLM") must consider two segments of a single pipeline that were each subject to that agency's control in a single EIS. 370 F. Supp. 2d 226, 232 (D.D.C. 2005).[17] In each of these cases, the court was confronted with a situation in which the

---

[17] The BLM's control over the project was based on the fact that approximately 100 miles of the project traversed lands under the BLM's jurisdiction, and the project sponsors were required to get a right-of-way from the BLM pursuant to the Mineral Leasing Act, 30 U.S.C. §§ 181-287.

federal agency had conducted an EA or EIS that was incomplete relative to the degree of that agency's control over or involvement with the underlying project, and the connected actions rule applied because the courts were required to assess whether the agencies had improperly *limited* the scope of the review of actions within their own jurisdiction—a determination that is fundamentally different from the question Plaintiffs present here, *i.e.*, whether the EIS must be *expanded* to include an environmental review of actions completely outside the agencies' purview.

This Court concludes that the connected action doctrine is inapplicable to the circumstances of this case, and also finds that it would be manifestly inconsistent with the purposes of NEPA to require the Federal Defendants to conduct an environmental impact assessment of the parts of the FS Pipeline over which the federal government has no control. Therefore, the Court rejects Plaintiffs' reliance on the connected action doctrine as a basis for its claim that Defendants had a NEPA duty to review the entire pipeline.

### C. The Corps Did Not Fail To Undertake A Cumulative Impacts Analysis In Violation Of NWP 12, The Clean Water Act, Or the APA

Plaintiffs' final contention regarding the conduct of the federal government in relation to the FS Pipeline is that the Corps violated the CWA and APA because it failed to abide by the requirements of NWP 12 in issuing its verifications. (Compl. ¶¶ 190-193 (Claim VI).) Specifically, Plaintiffs maintain that summary judgment should be entered in their favor because the Corps did not evaluate the "cumulative effects" of all of the 1,950 water crossings along the 600 mile span of the FS Pipeline *together* before verifying those crossings under NWP 12. (*See id.* ¶ 192; *see also* Pls.'

MSJ Br. at 41 (asserting that the Corps's verifications "failed to include a determination that the cumulative adverse environmental effects of the overall project would be minimal").) NWP 12 provides in relevant part that

> [i]n reviewing the PCN for the proposed activity, the district engineer will determine whether the activity authorized by the NWP will result in more than minimal individual *or cumulative* adverse environmental effects. . . . For a linear project, this determination will include an evaluation of the individual crossings to determine whether they individually satisfy the terms and conditions of the NWP(s), *as well as the cumulative effects caused by all of the crossings authorized by NWP.*

77 Fed. Reg. at 10,287 (emphasis added). According to Plaintiffs, this language requires that "a minimal cumulative effects determination [with respect to the entire pipeline] must be included in the verifications[,]" and the fact that no pipeline-wide cumulative effects analysis was done and included in the verification letters at issue here renders the Corps's verification determinations "arbitrary and capricious[.]" (Pls.' MSJ Br. at 43; *see also* Pls.' MSJ Reply at 22 (asserting that, not only was the Corps required to include a cumulative effects determination covering the entire pipeline in its verifications, but it was also required to provide evidence of its analysis).)

This Court finds Plaintiffs' argument unpersuasive. As the Federal Defendants point out, there is no legal requirement that the Corps conduct a pipeline-wide "cumulative effects" analysis because the same Federal Register Notice in which NWP 12 was published also explains that "cumulative effects are evaluated *on a regional basis*[,]" and the "[c]umulative effects analysis may be done on a watershed basis, or by using a different type of geographic area, such as an ecoregion." (Fed. Defs.' MSJ Br. at 42 (emphasis added) (citing 77 Fed. Reg. at 10,264).) This statement in the regulation is not "plainly erroneous or inconsistent" with the governing authorities,

*Auer v. Robbins*, 519 U.S. 452, 461 (1997), and it clearly undermines Plaintiffs'

contention that the Corps was required to analyze the impact of all of 1,950 water

crossings along the entire length of the FS Pipeline cumulatively.

Furthermore, the record demonstrates that a region-based analysis of the adverse

cumulative effects of the water crossings on the environment was precisely what was

done in this case. District Engineers from each of four different geographic regions

considered Enbridge's verification requests, and conducted both an individual *and*

cumulative analysis of the water crossings within that region, as evidenced by the

insertion of a statement in each verification letter to the effect that "[t]he proposed

activity would result in only minor individual and cumulative adverse environmental

effects and would not be contrary to the public interest." (AR App. Part 1 at 31 (Kansas

City Dist. Mem. for R.) (emphasis added); *see also* AR App. Part 9, ECF No. 79-9, at

123 (St. Louis Dist. Mem. for R.) (same); AR App. Part 6 at 39 (Rock Island Dist.

Mem. for R.) (determining that "[t]he proposed activity, with proposed mitigation

would result in no more than minor individual and cumulative adverse environmental

effects"); AR App. Part 10 at 13 (Tulsa Dist. Mem. for R.) (determining that "[t]he

proposed activity would result in no more than minimal individual and cumulative

adverse environmental effects and would not be contrary to the public interest, provided

the special conditions identified [] above are incorporated").) Thus, it is clear that each

district engineer made a cumulative effects determination as required by NWP 12, and

Plaintiffs have not convinced this Court that the CWA or NWP 12 requires anything

more.

To the extent that Plaintiffs' argument is that the Corps's cumulative effects determinations were insufficient because the Corps's district engineers did not provide enough information in their letters to justify the stated determinations (Pls.' MSJ Reply at 22-23), this Court rejects that conclusion as well. In fact, each of the statements in the verification letters regarding the cumulative effects determination was made at the end of a lengthy memorandum explaining, among other things, the details concerning the scope of the proposed project in each respective district, the expected effect of the project on waters of the United States within that district, and specific mitigation techniques to be employed in response to those effects—including construction techniques used to minimize impacts, the purchase of wetland credits to offsets impacts, and post-construction measures taken to counteract the impact of construction. (*See, e.g.*, AR App. Part 1 at 12-13; AR App. Part 6 at 18-19; AR App. Part 9 at 103-4; AR App. Part 10 at 12.) Based upon the detailed information in the Memoranda for Record, and in particular, the numerous statements regarding mitigation programs Enbridge had or would be implementing, this Court has little trouble finding that there was a factual basis in the evidentiary record for the district engineers to reach the conclusions they did regarding the cumulative effects of the portions of the pipeline planned for construction in their district.

Accordingly, this Court concludes that the Corps's verification determinations were not arbitrary and capricious, and that Defendants are entitled to judgment on Plaintiffs' claim that the Corps's engineers failed to conduct a cumulative effects evaluation under NWP 12 in violation of the CWA and APA.

**IV.    CONCLUSION**

In the instant case, this much is clear:  a private company is constructing the FS Pipeline project largely on privately-owned land; the federal agencies that have been consulted about aspects of the pipeline project have control over only a small portion of the land and waterways that the pipeline traverses; and no statute authorizes the federal government to regulate or oversee the construction of a domestic oil pipeline.  Given that the clear purpose of NEPA is "to foster excellent action" *on the part of the federal government*, 40 C.F.R. § 1500.1(c), this Court finds that the Federal Defendants' restraint in not initiating an environmental impact review of the entire privately-constructed FS Pipeline is clearly in accordance with the purpose of the NEPA statute. Put another way, the record evidence establishes that the FS Pipeline is not itself an "action" of the federal government—no matter how earnestly Plaintiffs contend that it is—and to the extent that Plaintiffs here insist that federal officials must conduct an environmental impact analysis of the entire pipeline anyway, they mistakenly view NEPA not as an appropriate means of informing agency officials about the environmental consequences of major actions that the federal government is poised to take, but as a mechanism for instituting federal evaluation and oversight of a private construction project that Congress has not seen fit to authorize the federal government to regulate.  This Court sees no basis in law or in fact for a conclusion that the Federal Defendants here violated any NEPA, CWA, or APA obligation.  Consequently, as set forth in the two separate orders that accompany this opinion, Plaintiffs' complaint against the PHMSA (Claim IV) is dismissed for failure to state a claim; summary

judgment will be entered in Defendants' favor on all other claims; and Plaintiffs'

pending motions to supplement and amend the complaint are denied as futile.


DATE:  August 18, 2014                          *Ketanji Brown Jackson*
                                                KETANJI BROWN JACKSON
                                                United States District Judge